UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| COMMAND ARMS ACCESSORIES, LLC, and CAA INDUSTRIES, LTD., | ) ) ) | |
| Plaintiffs, | ) | Case No. 1:19-cv-06982-LLS |
| | ) | |
| v. | ) ) | |
| ME TECHNOLOGY INC., | ) ) | |
| Defendant. | ) ) ) | |

**ME TECHNOLOGY'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    A.    CAA USA Is An Industry Leader With High Marks For Quality And Customer Service. ................................................................................. 3

    B.    Moshe Oz And Eldad Oz Sell 51% Of Each Of CAA Israel and CAA USA. ................................................................................................... 4

    C.    CAA Operates As A Single Company. ............................................... 5

    D.    CAA USA Has Long Used The Names Command Arms Accessories And CAA, And Command Arms Accessories, LLC, Has No Operations And No Assets. ................................................................................. 6

    E.    In 2015, CAA Rebrands For The Benefit Of Both CAA Companies. ..................... 8

    F.    CAA USA Creates A Valuable Market For CAA Products. ................... 9

ARGUMENT ........................................................................................................... 14

I.    CAA ISRAEL LACKS CAPACITY TO SUE, AND ITS CLAIMS THEREFORE FAIL AS A MATTER OF LAW. ..................................................................... 16

II.    PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE LIKELY TO SUCCEED ON THEIR TRADEMARK CLAIMS. ............................................ 20

    A.    Plaintiffs Have Not Established That Command Arms Accessories, LLC, Owns The Trade Name And Trademark COMMAND ARMS ACCESSORIES Or The Trademark CAA. ......................................... 20

    B.    Plaintiffs Have Not Established That They Are Likely To Succeed On Their Claims Concerning CAA Israel's Alleged Trademarks And Trade Dress. ................................................................................. 23

        1.    Plaintiffs Have Not Established That CAA Israel Owns The Lion Head Mark, The Lion Head Composite Mark, The DDP Mark, Or The Alleged CAA Trade Dress. ................................................... 23

        2.    Plaintiffs Have Not Established That CAA Israel Owns "Gear Up." ........ 25

i

GUNSTER, YOAKLEY & STEWART, P.A.

      3.      Plaintiffs Have Not Established That CAA Israel Owns The "Micro" Trademark..................................................................26

      4.      At A Minimum, CAA Israel Admittedly Authorized CAA USA To Use Its Marks—And CAA Israel Has Not Validly Revoked That Authorization. ..............................................................................29

   C.     Plaintiffs Have Not Established Irreparable Harm. ...............................30

III.   PLAINTIFFS HAVE NOT ESTABLISHED THEIR ENTITLEMENT TO AN INJUNCTION WITH RESPECT TO THEIR PATENT CLAIM. ...................................31

   A.     Plaintiffs Have Not Established They Are Likely To Succeed On The Merits. ...................................................................................32

   B.     Plaintiffs Have Not Established They Would Be Irreparably Harmed In The Absence Of A Preliminary Injunction. ............................................33

IV.   PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY LACK AN ADEQUATE REMEDY AT LAW. ...................................................................35

V.   THE BALANCE OF HARDSHIPS WEIGHS HEAVILY AGAINST GRANTING THE INJUNCTION. ...................................................................35

VI.   THE PUBLIC INTEREST DOES NOT FAVOR THE INJUNCTION. ...........................36

VII.   PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION BECAUSE CAA INDUSTRIES HAS UNCLEAN HANDS. ............................................37

VIII.   THE MOTION MUST BE DENIED BECAUSE IT DEPENDS ENTIRELY ON THE DECLARATION OF MOSHE OZ, WHICH DECLARATION MUST BE STRICKEN FOR FAILURE TO COMPLY WITH 28 U.S.C. § 1746. ...........................39

IX.   ANY PRELIMINARY INJUNCTION MUST BE CONDITIONED ON A SUBSTANTIAL BOND. ......................................................................42

CONCLUSION..........................................................................43

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                             **<u>Page(s)</u>**

*1-800 Contacts, Inc. v. WhenU.Com, Inc.*,
   414 F.3d 400 (2d Cir. 2005).........................................................................22, 30

*Am. Permahedge, Inc. v. Barcana, Inc.*,
   857 F. Supp. 308 (S.D.N.Y. 1994).....................................................................35

*Black and Decker, Inc. v. Hoover Serv. Ctr.*,
   765 F. Supp. 1129 (D. Conn. 1991)....................................................................15

*Buti v. Impressa Perosa, S.R.L.*,
   935 F. Supp. 458 (S.D.N.Y. 1996)...................................................23, 24, 25, 26

*CBF Industria de Gusa S/A v. Steel Base Trade AG*,
   No. 14 Civ. 3034 (RWS), 2015 WL 1191269 (S.D.N.Y. Mar. 16, 2015) .............17

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985)..........................................................................30, 31

*Coastal Inv. Partners, LLC v. DSG Global, Inc.*
   (S.D.N.Y. July 31, 2017) ..................................................................................15

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*,
   440 F. Supp. 2d 249 (S.D.N.Y. 2006)................................................................22

*Elastic Wonder, Inc. v. Posey*,
   179 F. Supp. 3d 307 (S.D.N.Y. 2016)...........................................................23, 25

*Eli Lilly & Co. v. Arch Ins. Co.*,
   113CV01770LJMTAB, 2017 WL 2930571 (S.D. Ind. July 10, 2017) ..................41

*Erchonia Corp. v. Bissoon*,
   410 F. App'x 416 (2d Cir. 2011) .................................................................27, 28

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
   13 F. Supp. 2d 417 (S.D.N.Y. 1998)...............................................................30, 31

*Hutterville Hutterian Brethren, Inc. v. Sveen*,
   776 F.3d 547 (8th Cir. 2015) .......................................................................20, 21

*ITC Ltd. v. Punchgini, Inc.*,
   482 F.3d 135 (2d Cir. 2007)........................................................................23, 24

*Jahr Printing & Publ'g Co. v. Meredith Corp.*,
   991 F.2d 1072 (2d Cir. 1993)............................................................................26

GUNSTER, YOAKLEY & STEWART, P.A.

*Ladas v. Potpourri Press, Inc.,*
    846 F. Supp. 221 (E.D.N.Y. 1994) ..........................................................................15

*Estate of Lennon by Lennon v. Screen Creations, Ltd.,*
    939 F. Supp. 287 (S.D.N.Y. 1996)...........................................................................37

*New Asia Enters. Ltd. v. Fabrique, Ltd.,*
    No. 13 Civ. 5271, 2017 WL 384687 (S.D.N.Y. Jan. 26, 2017)..........................16, 17

*Perez v. Westchester Cty. Dep't of Corr.,*
    No. 05 Civ. 8120(RMB), 2007 WL 1288579 (S.D.N.Y. Apr. 30, 2007) .................3

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC,*
    15-CV-3538 (VSB), 2019 WL 3858620 (S.D.N.Y. Aug. 16, 2019) ................16, 20

*Stokely-Van Camp, Inc. v. Coca-Cola Co.,*
    646 F. Supp. 2d 510 (S.D.N.Y. 2009)......................................................................15

*Threeline Imports, Inc. v. Vernikov,*
    239 F. Supp. 3d 542 (E.D.N.Y. 2017) .....................................................................23

*Tiffany (NJ) Inc. v. eBay Inc.,*
    600 F.3d 93 (2d Cir. 2010)........................................................................................30

*Universal City Studios, Inc. v. Nintendo Co.,*
    746 F.2d 112 117–18 (2d Cir. 1984)........................................................................28

*Wilmington Tr. Co. v. Hellas Telecomms., S.à.r.l.,*
    12-cv-8686 (JPO), 2016 WL 7339112 (S.D.N.Y. Aug. 4, 2016) ...........................17

## **Statutes**

15 U.S.C. § 1114..........................................................................................................22, 30

15 U.S.C. § 1125(a)(1)..................................................................................................22, 30

18 U.S.C. § 875(d) .............................................................................................................38

28 U.S.C. 1746....................................................................................................39, 40, 41, 42

28 U.S.C. § 1746(1) ...........................................................................................................41

Companies Law §§ 15, 17(a)..............................................................................................17

Companies Law § 19(2)......................................................................................................17

Companies Law § 49 .....................................................................................................17, 19

Companies Law § 55(a)......................................................................................................18

GUNSTER, YOAKLEY & STEWART, P.A.

Companies Law § 56(a) ...........................................................................18, 19, 30

Fla. Stat. § 836.05 ..........................................................................................38

## **Other Authorities**

59 Am. Jur. 2d Parties § 26 (2d ed. Aug. 2019 update)...............................16

6A Charles Alan Wright et al., Federal Practice and Procedure § 1559 (3d ed.
    Aug. 2019 update).....................................................................................16

11A Charles Alan Wright et al., Federal Practice and Procedure § 2954 (3d ed.
    Aug. 2019 update)................................................................................42, 43

Fed. R. Civ. P. 12(b)(2).................................................................................20

Fed. R. Civ. P. 17(b)(2).................................................................................17

Fed. R. Civ. P. 44.1 .......................................................................................17

Fed. R. Civ. P. 65(c) ......................................................................................42

55 Fla. Jur. 2d Trademarks & Unfair Competition § 6...........................24, 25

104 N.Y. Jur. 2d Trade Regulation § 147.................................................24, 25

N.Y. R. Prof. Conduct 3.4(e) ........................................................................39

R. Regulating Fla. Bar 4-3.4(g) .....................................................................39

18A Summ. Pa. Jur. 2d Commercial Law § 23:11 ........................................24

# INTRODUCTION

This is a rogue action by Moshe Oz, a minority shareholder of both Plaintiff CAA

Industries, Ltd. ("CAA Israel") and Defendant ME Technology, Inc. (d/b/a "CAA USA") whose

unauthorized actions on behalf of CAA Israel threaten to destroy both companies. The present

lawsuit is one of 8 between the two sides.[1]

CAA USA imports, produces, markets and sells firearms accessories to the U.S. market.

Until recently, and for approximately 9 years, it was the exclusive U.S. distributor for products

manufactured in Israel by its sister company, CAA Israel, and the two companies acted

essentially as one company known simply as CAA.[2] The heart of the issue is CAA USA's right

to manufacture and sell a pistol-carbine conversion kit called the MCK. Although CAA Israel

has a patent on a similar conversion kit called the Micro Roni, ***it is not claiming that the MCK***

***infringes that patent***. Rather, plaintiffs are making spurious claims of trademark, trade name,

and trade dress infringement, almost entirely based on alleged common law trademark rights, as

well as a claim that one part of the MCK infringes a separate patent. None of the claims is well-

founded, plaintiffs' principal evidence is a purported declaration that does not meet applicable

statutory requirements, and even if their evidence were admissible, plaintiffs cannot meet their

high burden to show a substantial likelihood of success, irreparable harm, an inadequate remedy

at law, and that the balance of harms and the public interest favor enjoining CAA USA from

---

[1]     *Moshe Oz v. RWC Group, LLC*, U.S. Dist. Court, Southern Dist. of Fla. No. 1:19-cv-62169-Moore; *Modern Global International Company Ltd. v. RWC Group, LLC*, U.S. Dist. Court, Southern Dist. of Fla. No.1:19-cv-23617-Altonaga; *Oz Asset Management, LLC v. ME Technology, Inc.*, U.S. Dist. Court, Southern Dist. of Fla. No. 1:19-cv-23619-Ungaro; *Modern Global International Company v. ME Technology, Inc.*, U.S. Dist. Court, Southern Dist. of Fla. No. 19-cv-62168-Williams; *RWC Group,* LLC, v. CAA Industries, Ltd., Florida Broward Circuit Court No. 19-016492 Div. 18; *ME Technology v. Oz and CAA Industries, Ltd., USDC*, U.S. Dist. Court, Southern Dist. of Fla. No. 1:19-61907-Martinez-Snow.  In addition, CAA USA learned on September 8, 2019 that Moshe Oz has filed suit in Israel seeking to enforce a settlement/stock swap agreement discussed below.  That lawsuit appears to be patently frivolous because the agreements were not signed and Oz failed to tender the money to close.

[2]     This Memorandum will generally refer to the combined companies as "CAA."  See Hartman Dec., ¶ 1.

running its business.  In fact, far from being entitled to a preliminary injunction, the declarations filed herewith show that CAA Israel's claims must be dismissed because they were filed at the direction of Moshe Oz, a minority shareholder of CAA Israel without authority to commence this action or bring claims against CAA USA on behalf of CAA Israel.

As to the claims of trademark and trade name infringement, the declarations clearly show that Plaintiff Command Arms Accessories, LLC, another company related to CAA Israel and CAA USA, holds no ownership interest, let alone an exclusive ownership interest, in the relevant marks "CAA" and "Command Arms Accessories."  CAA USA has been utilizing those marks without objection since approximately 2010 because, until this lawsuit, neither Command Arms Accessories, LLC, nor CAA Israel ever asserted any exclusive claim to those marks, and neither Command Arms Accessories, LLC, nor CAA Israel has proven it has any protectable right to either mark.

As to the other marks—which CAA Israel asserts ownership of—those marks were primarily developed jointly by CAA USA and CAA Israel in 2015, and CAA USA has always had a right to use those marks that is at least equal to any right CAA Israel may have.  Command Arms Accessories, LLC, and CAA Israel have also admitted that they gave CAA USA permission to use their marks, and that permission has not been validly revoked with respect to any mark.[3]  Additionally, Command Arms Accessories, LLC, and CAA Israel sat on their alleged rights for months before seeking this preliminary injunction, and neither can establish that it will be irreparably harmed in the absence of such an injunction.

CAA Israel also has not established its entitlement to an injunction in connection with its patent claim.  CAA Israel has offered no evidence of infringement, and the relevant patent is

---

[3]  CAA USA disputes that any sort of permission required because it had at least equal rights to the marks.

likely invalid in any event. CAA Israel also has not established that it would be irreparably harmed by CAA USA's sales of its MCK conversion kit in the United States or that it lacks an adequate remedy at law. CAA USA, by contrast, would suffer tremendously if a preliminary injunction were entered, without any benefit whatsoever to the public.

Even if CAA Israel had otherwise established its entitlement to a preliminary injunction, its unclean hands—its criminal extortion of CAA USA and the Micro Roni Stabilizer's infringement on a third party's patent—clearly preclude the requested injunctive relief. Plaintiffs' motion for preliminary injunction should therefore be denied. If it is not, CAA Israel should be required to post a significant bond to secure the considerable damage a wrongful injunction would cause to CAA USA.

## STATEMENT OF FACTS[4]

### A. CAA USA Is An Industry Leader With High Marks For Quality And Customer Service.

CAA USA sells firearms accessories to the U.S. market. It also manufactures certain accessories in the United States, notably the MCK Stabilizer, which is a pistol-carbine conversion kit. Hartman Dec. ¶28; Tiraturian Dec. ¶ 23. CAA USA is led by CEO Mikey Hartman, a well-known leader in the firearms industry. Hartman was a Colonel in the Israeli Defense Force and for many years led the IDF Marksmanship and Sharpshooting School. CAA USA has earned an outstanding reputation in the industry for quality and customer service.

---

[4] "It is settled law in this Circuit that motions for preliminary injunctions should not be decided on the basis of affidavits when disputed issues of fact exist. The existence of factual disputes necessitates an evidentiary hearing before a motion for a preliminary injunction may be decided." *Perez v. Westchester Cty. Dep't of Corr.*, No. 05 Civ. 8120(RMB), 2007 WL 1288579, at *8 (S.D.N.Y. Apr. 30, 2007) (citing *Commodity Futures Trading Comm'n v. Incomco, Inc.*, 649 F.2d 128, 131 (2d Cir. 1981) (internal punctuation marks and ellipses omitted). Here, there are no disputed issues of fact because Plaintiffs' lone declaration is not properly made under penalty of perjury (among other deficiencies) and therefore is entitled to no weight. Argument VIII, *infra*. The facts establishing CAA Israel's lack of capacity to sue are indisputable in any event. Argument I, *infra*. But should the Court elect not to deny Plaintiffs' motion on these two grounds, there are inarguably disputed issues of fact that preclude the Court from ruling on Plaintiffs' motion without holding an evidentiary hearing first.

GUNSTER, YOAKLEY & STEWART, P.A.

Hartman Dec. ¶ 27.   In addition, CAA USA was responsible for creating a robust market in the UNITED STATES for CAA's Micro Roni Stabilizer.  At this time, as will be explained below, CAA USA is the only company that can legally sell a pistol conversion kit utilizing the SB Tactical arm brace, an indispensable part utilized in both the MCK Stabilizer and the Micro Roni Stabilizer.  Hartman Dec., ¶ 22-24.  CAA Israel lost its right to sell that critical part by failing to pay royalties to the patent holder, SB Tactical, which canceled CAA Israel's license.

The revocation of this license is consistent with CAA Israel's poor reputation in the firearms industry and its severe financial difficulties, both of which are attributable to Moshe Oz's mismanagement of the company.  Hartman Dec. ¶ 35-36; Tiraturian Dec. ¶ 18-26.  Oz personally has an exceedingly poor reputation as business operator.  Second Hermoni Dec.; Hartman Dec. ¶ 33; Second Pomeranc Dec.

**B.     Moshe Oz And Eldad Oz Sell 51% Of Each Of CAA Israel and CAA USA.**

Until January 2015, Moshe Oz and his brother Eldad owned 100% of both CAA Israel and CAA USA.  At that time, they sold 51% of both companies to a company called Sky of Blue PTE Ltd.  Sky of Blue transferred the stock of CAA Israel to its parent company, Comaren Enterprises Corp.  Because of licensing issues, Sky of Blue did not consummate the acquisition of CAA USA and assigned its rights in the acquisition to Peter Viskovatykh and Michael Tiraturian.  The purchase price was $8 million for both companies, allocated as $5 million for CAA Israel and $3 million for CAA USA (including a subsidiary company called Stellcon USA, Inc., which holds certain U.S. licenses necessary for CAA USA's operations).  Tiraturian Dec. ¶ 7.

CAA Israel is governed by a board of directors consisting of four board members, two appointed by the majority shareholder and two appointed by the minority shareholders.  Cobi Moise and Tiraturian are the directors appointed by the majority shareholder, Comaren

Enterprises, and Eldad and Moshe Oz are the directors appointed by the minority shareholders. At the time of the acquisition, the two companies were presented to the buyers as essentially one operation. CAA Israel manufactured firearms related accessories, and CAA USA was the exclusive distributor of those products in the United States, which is by far the largest market for the products. CAA USA was CAA Israel's principal source of revenues. Tiraturian Dec. ¶ 4,7-9.

**C.      CAA Operates As A Single Company.**

The two companies have until recently operated essentially as a single company called "CAA." This point is well-illustrated by the business cards of the CEO of CAA USA:



Hartman's business card shows his address in Florida, the location of CAA USA. It was produced in the 2015 rebranding discussed below, and shows that the companies identified themselves simply as CAA.

> **D. CAA USA Has Long Used The Names Command Arms Accessories And CAA, And Command Arms Accessories, LLC, Has No Operations And No Assets.**

CAA USA is the registered fictitious name of ME Technology. Tiraturian Dec. ¶ 2. According to the Complaint, CAA is also the acronym for Command Arms Accessories, LLC, which is the name of both the plaintiff and a separate predecessor company of CAA USA. In 2010, the first Command Arms Accessories, LLC ("Liquidated Command Arms"), transferred certain assets to CAA Israel under the terms of an Asset Purchase Agreement. CAA Israel then assigned its rights under the Asset Purchase Agreement to a new company that later changed its name to Command Arms Accessories, LLC, i.e., the plaintiff here. Nowhere in the transfer papers produced by Plaintiffs is there any indication that the trademarks Command Arms Accessories or CAA were transferred from Liquidated Command Arms to CAA Israel. Asset Transfer Agreement, Oz Dec., Ex. 13. Moreover, on the date of the transfer, the defendant ME

6

Technology/CAA USA adopted the name Command Arms Accessories, began using the marks CAA and CAA USA, and began to serve as the U.S. distributor for CAA Israel. Oz Dec., ¶ 15-16 .

There is no indication that Command Arms Accessories, LLC, had any further operations after the 2010 transfer, and it ceased to be an operating company many years ago. Along with the names and marks, its remaining assets and operations were transferred into CAA USA before CAA USA's acquisition by Viskovatykh and Tiraturian in 2015. For example, the Asset Purchase Agreement specifically identifies, by serial number, 11 firearms CAA Israel purchased from Liquidated Command Arms. Oz Dec., Ex. 13, Schedule 1.1(m). Command Arms Accessories, LLC, would have assumed CAA Israel's rights in these firearms under the parties' Assignment and Assumption Agreement. Oz. Dec., Ex. 14. Of the 11 firearms, 9 are now on the books as assets of CAA USA. Similarly, the Liquidated Command Arms phone number transferred to Command Arms Accessories, LLC, is now and has long been paid for and used by CAA USA. Id., § 1.1.l. And the name "Command Arms Accessories," which was transferred, has long been used by CAA USA. For example, in 2015, CAA USA and CAA Israel entered into a critical licensing agreement with SB Tactical, the patent holder of a brace that was to be utilized for a new product to be sold by CAA, the Micro Roni Stabilizer. That license agreement referred to CAA USA as "ME Technology, Inc. dba Command Arms Accessories." Further, any operations that had been carried out by Command Arms Accessories, LLC, ceased long ago, and were either discontinued or taken up by CAA USA. For the last few years at least, CAA USA has filed (and paid for the preparation of) Command Arms Accessories, LLC's tax returns. Those tax returns show that ***the company has no income and no assets***, and thus Command

Arms Accessories, LLC, ***does not own or license any valuable trademarks or trade names, or anything else of value***.  Tiraturian Dec. ¶ 33.

    **E.    In 2015, CAA Rebrands For The Benefit Of Both CAA Companies.**

    Up until the time of the acquisition, CAA USA had been losing money, and CAA was having a difficult time increasing sales in the U.S. market.  Hartman Dec., ¶ 18-19.  In 2015, CAA (both companies jointly) undertook a rebranding effort directed at the U.S. market.  Although both companies participated in the effort, and both paid, CAA USA as the main user of the new image for the U.S. market took the lead and had the final say on all rebranding issues.  Hartman Dec., ¶ 7; Tiraturian Dec., ¶ 15.  CAA (again, both companies) hired an advertising firm called Dan Alexander & Co., which produced new marks and trade dress for CAA to use in the U.S. market.  The rebranding marks included the new Lion Head marks to replace the old CAA (with little soldier) marks.  Although CAA Israel claims that it hired Dan Alexander to do the rebranding for CAA Israel, that assertion is simply false.  It was done by and for both companies.  Hartman Dec., ¶ 7-8; Tiraturian Dec., ¶ 15-16, 38-41.

    As part of the rebranding, CAA (both companies jointly) hired a web designer, NG Soft, to design and build a new web platform for direct internet sales.  The new website, caagearup.com, was also designed for the use of both companies, although it was understood that CAA USA, as the marketing and sales company for the U.S. market, would be the main user.  Hartman Dec., ¶ 9-10.

    The rebranding included new business cards that illuminate clearly that the rebranding was for both companies and that both operated under the same marks.  Both the business cards for CAA USA's CEO, Mikey Hartman, and its senior vice president, Mika Tiraturian, clearly show that the company was called simply "CAA" and used the tag line "Gear Up."   Although

both their cards clearly show that they worked from the Florida headquarters of CAA USA, there was no distinction between the companies.  Hartman Dec., ¶ 12; Tiraturian Dec., ¶ 4, 16.

The rebranding was launched for both companies in connection with the January 2016 SHOT Show in Las Vegas, one of the largest annual events in the firearms industry.  Tiraturian Dec., ¶ 16, 41-42.  The new caagearup.com website was launched shortly thereafter.  It was registered with website hosting company GoDaddy.  The registration information provided by CAA Israel shows that it was registered and administered by CAA USA, not CAA Israel.  Oz Dec., Ex. 20; Hartman Dec. ¶ 9.  Although both companies utilized the website until 2018, CAA USA was the main user.  In early 2018, the CEO of CAA Israel, Tal Hermoni, transferred the full responsibility for the website to CAA USA.  Hermoni Dec., ¶ 3; Hartman Dec. ¶ 10.  CAA USA has since completely redesigned the website, at its own cost, and thus is no longer using the website designed for both companies by NG Soft.  Hartman Dec. ¶ 11.

In 2016, CAA Israel's CEO, Mikey Hartman, began serving as CEO of both companies. Hartman Dec. ¶ 1, 6.  In January of 2016, the companies launched the new rebranded image at the Las Vegas SHOT Show, along with the introduction of the new Micro Roni Stabilizer. Tiraturian Dec., ¶ 41-42.

**F.      CAA USA Creates A Valuable Market For CAA Products.**

By that time, CAA Israel was experiencing financial difficulties caused by Moshe Oz's disastrous business decisions and practices.  By the end of 2016, Hartman approached Moshe's brother Eldad, the president of CAA USA, and asked to transfer to the U.S. headquarters in Florida and serve as the full-time CEO of CAA USA.  In Mr. Hartman's words, he was seeking to put the Atlantic Ocean between himself and Moshe Oz.  Eldad Oz welcomed the opportunity to have Mikey Harman run CAA USA full-time, in part because Eldad was hoping to leave the firearms industry.  Moshe Oz concurred in the decision, remarking that "If anyone can save CAA

9

USA, it's Mikey."  Mr. Hartman moved from Israel to Florida at the end of 2016.  Hartman Dec., ¶ 16.

Upon taking the reins at CAA USA, Hartman focused on turning around the company, which had been losing money every year.  He stepped up the marketing, and particularly concentrated on creating the brand and market for the Micro Roni Stabilizer.  In a few months, Hartman and his team created or participated in a number of videos that "went viral," achieving millions of views on the internet.  Hartman was interviewed on a number of high profile industry TV and internet programs.  The sales of the Micro Roni skyrocketed.  Eldad Oz remarked that Hartman had performed a miracle, achieving a level of success in one year that Eldad had been unable to achieve in the 7 prior years.  Hartman Dec., ¶ 20.

Unfortunately, the turn-around at CAA USA was not enough to cure the problems at CAA Israel.  By mid-2018, Tal Hermoni, the CEO who had replaced Mikey Hartman, began raising issues with Moshe Oz's terrible business decisions.  In May, 2018, he called a meeting with Moshe Oz and the company's attorney to try to persuade Oz to cease certain illegal business practices, stating his intention to leave if they were not corrected.  Second Hermoni Dec.4-6; Tiraturian Dec. ¶ 19and Exs. 9-10 thereto.

At about the same time, Tiraturian, a director of CAA Israel and one of the joint owners of 51% of CAA USA, flew to Israel to try to address the problems at CAA Israel.  At that time, he met, along with CEO Hermoni, with representatives of a respected Israeli firearms company, IWC, about a possible sale of the company.  After IWC performed an initial due diligence, it declined to pursue a deal, remarking that the company "was a mess."  Tiraturian Dec., ¶ 19, 21-22.

GUNSTER, YOAKLEY & STEWART, P.A.

With no prospect of the sale of the company, and no action by Moshe Oz to cease his objectionable activities, Tal Hermoni resigned as CEO. Second Hermoni Dec., ¶6; Tiraturian Dec. Ex. 10. Moshe Oz took over day to day operations of the company, without the consent of the board of directors. Hartman Dec. ¶ 24; Second Pomeranc Dec.; Tiraturian Dec. ¶ 11. By this time, CAA USA, through its marketing efforts, had created a robust market for the Micro Roni Stabilizer. Undoubtedly seeing an opportunity to take advantage of the new market that CAA USA had created, Moshe Oz launched an attack on CAA USA in a transparent attempt to put the company out of business. Hartman Dec. ¶ 24.

First, Moshe Oz changed the terms of sale of product from CAA Israel to CAA USA. Up until that time, under an arrangement created by Moshe and Eldad Oz and adhered to for years, CAA Israel sold products to CAA USA on a Net45 arrangement, meaning payment was due 45 days after shipment. The reason was that there was a lag between shipment to the United States, arrival in the United States, and shipment by CAA USA to its customers, who customarily paid CAA USA on a Net30 day arrangement. Thus, the Net45 arrangement allowed CAA USA to receive payment from its customers before remitting payment to CAA Israel, helping to manage the company's cash flow. Moshe Oz immediately rescinded the Net45 terms and demanded prepayment of all product to be shipped to CAA USA, resulting in a potentially crippling cash flow problem for CAA USA. Hartman Dec. ¶ 25; Tiraturian Dec. ¶ 20.

Second, Moshe Oz began selling product directly to the U.S. market through an Israeli internet sales company called YRS. This practice was a circumvention of CAA USA's right as the exclusive U.S. distributor of CAA products. (In addition to circumventing CAA USA in the U.S. market, Oz began circumventing CAA's exclusive European distributor, Red Rock.) YRS began selling the Micro Roni Stablizer at prices far below the "Manufacturer's Advertised

11

Price," a minimum price set by sellers to protect their resellers from unauthorized discounting. The sales by CAA Israel through YRS at these cut-rate prices threatened to kill the brand value of the Micro Roni, in addition to being disastrous to CAA USA and its resellers, who continued to adhere to the MAP. As a result of Oz's circumvention, CAA USA lost its ability to sell the Micro Roni profitably, and lost the benefit of the money and effort it had put into creating the brand, principally through Hartman and his team's efforts in 2017-18. Hartman Dec. ¶ 20,24—27.

As Oz states in his Declaration, the parties attempted to resolve their differences, but it is not true that they were unable to come to an agreement. The majority shareholders of CAA USA agreed in principal with Moshe Oz that they would swap their 51% of CAA USA for the Oz brothers' minority interest in another company, RWC Group, LLC, and $685,000 to be paid by Moshe Oz. The parties set a closing date of September, 2018. Oz was unable to raise the money. The deadline was extended, twice, but Oz was never able to pay the money to close. Tiraturian Dec. ¶ 23.

In the meantime, faced with going out of business as a result of Oz's change of payment terms and his sales of Micro Roni Stabilizers s directly to the U.S. market at cut-rate prices, CAA USA decided to begin producing a new pistol-carbine conversion kit. When Oz learned of CAA USA's intention to produce this kit, he sent a cease and desist letter (through counsel) threatening enforcement of U.S. Patent No. 8,887,432. The '432 patent was granted in 2014 and covers the Roni conversion kit, an older version of the CAA conversion kit that never sold well in the U.S. market. It does not cover the new Micro Roni. Hartman Dec. ¶ 29, 32. At any rate, the August 2018 cease and desist letter made no mention of any infringement of the patent at issue in this case, Patent No. 8,8312,803, which covers a small, relatively minor and inexpensive

part of the conversion kit. The letter also made no mention of any claims for enforcement of or any exclusive rights over the names CAA or Command Arms Accessories, or any of the rebranded marks. Tiraturian Dec., Ex. 13.

In November of 2018, SB Tactical, which had licensed a patent for an arm brace to CAA, sent an infringement letter to CAA USA and CAA Israel in which it said that CAA had failed to provide an accounting of its sales of Micro Roni Stabilizers utilizing the SB Tactical arm brace and to pay royalties to SB Tactical. SB Tactical revoked the license to sell its arm brace, effective against both companies. Thereafter, CAA USA, with considerable effort and expense, convinced SB Tactical to reinstate CAA USA's license to sell products with the SB Tactical brace, which is an essential component of the Micro Roni Stabilizer kit (as well as CAA USA's own MCK conversion kit). SB Tactical told distributors that CAA USA is the only authorized seller of its brace, and that CAA Israel, YRS, and CAA Israel's new exclusive distributor have no right to sell its patented product. At this time, CAA Israel cannot lawfully sell its Micro Roni Stabilizer in the United States. Hartman Dec. ¶ 27.

Also in around November 2018, in recognition that it was no longer operating as the exclusive U.S. distributor for CAA Israel, CAA USA hired a web designer, Pixai, and paid for the development of an entirely new website. CAA USA no longer uses the website designed jointly with CAA Israel in 2015. Hartman Dec. ¶ 11.

CAA USA began selling its MCK conversion kit in December 2018. Tiraturian Dec. ¶ 26. Shortly thereafter, Moshe Oz began a campaign to try to undermine CAA USA's sales by disparaging the MCK conversion kit. Oz has published several communications to CAA USA's customers falsely claiming that the MCK conversion kit is unsafe and subject to accidental discharge because it, unlike the Micro Roni, does not have an external safety. Oz's publications

GUNSTER, YOAKLEY & STEWART, P.A.

are false and defamatory. As explained by CAA USA's Hartman, there is no need for an external safety switch on a conversion kit such as the MCK. Instead, the kit is able to safely rely on the internal safety designed and incorporated in the handguns used with the kits, and particularly the popular Glock handgun. Hartman Dec. ¶ 28-29. Oz's claim that the MCK is unsafe is simply false and an effort by Oz to thwart sales of the MCK in hopes of capturing those sales for the Micro Roni. CAA USA filed suit against Oz and CAA Israel in the United States District Court, Southern District of Florida, claiming trade defamation. Ex. 1.

In June 2019, Oz, through counsel, sent a letter purporting to revoke CAA USA's right to use the marks CAA and Command Arms Accessories and the rebranded marks. The letter did not mention any patent infringement claims. The letter also threatened CAA USA that CAA Israel would seek criminal sanctions through the FBI if CAA USA failed to yield to its demands to cease selling its product. Oz Dec., Ex. 26. This lawsuit followed.

The lawsuit includes no claim for infringement of the '432 patent, but includes a claim under the '803 patent. CAA Israel claims a minor part of its Micro Roni Stabilizer, a charging handle, is covered by the '803 patent. But the Micro Roni Stabilizer's charging handle is mismarked with the '432 patent number and nowhere identifies the '803 patent. Tiraturian Dec. ¶ 28 and Ex. 15 thereto.

## ARGUMENT

Plaintiffs concede, as they must, that they are only entitled to a preliminary injunction if they establish a substantial likelihood of success on the merits, irreparable injury, the lack of an adequate remedy at law, that the balance of hardships is in their favor, and that the public interest would not be disserved by the issuance of a preliminary injunction.

In evaluating a plaintiff's likelihood of success on the merits, the Court must consider both the elements of the plaintiff's claim and the defendant's affirmative defenses. Indeed, a

"plausible affirmative defense" precludes a plaintiff from establishing its entitlement to a preliminary injunction. *See, e.g., Coastal Inv. Partners, LLC v. DSG Global, Inc.*, at *2 (S.D.N.Y. July 31, 2017) (plaintiff failed to establish likelihood of success on the merits where defendant "set forth plausible affirmative defense of criminal usury). *See also Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 534 (S.D.N.Y. 2009) (unclean hands preclude preliminary injunction); *Ladas v. Potpourri Press, Inc.*, 846 F. Supp. 221, 226 (E.D.N.Y. 1994) (denying preliminary injunction on grounds defendant had demonstrated "extremely high likelihood of prevailing on the affirmative defense of acquiescence"). Thus, "on a motion for a preliminary injunction, the burden is on [the movant] to demonstrate a reasonable likelihood that th[e] affirmative defense asserted by [the non-movant] will fail." *Black and Decker, Inc. v. Hoover Serv. Ctr.*, 765 F. Supp. 1129, 1137 (D. Conn. 1991) (citation omitted).

Plaintiffs have not established their entitlement to a preliminary injunction. CAA Israel lacks capacity to sue and each of its claims therefore fails as a matter of law. Plaintiffs have not established that they own the vast majority of the marks that are the subject of their trademark infringement claims; CAA USA has permission to use each of the trademarks at issue in any event; and Plaintiffs also have not established a likelihood of irreparable harm if the Court does not preliminarily enjoin CAA USA's use of the marks. CAA Israel also has not established the elements necessary to support an injunction for alleged infringement of the '803 patent. CAA Israel's evidence on its patent infringement claim is limited to Moshe Oz's conclusory assertions that the charging arm produced by CAA USA is similar to CAA Israel's part, but these assertions fail to provide sufficient analysis of the particular claims of the '803 patent, and the Court cannot consider them in any event because they are not made under penalty of perjury. Further, even if CAA Israel could show a substantial likelihood of success on its claim for infringement,

GUNSTER, YOAKLEY & STEWART, P.A.

Plaintiffs' motion utterly fails to meet CAA Israel's burden of showing irreparable harm or the lack of an adequate remedy at law. The part that is allegedly subject to CAA Israel's patent is a small, inexpensive part, and if CAA Israel could succeed on its infringement claim, it would at most be entitled to modest damages, which would be an adequate legal remedy.

Additionally, even if Plaintiffs had otherwise established a likelihood of success on the merits and their entitlement to a preliminary injunction, they are not entitled to one here because they have unclean hands. If, despite all that, the Court intends to enter a preliminary injunction, it should be conditioned on the posting of a substantial bond to pay the costs and damages CAA USA will incur as a consequence of being wrongfully enjoined.

## I.    CAA ISRAEL LACKS CAPACITY TO SUE, AND ITS CLAIMS THEREFORE FAIL AS A MATTER OF LAW.

Capacity is "'the power to bring an action'" and "'the power to maintain it.'"  6A Charles Alan Wright et al., Federal Practice and Procedure § 1559 (3d ed. Aug. 2019 update) (citation omitted). It "should not be confused with the question of whether a party has an enforceable right or interest or is the real party in interest." *Id.* (citations omitted). *See also* 59 Am. Jur. 2d Parties § 26 (2d ed. Aug. 2019 update) ("'Capacity to sue' refers to the status of a person or group as an entity that can sue or be sued and is not dependent on the character of the specific claim alleged in the lawsuit."). A plaintiff "'must maintain its capacity to sue throughout litigation,' and lack of capacity is grounds for dismissal." *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 15-CV-3538 (VSB), 2019 WL 3858620, at *7 (S.D.N.Y. Aug. 16, 2019) (citations omitted). *See also New Asia Enters. Ltd. v. Fabrique, Ltd.*, No. 13 Civ. 5271, 2017 WL 384687, at *2–3 (S.D.N.Y. Jan. 26, 2017) (granting summary judgment against plaintiff organized then dissolved under Hong Kong law for lack of capacity); 59 Am. Jur. 2d Parties § 26 ("Lack of capacity . . . deprives a party of the right to come into court, and it does not go to the

existence of a cause of action."); *cf. Wilmington Tr. Co. v. Hellas Telecomms., S.à.r.l.*, 12-cv-8686 (JPO), 2016 WL 7339112, at *5–7 (S.D.N.Y. Aug. 4, 2016) (dismissing claims against dissolved British Virgin Islands entities); *CBF Industria de Gusa S/A v. Steel Base Trade AG*, No. 14 Civ. 3034 (RWS), 2015 WL 1191269, at *3 (S.D.N.Y. Mar. 16, 2015) (dismissing claims against Swiss corporate entity removed from Switzerland's Commercial Register).

A corporation's "[c]apacity to sue or be sued is determined . . . by the law under which it was organized." Fed. R. Civ. P. 17(b)(2). CAA Israel is a corporation organized under the laws of Israel. (Compl. ¶ 4.) Its capacity to sue is therefore governed by Israeli law.[5] *See, e.g.*, *New Asia Enters. Ltd.* 2017 WL 384687, at *2–3.

Israel's Companies Law of 1999[6] requires every company to have articles of association, which are "considered as a contract between the company and its shareholders, and between its shareholders themselves." Companies Law §§ 15, 17(a). A fully disclosed shareholders agreement also governs the operation of an Israeli company. Itai Fiegenbaum and Amir N. Licht, *Corporate Law of Israel* (European Corporate Governance Institute, Law Working Paper No. 372/2017, Oct. 2017).[7]

An Israeli company's articles of association may include "provisions regarding ways of managing the company[.]" Companies Law § 19(2). A company's "board of directors may exercise any power of the company not granted to any other organ by law or by the articles of association." Companies Law § 49. *See also Corporate Law of Israel*, *supra* ("Authority not specified in the Law or the company's bylaw is considered part of the Board of Director's [sic]

---

[5]    "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.

[6]    Available in English at http://www.ilo.org/dyn/natlex/docs/ELECTRONIC/79956/86202/F687126340/ISR79956.pdf.

[7]    Available at https://ecgi.global/sites/default/files/working_papers/documents/finalfiegenbaumlicht.pdf.

GUNSTER, YOAKLEY & STEWART, P.A.

residual authority."). "A company, or anyone acting on behalf of a company, . . . shall not perform an unauthorized act or an act that goes beyond any authorization." Companies Law § 55(a). "An act performed for a company . . . without authorization, or beyond such authorization, shall be invalid in respect of the company" (with certain inapplicable exceptions). Companies Law § 56(a).

CAA Israel's Articles of Association grant the company's board of directors the power to determine who may sign on behalf of CAA Israel. Pomeranc Opinion ¶ 8. The Articles of Association are silent as to who may authorize litigation on behalf of CAA Israel. *See* Pomeranc Opinion ¶ 9.

CAA Israel's Shareholders Agreement is consistent with its Articles of Association. It specifically reserves for the board of directors the authority to "exit[] from any partnership or joint venture," to "enter[] into, alter[] in any respect or terminat[e] any transactions in respect of any Intellectual Property Rights[8] (irrespective of the type and value of such transactions)," and to "enter[] into any arrangement, contract or transaction outside the normal course of business." Shareholders Agreement §§ 4.14.3, 4.14.6, 4.14.12, Tiraturian Dec., ¶ 10-14 and Ex. 5 thereto. The Shareholders Agreement does not specifically address the commencement of litigation, but it provides that CAA Industries' board of directors "shall have the authority in respect of any matter that does not require [shareholder approval] under [the Shareholders Agreement], [CAA Israel's Articles of Association] and/or the Applicable Law[.]" Shareholders Agreement § 4.14. The president of CAA Israel, by contrast, may only "exercise such powers and perform such

---

[8] "'Intellectual Property Rights' means any (i) copyrights, patents, database rights and rights in trademarks, designs, know-how and confidential information (whether registered or unregistered), (ii) applications for registration, and rights to apply for registration, of any of the foregoing rights and (iii) all other intellectual property rights and equivalent or similar forms of protection existing anywhere in the world[.]" (Shareholders Agreement Schedule 1 ¶ 1.34.)

duties as may from time to time be assigned to him by a Shareholder Consent." Shareholders Agreement § 4.28.5.

Because CAA Israel's Articles of Association and its Shareholders Agreement do not assign the power to authorize litigation on the company's behalf to anyone, that power resides solely with the company's board of directors. *See* Companies Law § 49; Shareholders Agreement § 4.14; Pomeranc Opinion ¶ 9. <u>CAA Israel's board of directors did not authorize the filing or maintenance of this action</u>. Tiraturian Dec. ¶¶ 15, 19; Pomeranc Opinion ¶¶ 3, 10; Rabinovich Dec. ¶ 3.

Nor did any Shareholder Consent empower CAA Israel's president, Moshe Oz, to file or maintain this action. A "Shareholder Consent" requires either (i) unanimous written consent of all CAA Israel shareholders or (ii) approval at a duly convened meeting attended by all shareholders. Shareholders Agreement § 4.8; Shareholders Agreement Schedule 1 ¶ 1.52. CAA Israel's shareholders did not provide unanimous written consent to the filing of this action or approve the filing of this action at a duly convened meeting attended by all shareholders. Rabinovich Dec. ¶ 3 ("Mr. Oz did not consult with or receive approval of . . . Comaren [CAA Israel's majority shareholder] for hiring lawyers or filing this lawsuit in the Southern District of New York against ME Technology, Inc."). CAA Israel's majority shareholder did not even receive notice of the claims Oz purports to assert for CAA Israel until after the filing of this action. Pomeranc Opinion ¶ 3.

In sum, Oz commenced this action for CAA Israel without authorization. His purported actions on behalf of CAA Israel are therefore invalid as a matter of Israeli law. Companies Law § 56(a). When a corporate agent or purported corporate agent commences an action for a corporation without the requisite authority, the corporation lacks the capacity to sue (and to

19

maintain its suit) as a matter of law. *Hutterville Hutterian Brethren, Inc. v. Sveen*, 776 F.3d 547,

553–56 (8th Cir. 2015) (dismissing corporation's claims because purported directors could not

establish their authority to sue in corporation's name). Lack of capacity requires dismissal. *See

id.*; *Sonterra Capital Master Fund, Ltd.*, 2019 WL 3858620, at *7.

Because Oz commenced this action for CAA Israel without authorization, CAA Israel

lacks the capacity to sue. *See* Fed. R. Civ. P. 12(b)(2); *Hutterville Hutterian Brethren, Inc.*, 776

F.3d at 553–56. CAA Israel therefore cannot establish the required likelihood of success on the

merits. To the contrary, its claims must be dismissed. *Id.*

## II. PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE LIKELY TO SUCCEED ON THEIR TRADEMARK CLAIMS.

### A. Plaintiffs Have Not Established That Command Arms Accessories, LLC, Owns The Trade Name And Trademark COMMAND ARMS ACCESSORIES Or The Trademark CAA.

Plaintiffs claim Command Arms Accessories, LLC, is "the owner by assignment" of the

"trade name and trademark COMMAND ARMS ACCESSORIES [and] the trademark CAA."

(Compl. ¶ 7.) But that is not what Plaintiff's evidence shows.

On November 16, 2010, Liquidated Command Arms—the now-liquidated Pennsylvania

limited liability company, not the plaintiff—and CAA Israel (f/k/a Tactical Arms, Ltd) entered

into an Asset Purchase Agreement. The evidence produced by Plaintiffs indicates CAA Israel

did <u>not</u> acquire all of Liquidated Command Arms' assets, as CAA Israel claims. *See* Oz Dec. ¶

12. It acquired "only those assets" identified in the Asset Purchase Agreement. APA at 1.

With respect to intellectual property, the identified (and thus the acquired) assets were (i)

"[t]he name"—not the trade name or trademark—"'Command Arms Accessories'" and (ii) "any

patents, trademarks, trade names, copyrights and all other intellectual property rights of

[Liquidated Command Arms] used in connection with or related to the Business listed on

Schedule 1.1(k)[.]" APA § 1.1(k). Despite the apparent breadth of that clause, Schedule 1.1(k) identified only four assets: a patent, a patent application, the website address commandarms.com, and a now abandoned registered trademark. *Id.* Schedule 1.1(k) did not include as a trade name or common-law trademark "COMMAND ARMS ACCESSORIES" or the common-law trademark "CAA." *See id.* To the contrary, Schedule 1.1(k) specifically and explicitly provided that CAA Israel acquired "[r]egistered marks only" (a single registered mark, in fact). *Id.* Thus, CAA Israel has not shown that it acquired the trade name or common-law trademark "COMMAND ARMS ACCESSORIES" or the common-law trademark "CAA" under the Asset Purchase Agreement.

Because CAA Israel has not showed that it acquired the trade name or trademark "COMMAND ARMS ACCESSORIES" or the common-law trademark "CAA" from Liquidated Command Arms, it could not assign that intellectual property to Command Arms Accessories, LLC, when CAA Israel assigned its rights under the Asset Purchase Agreement to Command Arms on December 15, 2010. Thus, Plaintiffs have not proven Command Arms Accessories, LLC, owns the trade name or trademark "COMMAND ARMS ACCESSORIES" or the common-law trademark "CAA."

Moreover, Command Arms Accessories, LLC, ceased operating long ago, and any of its remaining operations and assets were transferred to CAA USA, as noted above (pp. 6–8). Tiraturian Dec., ¶¶ 33–34. CAA USA handles any of its minimal activities now, including filing its tax return, at CAA USA's cost. Command Arms Accessories, LLC, clearly does not own the trade name or trademark "COMMAND ARMS ACCESSORIES" or the common-law trademark "CAA" because its tax returns report that the company has zero assets and zero income, i.e., no

income from any purported licensing agreement to CAA Israel. Tiraturian Dec., ¶ 33 Dec. and Ex. 16-17 thereto.

As Plaintiffs acknowledge, they cannot prevail on any trademark infringement claim unless they can prove ownership of a valid, legally protectable mark. Plaintiffs have not proven that Command Arms Accessories, LLC, owns the trade name or trademark "COMMAND ARMS ACCESSORIES" or the common-law trademark "CAA."[9]

Even if Command Arms Accessories, LLC, had shown that it owned the trade name and trademark "COMMAND ARMS ACCESSORIES" and the trademark "CAA," Command Arms has admitted that CAA USA began using the marks on December 15, 2015, with permission. Oz Dec. ¶ 15. Command Arms Accessories, LLC never revoked this alleged permission. Plaintiffs claim the permission was revoked through a letter sent on June 5, 2019. Oz. Dec. ¶ 33; Oz Dec. Ex. 26. But that letter was sent on behalf of CAA Israel, not Command Arms Accessories, LLC. Oz Dec. Ex. 26. The letter does not even mention Command Arms Accessories, LLC, or, for that matter, the trade name and trademark COMMAND ARMS ACCESSORIES. Id. As Command Arms Accessories, LLC, never revoked its consent to CAA USA's use of CAA and COMMAND ARMS ACCESSORIES, it cannot prevail on its trademark claims concerning these marks as a matter of law. See, e.g., *1-800 Contacts, Inc. v. WhenU.Com, Inc*., 414 F.3d 400, 407 (2d Cir. 2005) ("to prevail on a trademark infringement claim for registered trademarks, pursuant to 15 U.S.C. § 1114, or unregistered trademarks, pursuant to 15 U.S.C. § 1125(a)(1), a plaintiff must establish . . . the defendant used the mark . . . without the plaintiff's consent."). The motion

---

[9] Plaintiffs have not argued—or produced any evidence—that Command Arms Accessories, LLC, acquired a common-law trademark for "CAA" through first use or by any means other than the failed assignment from CAA Israel. It is black-letter law that "rights in a mark do not arise through 'mere adoption,' but only out of actual use." *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 270 (S.D.N.Y. 2006). Plaintiffs also do not claim CAA Israel owns a common-law trademark for "CAA." *See* Oz Dec. ¶ 17 (alleging CAA Israel licenses "CAA" from Command Arms Accessories, LLC).

to enjoin CAA USA's use of "COMMAND ARMS ACCESSORIES" and "CAA" fails accordingly.

  **B.**   **Plaintiffs Have Not Established That They Are Likely To Succeed On Their Claims Concerning CAA Israel's Alleged Trademarks And Trade Dress.**

    **1.**   **Plaintiffs Have Not Established That CAA Israel Owns The Lion Head Mark, The Lion Head Composite Mark, The DDP Mark, Or The Alleged CAA Trade Dress.**

  CAA Israel claims ownership of the Lion Head Mark, the Lion Head Composite Mark the DDP Mark, and the alleged CAA Trade Dress on the ground that it "hired a marketing firm, Dan Alexander & Co., in 2015[,] to develop" these marks. Brief at 23. But CAA USA also worked extensively with—and paid thousands of dollars to—Dan Alexander & Co. to on the rebranding to develop these marks for the benefit of both CAA Israel and CAA USA. Hartman Dec. ¶¶ 7, 12; Tiraturian Dec. ¶¶ 23, 41–45. CAA Israel's claim to a superior right in the marks, based on its work with and payments to Dan Alexander & Co. therefore fails because CAA USA has and has always had at least equal rights to use those marks.

  Furthermore, "'[t]rademark priority is not automatically granted to the person who was first to conceive of the idea of using a given symbol as a mark. . . . To acquire ownership of a trademark, one must <u>actually use the mark in the sale of goods or services</u>.'" *Buti v. Impressa Perosa, S.R.L.*, 935 F. Supp. 458, 468 (S.D.N.Y. 1996) (citation omitted) (emphasis added). *See also Threeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542, 559 (E.D.N.Y. 2017) (same); *Elastic Wonder, Inc. v. Posey*, 179 F. Supp. 3d 307, 315 (S.D.N.Y. 2016) ("Merely inventing or designing the mark, therefore, does not confer . . . ownership of the mark."). "The territoriality principle requires the use to be in the United States for the owner to assert priority rights to the mark under the Lanham Act." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 155 (2d Cir. 2007) (citation omitted). State common law likewise affords protection only in "the territory or

markets where [a trademark or trade name] has become established as such by actual use." 104 N.Y. Jur. 2d Trade Regulation § 147. *See also* 55 Fla. Jur. 2d Trademarks & Unfair Competition § 6 ("the right acquired by the prior appropriation and use of a trademark is exclusive in character, within the proper scope of its operation."); 18A Summ. Pa. Jur. 2d Commercial Law § 23:11 ("The right to the exclusive use of a trademark or trade name is normally limited to the territory or market over which the mark or name has become established by actual use, and it does not extend to territories or markets outside the competitive area of the owner of the mark.").

CAA Israel has offered only statements from Moshe Oz that CAA Israel has used the Lion Head Mark, the Lion Head Composite Mark the DDP Mark, and the alleged CAA Trade Dress "since at least as early as 2016." Oz Dec. ¶¶ 19, 22, 23. CAA Israel has offered <u>no evidence</u> of its use of these marks and this trade dress in the United States, the date on which it first used them in the United States, or its use of them in the United States before CAA USA— which has offered sworn testimony that it first used the marks and trade dress in the United States in January 2016. Tiraturian Dec. ¶ 46. CAA Israel has therefore failed to establish its first use of, and priority rights to, the marks and trade dress in the United States. *See ITC Ltd.*, 482 F.3d at 155; *Buti*, 935 F. Supp. at 468. CAA Israel has thus failed to establish likelihood of success on the merits of its Lanham Act claims concerning the Lion Head Mark, the Lion Head Composite Mark the DDP Mark, and the alleged CAA Trade Dress.

CAA Israel has likewise failed to offer proof of the geographic regions in the United States in which it has established the alleged marks and trade dress through actual use (or, for that matter, that CAA USA is using the same marks and trade dress in such regions). CAA Israel therefore has not established that it is likely to prevail on its claims under the common law concerning the Lion Head Mark, the Lion Head Composite Mark the DDP Mark, and the alleged

CAA Trade Dress.  *See* 104 N.Y. Jur. 2d Trade Regulation § 147; 55 Fla. Jur. 2d Trademarks & Unfair Competition § 6; 18A Summ. Pa. Jur. 2d Commercial Law § 23:11.

**2.      Plaintiffs Have Not Established That CAA Israel Owns "Gear Up."**

Plaintiffs claim CAA Israel also owns a "GEAR UP" trademark.  "GEAR UP" is a tag-line developed for use in connection with the 2015 branding  and the name for the new domain name, caagearup.com.  The only evidence for Plaintiffs' claim is Moshe Oz's conclusory statement that CAA Israel "developed the mark GEAR UP to use on the new website and use in the domain name," Eldad Oz's registration of the domain name www.caagearup.com on December 8, 2015, and the launch of the website sometime thereafter.  Oz. Dec. ¶ 24.

None of these three facts establishes CAA Israel's ownership of a "GEAR UP" trademark.  First, development of a mark is irrelevant, *Elastic Wonder, Inc.*, 179 F. Supp. 3d at 315; to acquire ownership of the trademark, CAA Israel was required to "actually use the mark in the sale of goods or services.'"  *Buti*, 935 F. Supp. at 468.  Second, "[r]egistration of a domain name, without more, does not in itself constitute use for purposes of acquiring trademark priority."  *Elastic Wonder, Inc.*, 179 F. Supp. 3d at 315.  And even if registration were sufficient, Eldad Oz—then the president of <u>CAA USA</u>, Oz Dec. ¶ 14—registered the domain name using CAA USA's address and phone number, not CAA Israel's.  Oz Dec. Ex. 20.  In fact, the registration of the website clearly shows that it was registered by CAA USA, not CAA Israel.  Hartman Dec., ¶ 9; Oz Dec. Ex. 20.  Third, the launch of the website—registered to CAA USA—does not establish CAA Israel's use of GEAR UP in the sale of goods or services.  If anything, it establishes <u>CAA USA's</u> use of GEAR UP for that purpose and thus CAA USA's ownership of a GEAR UP trademark.  Plaintiffs have thus failed to establish CAA Israel's ownership of a GEAR UP trademark and, accordingly, a likelihood of success on the merits of their claims concerning that mark.

### 3. Plaintiffs Have Not Established That CAA Israel Owns The "Micro" Trademark.

Plaintiffs also claim CAA Israel owns a protected "Micro" trademark. It does not because (i) there is no evidence CAA Israel has ever used the word "Micro"—and not "Micro RONI"—as a mark and, in any event, (ii) "Micro" is a descriptive mark and Plaintiffs have offered no evidence that "Micro" has acquired secondary meaning.

First, there is no evidence CAA Israel has ever used the word "Micro" as a mark. CAA Israel does not even allege it has used "Micro" as a stand-alone mark. As ownership of a mark is only acquired through actual use in the sale of goods or services, CAA Israel cannot establish that it owns the "Micro" trademark. *Buti*, 935 F. Supp. at 468.

Second, "Micro" would be a descriptive mark, entitled to protection only if it had acquired a secondary meaning, and Plaintiffs have presented no evidence whatsoever that "Micro" has acquired a secondary meaning here. A descriptive mark "tells something about a product, its qualities, ingredients or characteristics." *Gruner + Jahr USA Publ'g, a Div. of Gruner + Jahr Printing & Publ'g Co. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993). Those "characteristics" of course include "its size." *Id.*

Plaintiffs claim "Micro" is arbitrary or suggestive and tells the consumer nothing about "the nature or function of the product" or, presumably, its qualities or characteristics. Brief at 28. Plaintiffs' argument is plainly meritless. "Micro-" means "of reduced or restricted size," "small," or "very small in comparison with others of its kind."[10] That is precisely what "Micro" communicates (particularly, as here, when used in conjunction with other words): that the product is of reduced size or very small in comparison with others of its kind. Indeed, compared to the RONI, the Micro RONI was specifically designed to have a "reduced weight" and

---

[10] *Micro-*, Lexico.com (2019); *Micro-*, Dictionary.com (2019).

"reduced size."  Oz Dec. ¶ 28; Hartman Dec. ¶ 29 ("CAA calls the conversion kit the 'Micro Roni' because it is smaller and lighter than the original Roni.").  Other firearms manufacturers use the term "Micro" in precisely the same way.  McGinn Dec. Ex. A (describing Browning's BL-22 Micro Midas as a "true BL-22 lever action rimfire made for the smaller shooter" with "a shorter barrel for reduced weight and a 12" length of pull that is perfect for smaller frames"); McGinn Dec. Ex. B (describing Sig Sauer's P238 HD Micro-Compact CA Compliant as "just a fraction of the size of [Sig Sauer's] full-size pistols" and a "small handgun built with the same accuracy and reliability as large frame SIG SAUER pistols"); McGinn Dec. Ex. C (describing Kimber's Micro line as offering "Kimber Quality in a Pocket-Size .380 ACP Package," "made to the tightest allowable tolerances," and "[i]deal for shooters with small hands"); McGinn Dec. Ex. D (describing Micro Galil as a "subcompact version of the standard Galil assault rifle"); McGinn Dec. Ex. E (describing "CZ Scorpion EVO 3 S2 Pistol Micro w/ Brace" as a "diminutive Scorpion" and "the result of [CZ-USA's] development of a smaller, suppressed Scorpion"); McGinn Dec. Ex. F (describing Desert Tech's Micro Dynamic Rifle's "compact size" and low weight).  Because "Micro" communicates that the product is smaller in comparison with others of its kind, it is a descriptive mark.

"A mark that is merely descriptive of a product is not inherently distinctive and therefore merits protection only once it has acquired 'secondary meaning.'"  *Erchonia Corp. v. Bissoon*, 410 F. App'x 416, 418 (2d Cir. 2011).  "A mark obtains secondary meaning in one of two ways: 'it may be proved as a matter of fact that the mark connotes a single source of origin to the public consumer or secondary meaning may be established through registration of a trademark.'"  *Id.* (quoting *Gruner + Jahr,* 991 F.2d at 1076).  It is undisputed that CAA Israel has not registered "Micro."  Thus, to obtain trademark protection for "Micro," CAA Israel must prove that public

GUNSTER, YOAKLEY & STEWART, P.A.

consumers associate "Micro" only with CAA Israel.  *See id.* ("Secondary meaning is a question of fact, with the burden of proof on the party claiming exclusive rights in the mark.").

Plaintiffs have presented no evidence that an ordinary firearms consumer associates "Micro" exclusively with CAA Israel.[11]  Nor could they.  Micro is a term used by a number of players in the firearms industry to identify products that are smaller than others of the same kind. McGinn Dec. Exs. A–F.

Plaintiffs have thus failed to establish that "Micro" has acquired a secondary meaning. *See Erchonia Corp.*, 410 F. App'x at 418 (citation omitted) ("secondary meaning is established *only* in cases where an ordinary buyer associates the mark in question with a single source").  In the absence of a secondary meaning, "Micro" is not entitled to protection, *see id.*, and Plaintiffs cannot establish a likelihood of success with respect to their claims concerning that alleged mark.[12]

---

[11]   "Six factors are relevant to determining whether a mark has acquired secondary meaning: '(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use.'"  *Erchonia Corp.*, 410 F. App'x at 418 (citation omitted).  CAA Israel has presented no evidence bearing upon any of these six factors.  Even if CAA Israel's allegations were construed as evidence of plagiarism—and they should not be— "plagiarism, standing alone, is not dispositive."  *Id.* at 419.

[12]   Even if CAA Israel could prove it has a protected interest in "Micro," its claims would fail because it cannot prove confusion between its Micro RONI and CAA USA's Micro Conversion Kit.  "In order to determine if confusion is likely, each trademark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar."  *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112 117–18 (2d Cir. 1984) (citations omitted).  Micro RONI and Micro Conversion Kit are not confusingly similar.  *Universal City* is instructive on this point.  In that case, the Second Circuit concluded Nintendo's use of "Donkey Kong"—a video game ape—did not infringe on "King Kong," despite the latter's association with apes and other objects of enormous proportions.  *Id.* at 117.  The Second Circuit explained that Nintendo's use of the prefix 'Donkey' has no similarity in meaning or sound with the word 'King'" and, "[w]hen taken as a whole, . . . 'Donkey Kong' does not evoke or suggest the name of King Kong."  *Id.* at 117–18.  Here, likewise, "Conversion Kit" has no similarity in meaning or sound with the word "RONI" and, when taken as a whole, "Micro Conversion Kit" does not evoke or suggest "Micro RONI."  *See id.*

GUNSTER, YOAKLEY & STEWART, P.A.

### 4. At A Minimum, CAA Israel Admittedly Authorized CAA USA To Use Its Marks—And CAA Israel Has Not Validly Revoked That Authorization.

Even if CAA Israel did own the Lion Head Mark, the Lion Head Composite Mark, the DDP Mark, "Gear Up," the CAA Trade Dress, and "Micro," as it claims, it admittedly authorized CAA USA to use those marks, Oz Dec. ¶¶ 19, 23, as well as the marks RONI and Micro Roni. *Id.* ¶ 30. CAA Israel has not validly revoked that authorization.

CAA Israel's Shareholders Agreement specifically reserves for the board of directors the authority to "exit[] from any partnership or joint venture" and to "alter[] in any respect or terminat[e] any transactions in respect of any Intellectual Property Rights[13] (irrespective of the type and value of such transactions)." Shareholders Agreement §§ 4.14.3, 4.14.6 (emphasis added). CAA Israel's president, by contrast, has no independent authority to exit from any partnership or joint venture or to alter or terminate any transaction concerning CAA Israel's intellectual property rights. Shareholders Agreement § 4.28.5.

CAA Israel's board of directors did not revoke (or authorize Moshe Oz to revoke) CAA USA's authorization to use CAA Israel's alleged marks. Tiraturian Dec. ¶ 14. Nor did CAA Israel's shareholders provide a Shareholder Consent[14] empowering Oz to revoke CAA USA's authorization to use CAA Israel's alleged marks. Rabinovich Dec. ¶ 5. Oz's purported termination of CAA USA's authorization to use CAA Israel's trademarks was thus "an unauthorized act" for purposes of Israel's Companies Law of 1999.

---

[13] "'Intellectual Property Rights' means any (i) copyrights, patents, database rights and rights in trademarks, designs, know-how and confidential information (whether registered or unregistered), (ii) applications for registration, and rights to apply for registration, of any of the foregoing rights and (iii) all other intellectual property rights and equivalent or similar forms of protection existing anywhere in the world[.]" (Shareholders Agreement Schedule 1 ¶ 1.34.)

[14] As explained above, a Shareholder Consent requires either (i) unanimous written consent of all CAA Israel shareholders or (ii) approval at a duly convened meeting attended by all shareholders. Shareholders Agreement § 4.8; Shareholders Agreement Schedule 1 ¶ 1.52. CAA Israel's majority shareholder only learned of the claims Oz purports to assert for CAA Israel after the filing of this action. Pomeranc Opinion ¶ 3.

29

"An act performed for a company . . . without authorization"—like Oz's purported termination of CAA USA's authorization to use CAA Israel's trademarks" is "invalid in respect of the company." Companies Law § 56(a). In other words, to the extent CAA USA requires CAA Israel's permission to use its marks, <u>CAA USA has that permission as a matter of law</u>. Lack of consent is of course an element of each of Plaintiffs' trademark claims. *See, e.g.*, *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 407 (2d Cir. 2005) ("to prevail on a trademark infringement claim for registered trademarks, pursuant to 15 U.S.C. § 1114, or unregistered trademarks, pursuant to 15 U.S.C. § 1125(a)(1), a plaintiff must establish . . . the defendant used the mark . . . without the plaintiff's consent."). Thus, CAA Israel cannot establish a likelihood of success with respect to any of its claims concerning the Lion Head Mark, the Lion Head Composite Mark, the DDP Mark, "Gear Up," the alleged CAA Trade Dress, the alleged Micro mark, the RONI mark, or the Micro RONI mark.[15]

### C. Plaintiffs Have Not Established Irreparable Harm.

"Although a particular period of delay may not rise to the level of laches and thereby bar a <u>permanent</u> injunction, it may still indicate an absence of the kind of irreparable harm required to support a <u>preliminary</u> injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (emphasis added). Indeed, in trademark cases, "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998).

---

[15]    Even if CAA Israel were to validly withdraw its authorization of CAA USA's use of CAA Israel's trademarks and trade dress, CAA USA could continue to use the RONI and Micro RONI marks to sell the $1.815 million in CAA Israel products it has in its product inventory, Hartman Dec. ¶ 30, under the nominative fair use doctrine. *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102–03 (2d Cir. 2010) ("While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product.").

GUNSTER, YOAKLEY & STEWART, P.A.

Plaintiffs delayed far more than two months in seeking a preliminary injunction here. They first attempted to move for a preliminary injunction on August 19, 2019. ECF No. 11. CAA Israel was undoubtedly aware of CAA USA's marketing and sale of the MCK soon after sale began in December of 2018. Additionally, more than <u>four months before moving for an injunction,</u> on April 11, 2019, Moshe Oz publicly accused CAA USA of infringing CAA Israel's trademarks in an open letter to customers, dealers, and distributors mailed on CAA Israel letterhead. Hartman Dec. ¶ 28 and Ex. 9-10 thereto. And <u>two-and-a-half months</u> before Plaintiffs attempted to move, on June 5, 2019, counsel for CAA Israel sent CAA USA a letter purporting to revoke CAA USA's authorization to use the marks CAA, RONI, and MICRO RONI, and the alleged CAA Trade Dress. Oz Dec. Ex. 26. CAA Israel has offered no explanation for why it waited more than four months from the date of Oz's letter and two-and-a-half months from the date of the purported revocation letter to move for a preliminary injunction. CAA Israel has thus failed to establish irreparable harm in the absence of a preliminary injunction, and its motion for a preliminary injunction should be denied. *See Citytrust*, 756 F.2d at 276; *Gidatex, S.r.L*, 13 F. Supp. 2d at 419.

### III. PLAINTIFFS HAVE NOT ESTABLISHED THEIR ENTITLEMENT TO AN INJUNCTION WITH RESPECT TO THEIR PATENT CLAIM.

Plaintiffs likewise cannot demonstrate any of the elements to support a claim preliminary injunction on their patent claim.[16]

The single patent claim here, added on apparently almost as an afterthought as the 22nd count in a 22-count complaint, relates only a single small part utilized by CAA Industries in its MCK conversion kit: a charging handle. This patent claim appeared for the first time with the

---

[16] All of the defenses set forth above regarding Moshe Oz's capacity to pursue this lawsuit apply equally to the patent claim.

service of the Complaint.  It was not raised in the first formal cease and desist letter sent in August 2018, which was directed only at the '432 patent.  It was not raised in any of Moshe Oz's various defamatory publications leading up to the filing of the Complaint.  It was not raised in the cease and desist letter sent by CAA Israel's present counsel in June 2019.  In fact, that June 2019 letter failed to raise any patent issue at all.

Indeed, it was not until CAA USA began preparing its response to Plaintiffs' motion for preliminary injunction that it closely examined the charging handle included by CAA Israel in its Micro Roni kits.  Upon examination, it was clear that the charging handle is actually mismarked, and bears only the Patent No. for the '432 patent, which has nothing to do with the charging handle.  Thus, the Micro Roni kits made and marketed by CAA Israel provide false patent marking.  Indeed, the '432 patent marked on the Micro Roni products does not cover the Micro Roni products.  As a result, Defendant CAA USA did not receive either actual or constructive notice of the '803 patent until it was served with the instant law suit.  CAA Israel has been understandably negligent in both its patent marking on its own products and its enforcement attitude toward the small, inexpensive part that CAA Israel is now alleging that CAA USA is infringing.

### A.     Plaintiffs Have Not Established They Are Likely To Succeed On The Merits.

CAA Israel cannot carry its burden to demonstrate a substantial likelihood of success on its patent claim for the following reasons:  (a) there are multiple patent claim construction issues that have to be addressed and resolved by the Court before the parties can even begin to analyze analyzing whether the '803 patent may be infringed by CAA USA's products; (b) CAA Israel's Motion and supporting documents fail to demonstrate that each element of any of the '803 patent claims is found in CAA USA's product.  Instead, CAA Israel attempts to confuse the issue by comparing the two products, its own and CAA USA's.  A proper approach to patent

infringement analysis is to compare the allegedly infringing product with the specific, properly construed asserted patent claims. CAA Israel fails to do so, but merely recites the patent claims and argues that the pictures are sufficient to establish infringement The Motion offers no evidence that CAA USA's accused part is covered by the '803 patent claims, but merely offers a one sentence, self-serving conclusion to that effect from Moshe Oz. Oz Dec. ¶ 37. The Motion falls far short of its burden of establishing a likelihood of success on infringement.

CAA Israel must also overcome CAA USA's defense that the '803 patent is invalid. A brief consideration of the '803 patent file history from the U.S. Patent and Trademark Office demonstrates that the only reason the '803 patent was granted over the initial Examiner's refusal is that Examiner could not locate any prior art that disclosed charging slide tabs extending laterally. *See* Litovsky Dec. and Ex. A and B therto. However, a cursory review of firearms on the market informs that such firearms exist. *See* McGinn Dec. and Exs. G and H thereto.

CAA USA has not had a chance to conduct a thorough prior art search. However, CAA USA expects to uncover more relevant prior art showing that the simple addition of lateral tabs was not novel or inventive at the time the application for the '803 patent was filed, and which would compel a conclusion that the '803 patent is invalid and cannot be enforced.

**B.      Plaintiffs Have Not Established They Would Be Irreparably Harmed In The Absence Of A Preliminary Injunction.**

CAA Israel recognizes that it is entitled to no presumption of irreparable harm. Brief at 37. The Motion falls far short of demonstrating irreparable harm for any alleged patent violation. Indeed, CAA Israel fails to show any discernible harm if CAA USA continues to include the charging handle at issue in its MCK conversion kits.

The Motion does not even attempt to establish irreparable harm. The only discussion of irreparable harm for the alleged patent violation is on pages 39 and 40 of CAA Israel's brief,

GUNSTER, YOAKLEY & STEWART, P.A.

where CAA Israel first decries the loss of the presumption following the *ebay* decision. The Motion then argues, in conclusory fashion, that without an injunction CAA USA will become a compulsory licensee. There is no evidence presented to support this naked legal assertion. In fact, if CAA Israel carries its burden and proves at trial that its '803 patent is indeed infringed (which it will not be able to do), the Court, at that time will be in a position to (i) competently assess appropriate damages for any infringement period of time and (ii) decide whether a permanent injunction should be put in place. There will not be a compulsory license. Indeed, it is clear from the last sentence of page 40 that CAA Israel is not even arguing that it faces irreparable harm if CAA USA continues to use the charging handle, but rather that the argument is directed at the harm to CAA Israel from the competition of CAA USA selling the entire conversion kit. But, as the Court is aware, CAA Israel is not even attempting to enforce its patent over its RONI conversion kit. CAA Israel has simply failed to offer any evidence of any harm occasioned by CAA USA's use of the charging handle.

In the unlikely event that CAA Israel prevails on any of its claims, it knows full-well that CAA USA is in a good financial health to be able to pay any potential judgment in this case. Notably, in this respect, there is not even an allegation in CAA Israel's moving papers that CAA USA may not be able to pay on a judgment.

CAA Israel's delay in seeking a preliminary injunction further undercuts its claim of irreparable harm. Moshe Oz learned of CAA USA's intention to begin production of its own pistol-carbine conversion kit, and CAA Israel sent CAA USA a cease and desist letter, threatening a patent action, on August 7, 2018. Tiraturian Dec. Ex. 13. CAA USA proceeded with production and began selling its pistol-carbine conversion kit in December 2018. CAA Israel did nothing for eight months and only attempted to move for a preliminary injunction on

August 19, 2019. This extensive delay in seeking a preliminary injunction disproves CAA Israel's claim of irreparable harm. *See, e.g.*, *Am. Permahedge, Inc. v. Barcana, Inc.*, 857 F. Supp. 308, 324–25 (S.D.N.Y. 1994) (delay of more than a year in seeking preliminary injunction "fatal to plaintiff's claim of irreparable injury").

## IV.     PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY LACK AN ADEQUATE REMEDY AT LAW.

Plaintiffs have not carried their burden of establishing the inadequacies of their remedies at law. Plaintiffs offer no argument whatsoever regarding the inadequacy of their remedies with respect to CAA USA's alleged trademark infringements. Therefore, Plaintiffs are not entitled to any injunction of CAA USA's use of the marks at issue.

The Motion also does not attempt to make any argument about the lack of an adequate remedy for the alleged patent violation. It offers only a conclusory, non-specific argument about loss of market share with absolutely no citation to any supporting evidence. Indeed, Moshe Oz's Declaration fails to address market share at all, much less in the context of the market share for the charging handle. The reality is that the charging handle is a relatively inexpensive and insignificant part. Because CAA Industries failed to give notice of the infringement until the suit was served, any damages that can be recovered will be limited to some measure of profits attributable to the sales of this part, during the time period after August 6, 2019. Such damages would be modest, and there is no allegation that CAA USA would be unable to satisfy a damage award.

## V.     THE BALANCE OF HARDSHIPS WEIGHS HEAVILY AGAINST GRANTING THE INJUNCTION.

If the injunction proposed by the Plaintiffs is granted, CAA Israel has demonstrated NO hardship that it will face if CAA USA continues sell its products and operate its business. Tiraturian Dec. ¶ 44. On the other hand, if CAA USA is enjoined, depending on the scope of the

injunction, CAA USA will face likely face liquidation.  The company will lose value in excess of $12 million.  Twenty-five Florida factory workers, mostly minorities, will lose their jobs. Tiraturian Dec., ¶ 43.

## VI.     THE PUBLIC INTEREST DOES NOT FAVOR THE INJUNCTION.

The only argument that CAA Israel makes in support of its injunction based on its patent is that the MCK conversion kit is unsafe because it does not include an external trigger guard. That argument is disingenuous.  Indeed, as demonstrated by a simple review of the U.S. Patent and Trademark Office file history of the unasserted '432 patent, CAA Israel attempted, but failed, to obtain U.S. patent protection for a conversion kit without a trigger guard.  Litovsky Dec. Ex. C.  Furthermore, CAA Industry did obtain a European patent that covers a conversion kit without a trigger cover.  Litovsky Dec. ¶ D.  Thus, CAA Israel's own actions show that the trigger cover is not an essential part of the conversion kit.  In addition, CAA USA has thoroughly refuted the disingenuous "safety concern" argument from the practical standpoint.  Hartman Dec., 28-29.  There is no heightened danger of accidental discharge with the MCK.  An in any event, Intellectual Property rights are not intended to guard against safety concerns.  There are appropriate licensing and permitting procedures as well as government agencies that are charged with policing safety of the firearms made available to the public.  The "public safety" concern concocted by CAA Israel is baseless.

Because there is no basis for this safety argument, CAA Israel has failed to meet its burden of showing that the public interest favors the injunction.

On the other hand, if the injunction is granted, CAA USA will likely close down.  As noted, all of the employees will lose their jobs.  The public interest here is decidedly against the injunction.  Tiraturian Dec., ¶ 43.

36

## VII. PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION BECAUSE CAA INDUSTRIES HAS UNCLEAN HANDS.

"A court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Estate of Lennon by Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287, 293 (S.D.N.Y. 1996) (internal quotation marks omitted). CAA Israel has engaged in precisely this sort of unconscionable and bad faith conduct here.

The instant, meritless motion for preliminary injunction is CAA Israel's most recent tactic to put CAA USA out of business. Hartman Dec. ¶¶ 24–27. CAA Israel's prior actions in changing the terms of CAA USA's payment for product, and its violation of CAA USA's exclusivity, done by Moshe Oz without corporate authority, constitute unclean hands.

In addition CAA Industries illegally attempted to extort CAA USA. The Court need go no further than Plaintiffs' own motion for preliminary injunction to find evidence of CAA Industries' extortion. Oz Dec. Ex. 23. In a letter, dated June 5, 2019—after setting forth numerous arguments pertaining to purported violations of CAA Industries' intellectual property rights—counsel for CAA Industries, on behalf of his client, made a boldfaced threat that, if CAA Industries did not get what it desired, it might notify the FBI or other authorities for "criminal enforcement":

> We wish to receive your written assurances within ten (10) days of this letter that ME Technology and all related entities will discontinue all use of the CAA Marks. Specifically, but without limitation, we wish to receive your assurances that:
>
> 1) ME Technology will cease and desist all use of the CAA Marks in the United States and globally;
> 2) ME Technology will produce to CAA Industries all products and printed materials bearing the CAA Marks;

3) ME Technology will identify and terminate any existing contractual relationship, and refrain from entering into any new contractual relationship, with any search engine or website wherein ME Technology is an advertiser, sponsored listing or sponsored link in connection with any of the CAA Marks;

4) ME Technology will transfer ownership of the domain name *www.caagearup.com* to CAA Industries;

5) ME Technology will transfer possession of the website content of *www.caagearup.com* to CAA Industries;

6) ME Technology's new website will be completely remediated to remove all use of the CAA Marks; and,

7) ME Technology will provide a detailed accounting of all sales of the infringing goods.

***If you fail to so advise us by that date, CAA Industries may, without further notice to you, take such action as it deems advisable to assert its right to recover damages, lost profits, and the costs thereof, and to otherwise protect its interests. CAA Industries may also refer this matter to the FBI or other authorities for criminal enforcement***.

Oz Dec. Ex. 23 at 2 (emphasis added). CAA Israel's threat to "refer this matter to the FBI or other authorities for criminal enforcement" if CAA USA did not meet its demands was textbook criminal extortion under both federal law and Florida law. 18 U.S.C. § 875(d) ("Whoever, *with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing* any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or *any threat to accuse the addressee or any other person of a crime*, *shall be fined under this title or imprisoned* not more than two years, or both." (emphasis added)); § 836.05, Fla. Stat. ("Whoever, either verbally or *by a written or printed communication*, *maliciously threatens to accuse another of any crime or offense*, or by such communication maliciously threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of

chastity to another, *with intent thereby to extort money or any pecuniary advantage whatsoever*, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will, *shall be guilty of a felony of the second degree*, punishable as provided in s. 775.082, s. 775.083, or s. 775.084." (emphasis added)).  The Court should not permit CAA Industries to benefit from its illegal, extortionist tactics.[17]

In addition, CAA Israel is seeking to enjoin CAA USA from selling the MCK because of an alleged patent violation when it is clear that every sale of a Micro Roni Stabilizer is a violation of SB Tactical's patent.  CAA Israel should not be granted equitable relief when it is acting with such clear bad faith.

Finally, as noted, CAA Israel's attempt to shut down CAA USA with this injunction is simply the latest attempt at unfair trade activities.  CAA Israel has previously committed trade defamation against CAA USA.  For this and the reasons above, the motion for preliminary injunction should be denied because Plaintiffs have unclean hands.

## VIII.   THE MOTION MUST BE DENIED BECAUSE IT DEPENDS ENTIRELY ON THE DECLARATION OF MOSHE OZ, WHICH DECLARATION MUST BE STRICKEN FOR FAILURE TO COMPLY WITH 28 U.S.C. § 1746.

The Oz Declaration fails to comply with several verification requirements under 28 U.S.C. § 1746, which states:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary

---

[17]   In addition to CAA Industries' violation of criminal statutes, counsel for CAA Industries also violated his ethical obligations under the ethical rules of both Florida and New York.  R. Regulating Fla. Bar 4-3.4(g) ("A lawyer must not . . . present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."); N.Y. R. Prof. Conduct 3.4(e) ("A lawyer shall not . . . present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter.").

GUNSTER, YOAKLEY & STEWART, P.A.

public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the ***unsworn declaration***, certificate, verification, or statement, ***in writing of such person which is subscribed by him, as true under penalty of perjury, <u>and dated</u>, in substantially the following form***:

> **(1)** ***If executed without the United States***: "I declare (or certify, verify, or state) ***under penalty of perjury <u>under the laws of the United States of America</u>*** that the foregoing is true and correct. Executed on (date).
> (Signature)".

> **(2)** If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).
> (Signature)".

28 U.S.C. § 1746 (emphasis and underlining added). Under the terms of Section 1746, the Oz Declaration is deficient in at least three respects.

First, it does not comply with the requirement to state that the declaration is made under penalty of perjury "under the laws of the United States of America." *See id*; *see* Oz Decl., p. 19 ("To the best of my knowledge, I declare the foregoing to be true and correct *under penalty of perjury*." (emphasis added)). With regard to this requirement, Section 1746 specifically distinguishes between declarations made within the United States and those made outside the United States. Moshe Oz resides in Israel, so the Oz Declaration was presumably made in Israel, *i.e.*, outside the United States, and is subject to the requirement that the declarant state that the declaration was made under penalty of perjury "under the laws of the United States." The Oz Declaration is devoid of the required language. One recent federal case, dealing with this precise omission from an affidavit executed outside the United States, explained the importance of this requirement:

> [A]lthough the Affidavits provide that they are made under penalty of perjury . . . they do not indicate that they were made subject to

the penalties of perjury "under the laws of the United States," as required by 28 U.S.C. § 1746(1). . . . [T]he Affidavits were drafted and executed in the United Kingdom. . . . Therefore, while the Affidavits need not contain the exact language found within 28 U.S.C. § 1746(1), they must substantially follow the form set forth in that section. 28 U.S.C. § 1746. *In 28 U.S.C. § 1746, the form used for declarations or affidavits executed outside the United States is only distinguishable from those executed within the United States by requiring language specifying that the affiant or declarant is subject to the penalties of perjury "under the laws of the United States of America." See id. Therefore, a declaration or affidavit executed outside of the United States must include substantially similar language in order to comply with 28 U.S.C. § 1746.*

. . .

*Because the Affidavits do not substantially state that they were made pursuant to the penalties of perjury "under the laws of the United States of America," the Affidavits do not comply with the requirements of 28 U.S.C. § 1746. The absence of this language is critical because without it, the JLT Witnesses have not subjected themselves to the perjury laws of the United States, and there is no way for the Court to enforce such perjury laws to ensure the veracity of the Affidavit*s.

*Eli Lilly & Co. v. Arch Ins. Co.*, 113CV01770LJMTAB, 2017 WL 2930571, at *5–6 (S.D. Ind. July 10, 2017) (emphasis added). Thus, like the affidavits in *Eli Lilly*, the Oz Declaration is deficient because it fails to subject Mr. Oz to the penalty of perjury "under the laws of the United States of America." *See* 28 U.S.C. § 1746(1).

Second, the Oz Declaration is deficient because it fails to include a date, another explicit requirement of Section 1746. Oz Decl., p. 19 (containing blank line for date); 28 U.S.C. § 1746 (explaining that the unsworn declaration should be "in writing of such person which is subscribed by him, as true under penalty of perjury, *and dated*" (emphasis added)).

Third, the Oz Declaration is deficient because he qualifies the veracity of his declaration by stating that his statements are "[t]o the best of [his] knowledge . . . ." Oz Decl., p. 19. In

describing, with specificity, the language that should be contained in a declaration, Section 1746 provides no indication that a declarant may include such qualifying language. Moreover, this qualifying language creates further concerns about the veracity of a declaration that is already the subject of veracity concerns, given its failure to subject the declarant to the perjury laws of the United States.

Each of the above deficiencies is substantial in its own right, and taken together the deficiencies create even more serious doubts regarding the admissibility and reliability of the declaration. By submitting this declaration to the Court, Plaintiffs attempt to circumvent, at every turn, the important requirements set forth in Section 1746. The Court should not permit Plaintiffs to ignore the statute's requirements. Pursuant to Section 1746, the Court should consider the Oz Declaration a nullity and should not rely on it for any purpose.

## IX. ANY PRELIMINARY INJUNCTION MUST BE CONDITIONED ON A SUBSTANTIAL BOND.

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The purpose of the bond "is to enable a restrained or enjoined party to secure indemnification for any costs . . . and any damages that are sustained during the period in which a wrongfully issued equitable order remains in effect." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2954 (3d ed. Aug. 2019 update). "Accordingly, the judge usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained." *Id.*

GUNSTER, YOAKLEY & STEWART, P.A.

Entry of a preliminary injunction would likely put CAA USA, a company presently valued at approximately $12 million, out of business. Tiraturian Dec. ¶ 43. CAA USA's 25 factory employees will lose their jobs, and CAA USA's majority shareholders—who paid $3 million to acquire 51 percent of the company four years ago—will lose their initial investment and the millions of dollars in value they have added to the company since then. *Id.* The Court should not preliminarily enjoin CAA USA for the reasons set forth above, but if it does, it should set a bond of $12 million to cover the likely incidental and consequential costs CAA USA is likely to incur when it goes out of business as a consequence of the wrongful restraint. 11A Charles Alan Wright et al., Federal Practice and Procedure § 2954.

## CONCLUSION

A preliminary injunction is an extraordinary remedy. Plaintiffs have not met their heavy burden in establishing their likelihood of success on the merits or their entitlement to this exceptional relief. The Court should deny Plaintiffs' motion for preliminary injunction accordingly.

Dated: September 10, 2019

Respectfully submitted,

GUNSTER, YOAKLEY & STEWART, P.A.
Attorneys for Defendant ME Technology, Inc.

By: *s/ William K. Hill*
       William K. Hill
       Florida Bar No. 747180
       Timothy J. McGinn
       Florida Bar No. 1000377
       Gunster, Yoakley & Stewart, P.A.
       600 Brickell Avenue, Suite 3500
       Miami, Florida 33131
       305-376-6000 fax 6010
       whill@gunster.com
       tmcginn@gunster.com