EXHIBIT "6"

# LICENSE AGREEMENT

THIS AGREEMENT is entered into this 21st day of October, 2015 by and between Command Arms Accessories, LLC a Pennsylvania Limited Liability Company with offices at 1208 Branagan Drive, Tullytown, Pennsylvania 19007 ("CAA LLC"), ME Technology, Inc. dba Command Arms Accessories a New York Corporation with offices at 911 William Leigh Drive, Tullytown, Pennsylvania 19007 ("CAA USA") and CAA Industries Ltd., an Israeli Limited Company with offices at 1 HaBonim, Kiryat Gat Industrial Zone, 8258201 Israel ("CAA ISRAEL", each individually shall be referred to as "LICENSEE" and collectively "LICENSEES"), and NST Global, LLC dba SB Tactical, a Florida Limited Liability Company with offices at 1225 Darlington Oak Circle NE, St. Petersburg, Florida 33703 ("LICENSOR").

## WITNESSETH:

WHEREAS, LICENSOR is the sole and exclusive owner of the trademarks and United States Trademark Registrations identified more fully in Schedule A attached hereto (collectively, the "Trademarks"); and

WHEREAS, LICENSOR is the sole and exclusive owner of United States Letters Patents identified more fully in the attached Schedule A (collectively, the "Patents"); and

WHEREAS, LICENSOR has the power and authority to grant to LICENSEES the right, privilege, and license to use the Trademarks and Patents on or in association with the development and sale of the types of products listed in the attached Schedule A (the "Licensed Products"); and

WHEREAS, LICENSEES have represented that they have the ability to manufacture, market, and distribute the Licensed Products in the countries identified in Schedule A attached hereto (the "Territory") and to use the Trademarks on or in association with the Licensed Products; and

WHEREAS, LICENSEES desire to obtain from LICENSOR a nonexclusive license to use, manufacture, have manufactured, and sell Licensed Products in the Territory and to use the Trademarks on or in association with the Licensed Products; and

WHEREAS, each LICENSEE and LICENSOR are in agreement with respect to the terms and conditions upon which LICENSEES shall use the Trademarks;

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do promise and agree as follows.

## 1. LICENSE GRANT

A. LICENSOR hereby grants to LICENSEES, for the Term of this Agreement as recited in Schedule A attached hereto, a nonexclusive license to use the Trademarks on or in association with the Licensed Products in the Territory, as well as on packaging, promotional, and advertising material associated therewith.

B. LICENSOR hereby grants to LICENSEES, upon and subject to all the terms and conditions of this Agreement, a nonexclusive license under the Patents to make, use, and sell the systems and methods embodying the invention(s) described in the Patents, for the life of such Patents, in the Licensed Territory, as set forth in the attached Schedule A.

C. As used in the Agreement, the Patents shall mean and include the United States Letters Patents identified more fully in the attached Schedule A, along with any patents on improvements thereof and any renewals, divisions, reissues continuations, or extensions thereof.

D. LICENSOR hereby grants to LICENSEES, for the Term of this Agreement as recited in Schedule A attached hereto, the nonexclusive right and license to use, manufacture, have manufactured, sell, distribute, and advertise the Licensed Products in the Territory. It is understood and agreed that this license shall pertain only to the Trademarks, the Patents, and the Licensed Products and does not extend to any other mark, product or service.

E. LICENSEES may not grant any sublicenses under this agreement.

## 2. TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in Schedule A attached hereto (the "Term").

## 3. COMPENSATION

A. In consideration for the licenses granted hereunder, each LICENSEE agrees to pay to LICENSOR during the Term of this Agreement, a royalty in the amount recited in Schedule A attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products, and agrees to provide LICENSOR with other good and valuable consideration expressly set forth in this agreement, the receipt of which is hereby acknowledged by LICENSOR.

B. Only one royalty shall be paid hereunder as to Licensed Product whether or not it is covered by more than one (1) claim of a Patent, by the claims of more than one (1) Patent, or by the claims of Patents of more than one (1) country or by more than one (1) Trademark.

C. The Royalty owed to LICENSOR shall be payable on the last day of the month based on the Net Sales of each LICENSEE. "Net Sales" shall mean LICENSEE's gross sales (the gross number of units billed to customers) of Licensed Products, less any *bona fide* returns (net of all returns actually made or allowed as supported by credit memoranda actually issued to the customers). The Royalty owed shall be paid no later than sixty (60) days after Net Sales, upon the effective date of this Agreement.

D. With each Royalty Payment, the LICENSEE shall each provide LICENSOR with a written royalty statement in a form acceptable to LICENSOR. Such royalty statement shall be certified as accurate by a duly authorized officer of the LICENSEE, reciting on a country by country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed customers less discounts, allowances, returns, and reportable sales for each Licensed

Product. Such statements shall be furnished to LICENSOR whether or not any Licensed Products were sold during the Royalty Period.

E. A Royalty obligation shall accrue upon the sale of the Licensed Products regardless of the time of collection by the LICENSEE. For purposes of this Agreement, a Licensed Product shall be considered "sold" upon the date when such Licensed Product is billed, invoiced, shipped, or paid for, whichever event occurs first.

F. If the LICENSEE sells any Licensed Products to any party affiliated with the LICENSEE, or in any way directly or indirectly related to or under the common control with the LICENSEE, such a sale shall be included in the Net Sales.

G. The receipt or acceptance by LICENSOR of any royalty statement, or the receipt or acceptance of any royalty payment made, shall not prevent LICENSOR from subsequently challenging the validity or accuracy of such statement or payment.

H. Upon expiration or termination of this Agreement, all Royalty obligations, shall be accelerated and shall immediately become due and payable.

I. LICENSEE's obligations for the payment of a Royalty shall survive expiration or termination of this Agreement and will continue for so long as LICENSEE continues to manufacture, sell, or otherwise market the Licensed Products.

J. All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties.

K. Late payments shall incur interest at the rate of TWO PERCENT (2%) per month from the date such payments were originally due.

## 4. AUDIT

A. LICENSOR shall have the right, upon reasonable notice, to inspect each LICENSEE's books and records and all other documents and material in the LICENSEE's possession or control with respect to the subject matter of this Agreement. LICENSOR shall have free and full access thereto for such purposes and may make copies thereof. In no event shall LICENSOR have the right to examine information with respect to the LICENSEE's costs, pricing formulas, or percentages of markup. Any inspection hereunder shall take place at the LICENSEE'S offices upon a notice given no less than forty-eight (48) hours in advance of the commencement time. To the extent commercially feasible, the notice shall specify the type of documentation to be examined; however, nothing herein shall be deemed to prevent LICENSOR from requesting and examining additional information which may be deemed relevant during the inspection. LICENSEE shall be required to provide only that documentation, which is in its possession and control. LICENSEE shall not be deemed in breach of this paragraph to the extent that it requests reasonable extension of time to provide documentation, which is in its control but not in its possession (including without limitation, the documentation held by its accountants and/or counsel).

B. In the event that such inspection reveals a discrepancy in the amount of Royalty owed LICENSOR from what was actually paid, the LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of TWO PERCENT (2%) per month. In the event that such discrepancy averages in excess of TWO THOUSAND FIVE HUNDRED UNITED STATES DOLLARS ($2,500.00) per monthly royalty statement, the LICENSEE shall also reimburse LICENSOR for the cost of such inspection.

C. All books and records relative to each LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection in the United States for at least three (3) years after termination of this Agreement.

D. In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of the LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be retained in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party at any time, or without the prior express written permission of the LICENSEE, unless required by law (in which case LICENSEE shall be given sufficient advance written notice of subpoena or other legal requirement to produce LICENSEE'S book and records so that it may seek to prevent or limit the disclosure thereof). It is understood and agreed, however, that such information may be used in any proceeding based on the LICENSEE's failure to pay its actual Royalty obligation.

## 5. WARRANTIES AND OBLIGATIONS

A. LICENSOR represents and warrants that, to the best of its knowledge and belief, it is the owner of the entire right, title, and interest in and to the Trademarks; that it has the right and power to grant the licenses granted herein; that there are no other agreements with any other party in conflict with such grant. LICENSOR further represents and warrants that it has the right and power to grant the licenses granted herein and that there are no other agreements with any other party in conflict herewith.

B. LICENSOR further represents and warrants that, to the best of its knowledge and belief, LICENSEES' contemplated use of the Trademarks as represented to LICENSOR does not infringe any valid right of any third party.

C. LICENSOR represents and warrants that, to the best of its knowledge and belief, it is the owner of the entire right, title, and interest in and to the Patents; that it has the right and power to grant the licenses granted herein; that there are no other agreements with any other party in conflict with such grant; and that it knows of no prior art that would invalidate the Patents.

D. LICENSOR further represents and warrants that, to the best of its knowledge and belief, LICENSEES contemplated use of the Patents as represented to LICENSOR does not infringe any valid rights of any third party, and that there are no actions for infringement against LICENSOR with respect to items it manufactures and sells embodying the invention of the Patents anywhere in the world.

E. LICENSEES represent and warrants that they will use their best efforts to promote, market, sell, and distribute the Licensed Products.

F. LICENSEES shall be solely responsible for the manufacture, production, sale, and distribution of the Licensed Products and will bear all related costs associated therewith.

G. In the event that LICENSOR shall develop any improvement to the apparatus claimed in the Patents, and later incorporated in an improved or modified product by LICENSEE, such improved product shall be subject to the payment of a Royalty. All improvement made only to the apparatus disclosed and described in the Patents by the LICENSEE shall be promptly disclosed to LICENSOR and shall hereinafter become the property of LICENSOR. LICENSEE hereby agrees to execute any and all documents necessary to perfect LICENSOR's rights in such improvements. This section is specific only to the apparatus disclosed and described in the Patents.

H. For the duration of this Agreement, the LICENSEE shall not to manufacture, sell, offer to sell, import, or distribute any product that is a replacement for or competitive to the Licensed Products.

## 6. NOTICES, QUALITY CONTROL AND SAMPLES

A. The licenses granted hereunder are conditioned upon LICENSEES full and complete compliance with the marking provisions of the patent, trademark, and copyright laws of the United States and other countries in the Territory.

B. The Licensed Products, as well as all promotional, packaging, and advertising material relative thereto, shall include all appropriate legal notices as required by LICENSOR. Such notices shall at least include a notice that the Licensed Products are "manufactured under license from NST Global, LLC" or similar notice with prior approval from LICENSOR.

C. The Licensed Products shall be of a high quality which is at least equal to comparable products previously manufactured and marketed by LICENSEES under the Trademarks and in conformity with a standard sample approved by LICENSOR.

D. If the quality of a class of the Licensed Products falls below such a production-run quality, as previously approved by LICENSOR, LICENSEES shall use its best efforts to restore such quality. In the event that LICENSEES has not taken appropriate steps to restore such quality within ninety (90) days after notification by LICENSOR, LICENSOR shall have the right to terminate this Agreement and require that the LICENSEES cease using the Trademarks.

E. Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEES shall submit to LICENSOR, at no cost to LICENSOR and for approval as to quality, six (6) sets of samples of all Licensed Products which LICENSEES intend to manufacture and sell, and one (1) complete set of all promotional and advertising material associated therewith. Failure of LICENSOR to approve or disapprove such samples within ten (10) working days after receipt thereof will be deemed approval. If LICENSOR should disapprove any sample, it shall provide specific reasons for such disapproval. Once such samples have been approved by LICENSOR,

LICENSEES shall not materially depart therefrom without LICENSOR's prior express written consent, which shall not be unreasonably withheld.

F. LICENSEES shall submit to LICENSOR all marketing and advertising materials prior to any use of such materials. Failure of LICENSOR to approve or disapprove of marketing or advertising materials or provide substitutes within thirty (30) working days after receipt thereof will be deemed approval.

G. At least once during each calendar year, LICENSEES shall submit to LICENSOR, for approval, an additional twelve (12) sets of samples.

H. The LICENSEES agree to permit LICENSOR, or its representative, to inspect the facilities where the Licensed Products are being manufactured and packaged.

### 7. NOTICE AND PAYMENT
A. Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B. Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

### 8. PATENTS, TRADEMARKS, AND COPYRIGHTS
A. LICENSOR shall seek, obtain and, during the Term of this Agreement, maintain in its own name and at its own expense, appropriate protection for the Trademarks in the United States. LICENSOR shall have no obligation whatsoever to obtain and/or maintain protection for the Trademarks in countries outside the United States.

B. The decision whether to obtain and/or maintain protection for the Trademarks in countries outside the United States shall be at LICENSOR's sole discretion and expense.

C. It is understood and agreed that LICENSOR shall retain all right, title, and interest in the Trademarks as well as any modifications made to the Trademarks by LICENSEES.

D. The parties agree to execute any documents reasonably requested by the other party to effect any of the above provisions.

E. Each LICENSEE acknowledges LICENSOR's exclusive rights in the Trademarks and, further, acknowledges that the Trademarks are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Trademarks or the validity thereof.

F. Each LICENSEE acknowledges that the Trademarks have acquired secondary meaning.

G. Each LICENSEE agrees that its use of the Trademarks inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Trademarks.

## 9. TERMINATION

The following termination rights are in addition to the termination rights that may be provided elsewhere in this Agreement:

A. LICENSOR has the right to terminate this Agreement by giving written notice to LICENSEES, after an opportunity to correct within ninety (90) days of notice, in the event that any LICENSEE:

(1) fails to make Payment for Royalty as described above; or

(2) files a petition in bankruptcy or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or if the LICENSEE discontinues its business or a receiver is appointed for the LICENSEE's business and such receiver is not discharged within ninety (90) days; or

(3) breaches any of the provisions of this Agreement relating to the unauthorized assertion of rights in the Trademarks; or

(3) breaches any of the provisions of this Agreement relating to the unauthorized assertion of rights in the Patents; or

(4) fails, after receipt of written notice from LICENSOR, to immediately discontinue the distribution or sale of the Licensed Products or the use of any packaging or promotional material which does not contain the requisite legal legends.

## 10. POST TERMINATION RIGHTS

A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEES shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on-hand (the "Inventory").

B. Upon expiration or termination of this Agreement, except for any reason listed in Section 9 of this Agreement, LICENSEES shall be entitled, for an additional period of eighteen (18) months and on a nonexclusive basis, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days after the close of the said eighteen (18) month period.

C. Upon the expiration or termination of this Agreement, all of the rights of LICENSEES under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEES shall immediately discontinue all use of the Trademarks at no cost whatsoever to LICENSOR.

D. Upon termination of this Agreement for any reasons whatsoever, each LICENSEE agrees to immediately return to LICENSOR all material relating to the Trademarks including, but not

limited to, all artwork, color separations, prototypes and the like, as well as any market studies or other tests or studies conducted by the LICENSEE with respect to the Trademarks, at no cost whatsoever to LICENSOR.

## 11. GOOD WILL
Each LICENSEE recognizes the value of the good will associated with the Trademarks and acknowledges that the Trademarks and all rights therein including the good will pertaining thereto, belong exclusively to LICENSOR.

## 12. INFRINGEMENTS
A. LICENSOR shall have the sole and exclusive right, in its discretion, to institute and prosecute lawsuits against third persons for infringement of the rights licensed in this Agreement. All sums recovered in any such lawsuits, whether by judgment, settlement or otherwise, in excess of the amount of reasonable attorneys' fees and other out of pocket expenses of such suit, shall be retained solely by LICENSOR.

B. LICENSEES agree to fully cooperate with LICENSOR in the prosecution of any such suit against a third party and shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. The LICENSOR shall reimburse the LICENSEES for any expenses incurred as a result of such cooperation.

## 13. INDEMNITY
A. Each LICENSEE agrees to defend and indemnify LICENSOR, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on the manufacture or sale of the Licensed Products including, but not limited to, actions founded on product liability.

B. LICENSOR agrees to defend and indemnify LICENSEES, their officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) against any and all claims in relation to any alleged United States patent, United States trademark / service mark, or United States copyright infringement or unfair business practice resulting from or relating to the permitted use of the Licensed Patents or the Licensed Trademarks in conjunction with the Licensed Products in accordance with this Agreement; provided, however, that LICENSEE gives LICENSOR: (i) a written notice of any relevant action or allegation within five (5) days following receipt of notice thereof; (ii) sole control of the defense and settlement of such claims; and (iii) assistance reasonably requested by LICENSOR at LICENSOR'S expense. In the event that a final injunction is issued against the use of any Licensed Product or an element of intellectual property associated therewith or if, in the LICENSOR'S opinion, any element of Licensed Products is likely to become the subject of a claim of infringement, LICENSOR may, at its sole option and expense: (a) obtain for Licensee the right to continue using such element or (b) replace or modify such element so that it becomes non-infringing.

## 14. INSURANCE
LICENSEES shall, throughout the Term of the Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business in Pennsylvania and Florida, standard Product Liability Insurance naming LICENSOR as an additional named

insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in Schedule A attached hereto. The policy shall provide for ten (10) days notice to LICENSOR from the insurer by Registered or Certified Mail, return receipt requested, in the event of any modification, cancellation or termination thereof. LICENSEES agree to furnish LICENSOR a certificate of insurance evidencing same within thirty (30) days after execution of this Agreement and, in no event shall LICENSEES manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

### 15. JURISDICTION AND DISPUTES
A. This Agreement shall be governed in accordance with the laws of the State of Florida, United States of America.

B. Except as provided for herein, any dispute or disagreement which may arise between LICENSOR and any LICENSEE in connection with either any interpretation of this Agreement or the performance or nonperformance thereof shall be settled by a non-binding mediation, and if not resolved initially then all disputes relating to and the enforcement of any obligations arising under this Settlement Agreement shall be subject to the exclusive jurisdiction and venue of the state or federal courts located in the State of Florida and that the Parties shall be subject to the personal jurisdiction of those courts.

### 16. AGREEMENT BINDING ON SUCCESSORS
The provisions of this Agreement shall be binding on and shall inure to the benefit of the parties hereto, and their heirs, administrators, successors, and assigns.

### 17. WAIVER
No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

### 18. SEVERABILITY
If any term, clause, or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

### 19. NO JOINT VENTURE
Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

### 20. ASSIGNABILITY
The license granted hereunder is personal to each LICENSEE and shall not be assigned by any act of the LICENSEE or by operation of law unless in connection with a transfer of substantially all of the assets of the LICENSEE or with the consent of LICENSOR.

## 21. GOVERNMENTAL APPROVAL

As promptly as possible after execution of this Agreement, LICENSEES agree to submit copies of this Agreement to any governmental agency in any country in the Territory where approval of a license agreement is necessary and agrees to promptly prosecute any such application diligently. This Agreement shall only become effective in such country or countries upon receipt of appropriate approval from the applicable governmental agency.

## 22. GOVERNING LANGUAGE

This Agreement is in the English language. No translation of this Agreement into any language other than English shall be considered in the interpretation thereof, and in the event that any translation of this Agreement is in conflict with the English language version, the English version shall govern.

## 23. BLOCKED CURRENCY

A. In the event that any payment required to be made to LICENSOR pursuant to this Agreement cannot be made when due because of the exchange control of any country in the Territory and such payment remains unpaid for twelve (12) months, LICENSOR may, by notice served to the LICENSEE, elect any of the following alternative methods of handling such payment:

(1) if the currency can be converted into currency other than U.S. Dollars for purposes of foreign remittance, LICENSOR may elect to receive such payment in any such currencies as it may specify and, in such case, the amount payable in the foreign currency so selected shall be determined by reference to the then existent legal rate of exchange which is most favorable to LICENSOR.

(2) LICENSOR may elect to have payment made to it in the local currency, deposited to the credit of LICENSOR in a bank account in such country designated by LICENSOR, in which event LICENSEE shall furnish to LICENSOR evidence of such deposit.

(3) LICENSOR may elect to receive payment in shares of stock in the LICENSEE corporation at such price as LICENSOR and LICENSEE may agree to at such time.

B. All expenses of currency conversion and transmission shall be borne by LICENSEE and no deduction shall be made from remittances on account of such expense. LICENSEE from time to time may prepare all applications, reports or other documents which may be required by the government of the applicable country in order that remittances may be made in accordance with this Agreement.

## 24. EXPORT CONTROL

Anything contained in this Agreement to the contrary notwithstanding, the obligations of the parties hereto and of the Subsidiaries of the parties shall be subject to all laws, present and future and including export control laws and regulations, of any government having jurisdiction over the parties hereto or the Subsidiaries of the parties, and to orders, regulations, directions, or requests of any such government. Each party shall undertake to comply with and be solely responsible for complying with such laws applicable to such party.

## 25. TAXES AND GOVERNMENTAL APPROVALS

A. LICENSEES shall be solely responsible for the payment of any and all taxes, fees, duties, and other payments incurred in relation to the manufacture, use and sale of the systems and methods of the Patents or Licensed Products.

B. LICENSEES shall be solely responsible for applying for and obtaining any approvals, authorizations, or validations necessary to effectuate the terms of this Agreement under the laws of the appropriate national laws of each of the countries in the Licensed Territory.

## 26. CONFIDENTIALITY

A. "Confidential Information" shall mean any confidential technical data, trade secret, know-how or other confidential information disclosed by any party hereunder in writing, orally, or by drawing or other form and which shall be marked by the disclosing party as "Confidential" or "Proprietary." If such information is disclosed orally, or through demonstration, in order to be deemed Confidential Information, it must be specifically designated as being of a confidential nature at the time of disclosure and reduced in writing and delivered to the receiving party within ninety (90) days of such disclosure.

B. Notwithstanding the foregoing, Confidential Information shall not include information which: (i) is known to the receiving party at the time of disclosure or becomes known to the receiving party without breach of this Agreement; (ii) is or becomes publicly known through no wrongful act of the receiving party or any subsidiary of the receiving party; (iii) is rightfully received from a third party without restriction on disclosure; (iv) is independently developed by the receiving party or any of its subsidiary; (v) is furnished to any third party by the disclosing party without restriction on its disclosure; (vi) is approved for release upon a prior written consent of the disclosing party; (vii) is disclosed pursuant to judicial order, requirement of a governmental agency or by operation of law.

C. The receiving party agrees that it will not disclose any Confidential Information to any third party and will not use Confidential Information of the disclosing party for any purpose other than for the performance of the rights and obligations hereunder during the term of this Agreement and for a period of three (3) years thereafter, without the prior written consent of the disclosing party. The receiving party further agrees that Confidential Information shall remain the sole property of the disclosing party and that it will take all reasonable precautions to prevent any unauthorized disclosure of Confidential Information by its employees. No license shall be granted by the disclosing party to the receiving party with respect to Confidential Information disclosed hereunder unless otherwise expressly provided herein.

D. Upon the request of the disclosing party, the receiving party will promptly return all Confidential Information furnished hereunder and all copies thereof.

E. The Parties agree that all publicity and public announcements concerning the formation and existence of this Agreement shall be jointly planned and coordinated by and among the Parties. Neither party shall disclose any of the specific terms of this Agreement to any third party without the prior written consent of the other party, which consent shall not be withheld unreasonably.

Notwithstanding the foregoing, any party may disclose information concerning this Agreement as required by the rules, orders, regulations, subpoenas or directives of a court, government or governmental agency, after giving prior notice to the other party.

F. If a party breaches any of its obligations with respect to confidentiality and unauthorized use of Confidential Information hereunder, the non-breaching party shall be entitled to equitable relief to protect its interest therein, including but not limited to injunctive relief, as well as money damages notwithstanding anything to the contrary contained herein.

G. Except as otherwise set forth in this Agreement, neither party will make any public statement, press release or other announcement relating to the terms of or existence of this Agreement without the prior written approval of the other.

## 27. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

**NST Global, LLC dba SB Tactical**

By: Alessandro Bosco
Title: Chief Executive Officer
Date:

**ME Technology, Inc. dba Command Arms Accessories**

By: Thomas K. McCrossin
Title: Chief Executive Officer
Date:

**Command Arms Accessories, LLC**

By: Pidsa Oz
Title: Member
Date: 26/10/2015

**CAA Industries Ltd.**

By: Mikey Hartman
Title: Chief Executive Officer
Date:

12

# SCHEDULE A

## 1. Licensed Trademarks
The following Trademarks form part of this Agreement:
   a) SB word mark: U.S. Trademark Registration No. 4,616,046, for use with Stabilizing braces for firearms.
   b) STABILIZING BRACE word mark: U.S. Trademark Application No. 86/598,056, for use with Accessories for firearms.

## 2. Licensed Patents
The following Patents form part of this Agreement:
   a) U.S. Patent No. 8,869,444 titled "Forearm-gripping stabilizing attachment for a handgun"
   b) Any U.S. Design Patent Application filed by NST Global, LLC for any design designated in writing by NST Global, LLC to have been created for use with the RONI Recon product.

## 3. Licensed Products
The following Licensed Products form part of this Agreement: wrist mounted stabilizing firearm accessories consisting of a rubberized shell that fits around the wrist, a mounting tube and a strap that tightens the rubberized shell, designed to provide additional support, control and stability when attached to firearms, namely, stabilizing braces, for use with LICENSEES' RONI Recon model of products.

## 4. Territory
The following countries shall constitute the Territory:
   a) United States of America
   b) Israel.

## 5. Term
This Agreement shall commence on the date executed by both parties and shall extend for an initial Term of: Four (4) years.

LICENSOR hereby grants LICENSEES a one-time automatic renewal of the Agreement for an additional four (4) years after the expiration of the initial Term of four (4) years. Any changes to this initial Agreement must be made in writing within sixty (60) days of the renewal period.

## 6. Royalty
LICENSEES shall pay the following royalty rate: Twenty Five United States Dollars ($25.00) per unit sold.

## 7. Product Liability Insurance
LICENSEES shall maintain a One Million United States Dollars ($1,000,000.00) combined single limit, with a deductible amount not to exceed Ten Thousand United States Dollars ($10,000.00), for each single occurrence for bodily injury and/or for property damage.