UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NE YORK

CASE NO. 1:19-cv-06982-LLS

COMMAND ARMS ACCESSORIES, LLC
And CAA INDUSTRIES, LTD.

    Plaintiffs,

vs.

ME TECHNOLOGY, INC.,

    Defendant.

_____/

## **DECLARATION OF MICHAEL TIRATURIAN**

1. My name is Michael ("Mika") Tiraturian. Since 2015, I have been the Senior Vice President of ME Technology, Inc. d/b/a/ CAA USA. I am an American citizen and a resident of the State of Florida.

2. CAA USA is the dba of ME Technology, Inc., a New York corporation registered to do business in Florida, with its principal place of business for both corporate activities and operations in Pompano Beach, Florida. Ex. 1. CAA USA also uses the more complete name, Command Arms Accessories, a fictitious name registered by ME Technology. Ex. 2. The company does not and has never had any operations in New York. Prior to 2016, it operated in Pennsylvania.

3. In early 2016, we moved the company to its new headquarters in Florida. Later that year, Peter Viskovatykh and I acquired the majority of the CAA USA shares (as explained below). We have operated continuously and exclusively in Florida since early 2016. Neither Eldad Oz nor Moshe Oz has any operational responsibility or control of CAA USA, although Eldad Oz

1

managed the company as President until December of 2016, when Mikey Hartman moved to Florida to become the full-time CEO.

4. CAA USA for many years operated as the exclusive distributor in the United States for the sale of firearms accessories manufactured in Israel by its sister company CAA Industries, Ltd. ("CAA Israel"). The two companies operated essentially as a single operating entity, with CAA Israel manufacturing the product and CAA USA selling in the United States.

5. CAA USA has been using the name CAA exclusively for its business, with the full knowledge of CAA Israel, for many years. In fact, since I became involved in 2015, everyone in the business has known us as CAA, never as ME Technology. Even our invoices, business cards, email signatures, letterheads, booths at shows, have used CAA, not ME Technology. And for many years prior, ME Technology always operated under the name CAA.

6. CAA Israel is and has been well aware for years that CAA USA uses and has used the name Command Arms Accessories for many years. The attached licensing agreement involving SB Tactical identifies all three of the parties to this lawsuit as follows: plaintiff Command Arms Accessories, LLC is referred to as "CAA LLC;" defendant ME Technology, Inc. dba Command Arms Accessories is referred to as "CAA USA;" and plaintiff CAA Industries, Ltd. is referred to as "CAA Israel." Ex. 3. Plaintiffs have known for a long time and never raised an issue that CAA USA has been using the names Command Arms Accessories and CAA USA for many years.

7. In 2015, Sky of Blue PTE Ltd., a Singapore company, entered into stock purchase agreements to acquire 51% of the shares of CAA Israel and CAA USA (including Stellcon USA, Inc.) from Moshe and Eldad Oz for a total purchase price of approximately $8 million. I was personally involved in that acquisition and it was always presented to the buyer that the purchase

was for 51% of CAA without specifying which CAA – U.S. or Israel, i.e., 51% of both CAA companies were sold in that deal. In fact, the due diligence report prepared by Price Waterhouse Coopers was titled simply "Project CAA," and identified the companies together as "the Targets." Ex. 4. The sale price was allocated as approximately $5 million for CAA Israel, $2.6 million for CAA USA and $400,000 for an affiliate of CAA USA, Stellcon USA, Inc. ("Stellcon"), which holds the US licenses necessary for CAA USA's operations. Sky of Blue PTE Ltd. ultimately did not consummate the acquisition of CAA USA, and assigned its rights to the acquisition of CAA USA and Stellcon to Peter Viskovatykh and me, with Moshe and Eldad Oz's consent. As a result, Mr. Viskovatykh and I became the owners of the majority of the stock of CAA USA (25.5% each), with Moshe Oz and Eldad Oz each retaining 24.5%.

8. With regard to CAA Israel, Sky of Blue PTE Ltd. later transferred its 51% shares of the company to its parent company Comaren Enterprises Corp., a British Virgin Islands company, which is now the majority owner of CAA Israel.

9. CAA Israel is governed by a board of directors consisting of four board members, two appointed by the majority shareholder and two appointed by the minority shareholders. Cobi Moise and I are the directors appointed by the majority shareholder, Comaren Enterprises, and Eldad and Moshe Oz are the directors appointed by the minority shareholders, i.e., themselves. Thus, I am a member of the board of directors of one of plaintiffs, CAA Israel.

10. Moshe Oz holds himself out as the "founder" and "president" of CAA Israel. Certainly, the term "founder" is legally meaningless. As for the title president, it is not a title of significance with regard to the authority to manage and govern CAA Israel. As set forth in the CAA Industries Shareholders Agreement ("Shareholders Agreement"), CAA Israel is governed by its board of directors with regard to "any matter that does not require Shareholder Consent

under this agreement, the Articles and/or Applicable Law. Ex. 5, § 4.14. In addition, among other matters, the board specifically has exclusive authority over the following:

-- entering into, altering in any respect or terminating any transactions in respect of any Intellectual Property Rights (Shareholders Agreement , §4.14.6)

-- entering into or varying any contract, agreement or other arrangement with any of the Shareholders or any of such Shareholder's Affiliates (Shareholders Agreement, §4.14.7);

-- entering into any arrangement, contract or transaction outside the normal course of business (Shareholders Agreement, §4.14.12).

11. The company also ordinarily has a CEO who generally runs the company, reporting to the Board of Directors. Id., § 4.22. Until 2018, CAA Israel had duly appointed CEOs, i.e., Mikey Hartman until he resigned in December, 2016, followed by Tal Hermoni until he resigned in May 2018. After that, no CEO has been properly appointed or approved by shareholders, as required by § 4.22.

12. The title "President," provides no defined authority on behalf of CAA Israel.

13. The term Intellectual Property Rights, over which the Board of Directors has exclusive authority, is defined broadly to mean: "any (i) copyrights, patents, database rights and rights in trademarks, designs, know-how and confidential information (whether registered or unregistered), (ii) applications for registration, and rights to apply for registration, of any of the foregoing rights and (iii) all other intellectual property rights and equivalent or similar forms of protection existing anywhere in the world. Id., § 1.34.

14. The following actions taken by Moshe Oz, as described more fully below and in the Declaration of Michael Hartman, amount to clear violations of the Shareholders Agreement

4

because they were done without required authority, which could only be gotten through approval of the board of directors, and which approval was not sought or obtained.

   a. First, Moshe Oz had no authority to change the terms of sale of product from CAA Israel to CAA USA, from Net 45 days to prepayment. Such an action violated § 4.14.12 (transaction outside the normal course of business).

   b. Second, Moshe Oz had no authority to terminate what he describes as a license or permission granted to CAA USA with respect to CAA Israel's Intellectual Property Rights. As defined in the Shareholders' Agreement, this term would cover all of the various trademarks, trade names, website and trade dress that CA Israel is claiming rights over in this lawsuit. CAA USA contests that there were any licenses or permissions granted by CAA Israel to CAA USA. No such licenses or permissions were needed because CAA USA had at least the equal right to use all intellectual property to which CAA Israel now claims ownership because CAA USA has paid for the development, promotion, advertising and brand recognition for its joint use with CAA Israel (the rebranding marks discussed below) or its prior long-term use without objection (names CAA USA and Command Arms Accessories). At any rate, if Moshe Oz could establish that CAA Israel had granted any license for CAA USA to use any intellectual property that he claims is owned by CAA Israel, he had no authority to alter or cancel any such licenses (§ 4.14.6).

   c. Third, Moshe Oz now claims that CAA Israel has recently applied to register certain marks that were selected in the rebranding campaign in 2015 (as described below). He had no authority to do so (§4.14.6).

d. Fourth, Moshe Oz had no authority to hire counsel on behalf of CAA Israel to file lawsuits in the United States, and particularly a lawsuit related to the Intellectual Property Rights, as that term is broadly defined. Such action violates § 4.14.6 (Intellectual Property Rights) and § 4.14.12 (transaction outside the normal course of business).

e. Fifth, Moshe Oz had no authority to authorize the filing, on behalf of CAA Israel, a lawsuit in the United States, and particularly a lawsuit related to the Intellectual Property Rights, as that term is broadly defined. Such action violates § 4.14.6 (Intellectual Property Rights) and § 4.14.12 (transaction outside the normal course of business).

f. Sixth, although CAA Israel has stated that it is ready willing and able to post a bond in connection with its requested injunction, Moshe Oz has no authority to do so, as it would violate §4.14.12 (transaction outside normal course of business) and §4.14.19 (giving any guarantee, indemnity or other security).

15. In 2015, CAA USA and CAA Israel undertook a major rebranding effort in order to increase sales in the US market. The rebranding was a joint effort and paid for by both companies. CAA USA paid more than $16,000 in connection with the design of new marks by Dan Alexander & Company, and more than $19,000 in connection with the design and creation of the new website, caagearup.com. Exhibits 6 and 7. At all times, the rebranding was intended to benefit both companies, working together to sell CAA products in the US market. In fact, I was personally involved in the rebranding, along with a number of other employees of CAA Israel. At no time was there any indication from Moshe Oz or anyone else at CAA Israel that the results of the rebranding, i.e., new marks, trade dress and website, would be owned exclusively

by CAA Israel and that CAA Israel could revoke CAA USA's right to use them. If that had been stated, I would not have allowed CAA USA to pay for the rebranding or the new website.

16. Attached hereto as Exhibit 8 is a true and accurate copy of my business card made as part of the 2015 rebranding effort and provided to me by CAA Israel in advance of the January 2016 SHOT Show. It shows that the 2 companies were considered one, as my card identifies me only as VP of CAA, and shows my address and phone number as the Florida headquarters (CAA USA).

17. From the beginning of my involvement with CAA until approximately May 2018, when Tal Hermoni resigned as CEO of CAA Israel, the two companies worked together. In fact, once Mikey Hartman took over as CEO of CAA USA in December 2016, it was his and CAA USA's marketing efforts that essentially created the market for CAA's then new Micro Roni conversion kit in the United States. That marketing effort (which involved extensive use of the marks asserted by Plaintiff in this case) was paid for by CAA USA to benefit both companies. In 2016, CAA USA spent on marketing and advertising (excluding rebranding which is accounted for separately) approximately $216,000; in 2016, $296,000; and in 2017, $211,000. Due to CAA USA's efforts, demand for the Micro-Roni skyrocketed.

18. Although Moshe Oz claims that the problems began when his brother Eldad "retired" from CAA USA, that is not true. By the end of his time at CAA USA, Eldad was rarely present and participated almost entirely via telephone or video conferences (although he missed many of those conferences). The problems between the companies had nothing to do with Eldad Oz, but began long before Eldad's departure due to rising financial problems at CAA Israel. CAA USA in no way caused these problems and in fact CAA had continued to increase its monthly payments in support of CAA Israel.

19. The problems between the two companies began in or about April-May 2018, leading up to the resignation of Tal Hermoni as the CEO of CAA Israel. In spring 2018, when CAA USA's sales were growing, along with our monthly payments to CAA Israel, we began to have problems with shipments from Israel. Products were late; products not ordered were sent; products ordered were not sent; and there were quality problems with the product. Tal Hermoni sent a letter to the shareholders raising his concerns about cash flow issues. Ex. 9. Mr. Hermoni later resigned because of the tremendous debts CAA Israel had generated due to the wrongdoings and reckless and unauthorized decisions made by Moshe Oz. Second Hermoni Declaration; Ex. 10.

20. To satisfy CAA Israel's need for cash to cover the debts created by Moshe's wrongdoing, immediately after he took over, he changed the terms of sale of products to CAA USA, from net 45 (meaning payment was due 45 days after shipment) to pre-paid. This change would have caused considerable cash flow problems to CAA USA and it definitely would not have fixed any problems CAA Israel had with its vendors, employees or government agencies, as well as the other problems discussed herein. And, there was no way to guarantee that prepayment of the orders would have guaranteed CAA USA's receipt of proper shipments because CAA Israel had increasing difficulty filling orders because of its loss of employees and relationships with vendors. In fact, CAA USA was wary of sending prepayment for product because CAA Israel was facing insolvency and may have been unable to fill orders.

21. I traveled to Israel in May of 2018 both in my capacity as a shareholder and a Senior Vice President of CAA USA and also as a Director of CAA Israel, based on concerns that had been raised by Tal Hermoni. On that trip, having spent some time at CAA Israel's offices, I saw a completely mismanaged company which Moshe Oz had driven to the ground, with tremendous

debts, terrible morale, unhappy employees quitting their jobs, angry vendors, unpaid and uncompleted tax returns for several years, unfiled and unpaid employee pension funds, unpaid employee taxes, unauthorized loans, improper expenses, extensive collateral given to banks, exposure to the liquidation, lawsuits from the employees, and actions from the government agencies. For example, CAA Israel owed approximately $430,000 in wages to employees, who were threatening to go to Israeli labor authorities, which would have been disastrous because it could lead to forced liquidation of the company. Also, there was a secured debt of close to $3.5 million Mizrahi Bank, and as a result, the Bank was holding all of the revenue and expenses and holding or releasing payments. This secured loan was entered by Moshe Oz without approval of the board of directors or the shareholder. There was also a debt of about $1 million to vendors. There was a refund required to be paid back to Republic of Congo of approximately $600,000 for breach of contract. And Moshe Oz claimed that he had made a personal loan to the company of approximately $3 million. With all these crushing debt problems, there was simply nothing that CAA USA could have done to harm CAA Israel. During that trip, Moshe Oz recognized the problems with the companies.

22. During my trip to Israel, Mr. Hermoni introduced me to Mr. Sami Katsav, the owner of IWI (Israeli Weapons Industry) and Mr. Shlomi Sabag, CEO of IWI. IWI is a legend in the Israeli firearms industry. Mr. Hermoni introduced me as the representative of CAA because that company would not have anything to do with Moshe Oz. As a member of the Board of Directors and the representative of the majority shareholder for CAA Industries, Ltd., and Sr. VP of CAA USA, I tried to reach a deal with IWI, whereby IWI would acquire a majority of CAA. Initially, IWI was interested, as long as Moshe Oz would have nothing to do with the operation of the company. However, after IWI sent its auditor to CAA Israel, to perform due diligence, they very

9

quickly withdrew their interest, with the comment to me "that it [CAA Israel] is a mess." I left Israel and during my flight home, Moshe Oz forced the resignation of Tal Hermoni, who found working with Moshe Oz to be impossible.

23. As Moshe Oz noted in his declaration, the parties attempted to resolve their differences by means of a complete separation of the ownership of the two companies. It is not true that we were unable to agree on terms. We agreed in principal to a formal settlement agreement, that (a) Moshe and Eldad Oz would repurchase the majority ownership in CAA USA, (b) Peter Viskovatykh and I would purchase the ownership of another company, RWC Group, LLC, held by Moshe and Eldad Oz, (c) both sides would forgive various investor loans made to the two companies, and (d) Moshe Oz would pay $685,000 to Peter Viskovatykh and me. The agreements were prepared and held unsigned in an escrow that was opened with an attorney in Florida. We set a closing date in September, 2018. Moshe Oz was unable to raise the $685,000 to close that deal. At his request, I agreed twice to extend the closing date, but he was never able to meet the deadlines to close. When he failed to close, on November 12, 2108, the escrow agent forwarded an email from the representative of our side, to all participants, indicating that the deal would not go forward. Ex. 11.

24. Going back to the problems between CAA USA and CAA Israel, when CAA USA did not assent to Moshe Oz's demands to change the terms of sale, he recognized that CAA USA had created a new, robust market for CAA products, and, most importantly, for the Micro Roni. Moshe Oz saw an opportunity to circumvent CAA USA in violation of the exclusive distributorship arrangement between the two companies, as well as a violation of the SB Tactical licensing agreement. In or about May/June 2018, CAA Israel, over CAA USA's objection, began to sell into the US market through an internet seller in Israel called YRS Inc. Its website is

10

located at https://www.yrsinc.com/en/. In addition to selling to the US through this new distributor, the sales through YRS were priced far below the Minimum Advertised Price, which threatened to destroy CAA USA's ability to sell Micro Ronis profitably, and indeed threatened to destroy the market and the whole network of dealers and distributors that we had worked so hard to develop and spent considerable funds to create.

25. CAA Israel's sale of the Micro Roni conversion kits outside of the exclusivity of CAA USA has already caused considerable damage to the CAA USA's market, to the brand, and to CAA USA's reputation. We received many complaints from our customers complaining that Moshe's new sales company YRS and that it was selling Micro Roni at absurdly low prices. One customer wrote to us:

> I have been selling this bag to law enforcement agencies all over the United States. I've been using your Micro Roni weapon system in this bag. I have sold numerous Micro Ronis over the last 6 months to these agencies. I have over 15 agencies using your weapon system. I have even created a qualification course to certify the officers with the Micro Roni.
> I received many phone calls from officers that were upset regarding the price that was paid for the Micro Ronis. They feel that I over charged them. A company called YRS INC. is selling Micro Ronis on Gun Broker for a ridiculously low price.
> YRS Inc. is selling the Micro Ronis at a lower price than I'm purchasing directly from you. This is not ethical and is going to hurt any dealer that is legitimately selling your products.
> I received many phone calls from officers that were upset regarding the price that was paid for the Micro Ronis. They feel that I over charged them. A company called YRS INC. is selling Micro Ronis on Gun Broker for a ridiculously low price.
> YRS Inc. is selling the Micro Ronis at a lower price than I'm purchasing directly from you. This is not ethical and is going to hurt any dealer that is legitimately selling your products.
> I can't compete with his prices and will be forced to use another weapon platform when I sell to these law enforcement agencies. I use your weapon system because I believe in it and stand behind it. I recently retired from the Los Angeles Police Department and the officers trust me when I present your products to them. I could use any SBR in my bags but I've been using yours.
> I would like to hear from you regarding this YRS INC. and their sales pricing. I will be presenting by Ballistic Sling Bag to numerous police agencies in November and December. I would like to continue using yours, but reality is that I can use any SBR in my bag.

> Please take a look at this YRS INC because they may result in your company losing out to law enforcement agencies all over the United States.

Ex. 12. This letter is just an example of many such complaints from our customers showing the damage that CAA Industries, Ltd. and Mr. Moshe Oz were causing to CAA USA and to the brand we had worked so hard to build.

26. As a result of Moshe Oz's and CAA Israel's attempt to change of the intracompany sale terms to CAA USA, their efforts to circumvent and undercut CAA USA by selling through another distributor into the US market, and the fact that CAA Israel was teetering on the edge of bankruptcy and liquidation, CAA USA was also faced with financial ruin, only a brief period after Mr. Viskovatykh and I had paid $3 million for 51% of the company. To replace the revenues lost due to CAA Industries' incompetent and illegal actions, CAA USA designed a new pistol carbine conversion kit, to be manufactured in the US for the US market. We began selling the MCK just before Christmas, 2018.

27. When Moshe Oz learned of CAA USA's intention to begin production of its own products, CAA Israel sent a cease and desist letter to CAA USA, dated August 7, 2018. Ex. 13. The letter recognized that CAA USA was in the process of manufacturing a pistol-carbine conversion kit, and claimed that it infringed CAA Israel's U.S. Patent No. 8,887,432 ("'432 Patent"). The letter made no mention of CAA Israel's Patent No. 8,312,803 ("'803 Patent"). Counsel for CAA USA responded and requested further information about the alleged violation of the '432 Patent. Ex. 14. CAA USA received no further communication from counsel for CAA Industries regarding any alleged patent violation until the service of the present lawsuit on August 6, 2019.

28. The patent allegations in this lawsuit are based solely on the '803 Patent, which CAA USA had no knowledge of prior to being served with the instant law suit. Plaintiff alleges that

its Micro Roni conversion kit includes a charging handle protected by the '803 Patent. However, the charging handle that is included in Micro Roni kits is not marked with the '803 patent number. Instead, it illegally displays the US Patent No. 8,887,432, which his irrelevant to the charging handle. Ex. 15.

29. CAA Israel sent its cease and desist letter to CAA USA on June 4, 2019, but that letter did not claim any patent violations, and did not mention the '803 Patent. Oz Dec. Ex. 26. The service of this lawsuit was the first notice to CAA USA that CAA Israel was attempting to enforce the '803 Patent.

30. Moshe Oz now takes the position that CAA USA has no rights to use any of the marks that it was using prior to our acquisition of 51% of the shares in CAA USA for $3 million, specifically what he calls the trademark and trade name "Command Arms Accessories" and the trade mark "CAA." He takes the position that these marks were owned by a different company, Command Arms Accessories, LLC, which company he and his brother Eldad continue to own after our acquisition of 51% of CAA USA, and that they are licensed by Command Arms Accessories, LLC to CAA Israel, which in turn licensed them to CAA USA. Had I known that Moshe Oz took the position that Command Arms Accessories, LLC owned those marks, and that that company or CAA Israel could revoke their permission for use by CAA USA at any time, I would not have paid $3 million for 51% of CAA USA, as the value of the company would have been far less. If Moshe Oz's story about the ownership and control of those marks is true, which it certainly is not, then Moshe Oz defrauded Peter Viskovatykh and me when he sold us the shares under false pretenses. Moshe Oz is saying that we paid him $3 million for a marketing, sales and distributorship company with no rights to the intellectual property it had been using and depending on for years, and no right to continue its exclusive sales arrangement to sell the

13

principal product that it relied upon. And, according to a recent lawsuit filed by Moshe Oz, he Moshe Oz's position would make the original sale a fraud.

31. However, it is simply not true that Command Arms Accessories, LLC owns and licenses the marks CAA and Command Arms Accessories to CAA Israel, or that CAA Israel licensed those marks to CAA USA.

32. First, there is no evidence presented of any license from Command Arms Accessories, LLC to CAA Israel. There is no written license. If there were an oral license, no one has ever stated to me the terms such as length of the license, terms of use, restrictions on sub-licensing, or licensing fees. To my knowledge, CAA Israel has never paid a license fee to Command Arms Accessories, LLC.

33. Second, the reality is that Command Arms Accessories, LLC is a non-operating shell company. It has been maintained for years as a shell company by the efforts and at the cost of CAA USA. CAA USA files the tax returns (at CAA USA's expense). For the last several years, those tax returns show that Command Arms Accessories, LLC has zero assets and zero income. Ex. 16 and 17. Accordingly, Command Arms Accessories, LLC does not own any rights to any intellectual property, including the supposed trademark/trade name Command Arms Accessories or the trade mark CAA. It likewise has no income from the supposed licensing of these marks to CAA Israel. Accordingly, Command Arms Accessories, LLC does not own anything of value, including those supposed marks, and it does not license anything to anyone.

34. Third, all operations and any assets of any value belonging to Command Arms Accessories, LLC were long ago transferred to CAA USA. CAA USA took over the US distribution function previously done by Command Arms Accessories, LLC back in 2010, after which, to my knowledge, Command Arms Accessories, LLC ceased to function as an operating

distribution company. This point is made clear by the APA between CAA Israel's predecessor and the old company called Command Arms Accessories, LLC. Ex. 18. Among the assets acquired by CAA Israel then assigned to Command Arms Accessories, LLC were 11 firearms, identified by serial number. Ex. 18, APA, Schedule 1.1(m). Nine of the 11 firearms are presently, and have been for years, listed in the assets of CAA USA. They are stored at CAA USA's facility (at CAA USA's cost) in Pompano Beach. Another of the assets that was specifically listed in the APA and thus transferred to Command Arms Accessories, LLC was the telephone number (866) 611-9576. That number is now and has for years been a toll-free number paid for and utilized by CAA USA. This is further evidence that CAA USA is and has been since 2010 the distributing company with all rights to whatever assets were to Command Arms Accessories, LLC, including any rights to the names Command Arms Accessories and CAA. Those assets were transferred into CAA USA long ago and used continuously in the United States since that time.

35. Fourth, there has never been a license agreement between CAA Israel and CAA USA. That assertion by Moshe Oz is simply false. Since my involvement, CAA USA has never been billed for or paid a license agreement to CAA Israel, for the simple reason that CAA USA always had equal rights to use the marks involved in the marketing and sale of CAA products, both the marks that Moshe Oz claims were transferred to Command Arms Accessories, LLC (i.e., CAA and Command Arms Accessories), and the marks and the website developed during the 2015 rebranding.

36. Fifth, the due diligence done for the purchase of CAA in 2015 did not anywhere mention any license agreement, and did not reference any payments for any such agreement or any value on the balance sheet for any such license.

37. As for the rebranding in 2015, it was always clear that the rebranding was being done for the benefit of CAA USA as well as CAA Israel. The attached email from early in the process was sent from Dan Alexander & Co. to Eldad, president of CAA USA, and forwarded to me and others from CAA USA showing the CAA SYMBOL & LOGTYPE proposal. Ex. 19 (email of May 18, 2015 and Logo and Visual Language Updates dated May 26, 2015). Similar is the email among a number of participants at CAA USA on June 18, 2015, regarding the various new trademarks, including Gear Up. Ex. 20.

38. CAA USA, including myself, clearly participated directly in the rebranding. Ex. 21 (email of September 10, 2015). I even traveled with Eldad Oz

39. Dan Alexander & Co. billed CAA USA directly for its share of the costs of the rebranding. Ex. 22 (emails of November 16, 2015; November 24, 2015; invoice). In fact, at one point I questioned Eldad Oz as to whether CAA USA was required to pay for the rebranding. Eldad confirmed that CAA USA had to participate in paying for the rebranding as had already been agreed. Ex. 23 (Email of November 19, 2019).

40. At the end of the rebranding, Dan Alexander & Co. sent a letter to Eldad Oz and me with a proposal to provide brand maintenance and support to both Kalashnikov USA and CAA following completion of the rebranding. Ex. 24.

41. CAA USA also spent considerable money and effort in promoting the new CAA rebranding, including hiring and paying an independent branding consultant. Ex. 25 (Email of October 8, 2015). CAA USA then spent considerable money and effort on the 2016 SHOT Show, where the CAA Micro Roni was introduced. Ex. 26 (various emails).

42. The new marks from the rebranding were not used first by CAA Israel in the United States. CAA USA began using them in the US as soon as they were available in connection with

16

the January 2016 SHOT Show in Law Vegas. CAA Israel did not use them in the US before that time.

43. In conclusion, it should be clear that Moshe Oz had no authority to destroy the relationship between CAA Israel and CAA USA, to the detriment of both companies. He had no authority to hire counsel or file this lawsuit. CAA Israel never had exclusive rights to either the Command Arms Accessories or CAA names, or to the rebranded marks, which CAA USA paid for. If the injunction sought is granted, it will likely put CAA USA out of business. We have 25 employees in our factory in Pompano Beach, Florida who will lose their jobs. Additionally, based on the purchase price of $3 million for 51%, the value of the company at that time was approximately $6 million. Since that time, we have significantly improved the performance and profitably of the company, so that it should now be valued at far more, and likely 2-3 times more. Accordingly, if the injunction is granted, in addition to the loss of jobs and impact on our community, it is likely the company will lose its entire value of greater than $12 million.

44. By contrast, if the injunction is not granted, while I do not think that there would be any basis for this company to have to pay damages to CAA Israel, our company is profitable and we would certainly be able to pay a judgment if we had to. While nothing we are doing prevents CAA Israel from continuing to sell its products, and even to benefit from the market for its Micro Roni that we created, CAA Israel should not be able to show any significant money damages here when the Court takes into account the fact that CAA Israel is not able to sell legally its main US product, the Micro Roni Stabilizer (because it is infringing the SB Tactical patent). It is unlikely that CAA Israel can show that it is losing any significant sales revenue based on our selling the MCK kit. And, if the Court reviews the possible damages that CAA Israel will try to prove regarding the '803 patent on the charging handle, that is a small, relatively inexpensive

part, so if there were damages based on sale of that part, they would not be significant. Further, CAA USA is challenging the enforceability of that patent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on   Sept 10 2019  (date)

_____
MICHAEL TIRATURIAN

MIA_ACTIVE 5076156.1