**DATED January // 2015**


between


**SKY OF BLUE PTE LTD**


**ELDAD OZ**


**MOSHE OZ**


and


**CAA INDUSTRIES LTD.**


**CAA INDUSTRIES SHAREHOLDERS
AGREEMENT**

**THIS CAA INDUSTRIES SHAREHOLDERS AGREEMENT** is made on January ___ 2015

**BETWEEN:**

(1)　　**SKY OF BLUE PTE LTD**, a company organised and existing in accordance with the laws of Singapore with registration number 201430567W and having its registered office at 2 Marina Boulevard, #66-08, the Sail @ Marina Bay, Singapore (018987) (the "**Shareholder 1**");

(2)　　**ELDAD OZ**, a citizen of the State of Israel, date of birth March 22, 1979, having passport number 031520539 and residing at 8/3351 Herzel Rosenblum Street, Tel Aviv (the "**Shareholder 2**");

(3)　　**MOSHE OZ**, a citizen of the State of Israel, date of birth 13 April 1974, having passport number 21523072and residing at 8/134 Herzel Rosenblum Street, Tel Aviv (the "**Shareholder 3**"); and

(4)　　**CAA INDUSTRIES LTD.**, a company organised and existing in accordance with the laws of the State of Israel with registration number 51-4030832 and having its registered office at 1 Habonim St. Kiryat Gat, Israel, further details of which are set out in Schedule 2 (the "**Company**").

**RECITALS**

A.　　As of the date of this agreement, the Company's issued share capital consists of one hundred and sixteen (116) Shares, of which 59 Shares (being as of the date hereof 51% of all issued Shares of the Company) are registered in the name of the Shareholder 1, 17 Shares (being as of the date hereof 14.5% of all issued Shares of the Company) are registered in the name of the Shareholder 2, and 40 Shares (being as of the date hereof 34.5% of all issued Shares of the Company) are registered in the name of the Shareholder 3.

B.　　The Parties have agreed to operate and manage the Company in accordance with the provisions of this agreement.

**AGREED TERMS**

1　　**DEFINITIONS AND RULES OF INTERPRETATION**

In this agreement (including the Recitals), all defined terms shall have the meanings assigned to them in paragraph 1 of Schedule 1 and the rules of interpretation set out in paragraph 3 through paragraph 17 (inclusive) of Schedule 1 shall apply, subject to any express contrary indication.

2　　**BUSINESS**

2.1　　The core business of the Company shall be the production, distribution and servicing of various weapons and weapon accessories (the "**Business**").

3　　**FUNDING SUPPORT**

3.1　　As of the date of this agreement the Shareholders have agreed to provide to the Company a loan financing in the total amount of US$2,000,000 (Two Million US Dollars), of which US$1,020,000 (One Million Twenty Thousand US Dollars) shall be provided by the Shareholder 1, and US$980,000 (Nine Hundred Eighty Thousand US Dollars) shall be provided jointly by the Shareholder 2 and Shareholder 3 on the terms agreed by all of the

Shareholders.

3.2 Other than the loan financing referred to in Clause 3.1, the Parties intend that the Company shall be self-financing and shall obtain any additional funds from third parties without recourse to the Shareholders and that, save with a prior Shareholder Consent, none of the Shareholders shall be obliged to contribute any further funds or participate in any guarantee or similar undertaking for the Company's benefit.

4 **MANAGEMENT**

4.1 **Company Shareholders Meeting**. The Company Shareholders Meeting shall have the authority in respect of any matter reserved to it under the terms of this agreement and/or the Applicable Law (which includes *inter alia* any matter requiring under the terms hereof a Shareholder Consent), as well as in respect of each of the following matters:

4.1.1 altering in any respect the Articles;

4.1.2 altering in any respect the Company's name;

4.1.3 any altering (increase or decrease) of the amount of the Company's issued share capital, granting any option or other interest (in the form of convertible securities or in any other form) over or in the Company's share capital, redeeming or purchasing any of the Shares or effecting any other reorganisation of the Company's share capital or any changing of the rights attached to any Share;

4.1.4 any allotment of the issued share capital of the Company;

4.1.5 decisions on the dividend policy and declaring or paying any dividends by the Company;

4.1.6 any corporate reorganisation, liquidation, winding-up or dissolution of the Company (whether or not in the course of any insolvency or similar proceedings);

4.1.7 material deviation in any respect of the Company's Business; and

4.1.8 creating any Encumbrances over any of the Shares.

4.2 Each Shareholder may appoint any person to act as its agent and attorney in fact for the purposes of giving its approval or disapproval of any matter reserved to the Company Shareholders Meeting (such person, the "**Shareholder Representative**") and hereby authorises such Shareholder Representative to give approval or disapproval of any such matter on behalf of such Shareholder. Any appointment or removal of the Shareholder Representative shall be notified in writing to the other Shareholder and the Company at least 3 Business Days prior to the effective date of such appointment or removal. For the avoidance of doubt, any such approval or disapproval given by a Shareholder Representative shall be deemed to be approval or disapproval, as applicable, given by a Shareholder that appointed such Shareholder Representative in accordance with this Clause 4.2.

4.3     The annual Company Shareholders Meeting shall be convened and held annually within 15 months from the date of the previous annual Company Shareholders Meeting.

4.4     Any Company Shareholders Meeting shall be convened at the written request of any Shareholder or any of the Directors.

4.5     Each Shareholder shall be given at least 15 Business Days' written notice (to be delivered in the manner for delivery set out in Clause 12) of any Company Shareholders Meeting and such notice shall be accompanied by any materials to be discussed at such Company Shareholders Meeting and an agenda setting out in such reasonable detail as may be practicable in the circumstances the subject matter of such Company Shareholders Meeting. Any Shareholder (or its Shareholder Representative) may at any time waive its right to receive such notice and if such Shareholder is present, or is represented by its Shareholder Representative, at any Company Shareholders Meeting, such presence or representation shall constitute waiver by such Shareholder (or its Shareholder Representative) of such notice.

4.6     Each Share that is fully paid shall entitle its Holder to <u>one vote</u> on all matters that are within the competence of, or otherwise reserved to, the Company Shareholders Meeting.  If any chairman of the Company Shareholders Meeting is appointed at such meeting, such chairman shall have no second or casting vote.

4.7     All matters that are within the competence of, or otherwise reserved to, the Company Shareholders Meeting shall be resolved by a Shareholder Consent.

4.8     A quorum for any Company Shareholders Meeting shall exist and such Company Shareholders Meeting shall be quorate for all purposes of this agreement if at such duly convened meeting in respect of all matters that are on the agenda for such a meeting <u>all Shareholders</u> are present either personally or by their respective Shareholder Representatives (as applicable), in each case within an hour of the moment at which the meeting is supposed to begin (such requirements, the **"Shareholders Meeting Quorum Requirements"**).

4.9     Any duly convened Company Shareholders Meeting shall be adjourned if the Shareholders Meeting Quorum Requirements are not met in respect of at least a single matter that is on the agenda for such Company Shareholders Meeting.

4.10    **Company Board**. The Company Board shall be comprised of 4 Directors. The Shareholder 1 shall have the right to nominate 2 Directors and the Minority Shareholders shall have the right to jointly nominate 2 Directors. Each Director shall have one vote and no Chairman of the Board shall have any casting or second vote.

4.11    The right of a Shareholder to nominate a Director pursuant to this Clause 4 shall equally be construed as the right of that Shareholder (or in the case of the Minority Shareholders, acting jointly) to suspend the office of, dismiss and replace such Director at any time on the terms of this Clause 4.

4.12    A Shareholder removing a Director shall (and in the case of the Minority

E.C                                    - 3 -                                    M.V

L.R.

Shareholders, on a joint and several basis) indemnify and keep indemnified each of the Company, the other Shareholders and such other Shareholders' Affiliates against any claims by such Director related solely to his/her removal from his/her office.

4.13 Any nomination, suspension of duties and/or replacement by a Shareholder of any person which such Shareholder may nominate to the Company pursuant to this Clause 4 (a Shareholder which is entitled to do so under this agreement, the "**Appointing Shareholder**") shall:

4.13.1 not require any prior approval of any management body of the Company or any other Shareholder;

4.13.2 be made by notice of the Appointing Shareholder in writing to each of the Company and the other Shareholders, which notice shall be effective from the later of the date stated in such notice and the date of receipt of such notice by the Company on the terms of Clause 12; and

4.13.3 trigger the obligation of each of the other Shareholders and the Company to take all Necessary Actions to (and to procure that each of its nominees takes all Necessary Actions to) give or cause any desired effect to any nomination, appointment, suspension of duties or replacement of the relevant person made by the Appointing Shareholder in compliance with this agreement.

4.14 The Company Board shall have the authority in respect of any matter that does not require a Shareholder Consent under this agreement, the Articles and/or the Applicable Law as well as in respect of each of the following matters:

4.14.1 adopting or amending the Business Plan and the Budget for each Financial Year;

4.14.2 adopting or amending the financial statements and annual report for each Financial Year;

4.14.3 unless already agreed in the then approved Business Plan and/or Budget, forming any subsidiary, acquiring or disposing of shares in any other company, participating in or exiting from any partnership or joint venture;

4.14.4 unless already agreed in the then approved Business Plan and/or Budget, entering into, altering in any respect or terminating any transactions in respect of any real estate assets (irrespective of the type and value of such transactions);

4.14.5 unless already agreed in the then approved Business Plan and/or Budget, creating or granting any Encumbrance over the whole or any part of the Company's business, undertaking or assets;

4.14.6 unless already agreed in the then approved Business Plan and/or Budget, entering into, altering in any respect or terminating any transactions in respect of any Intellectual

Property Rights (irrespective of the type and value of such transactions);

4.14.7    unless already agreed in the then approved Business Plan and/or Budget, entering into or varying any contract, agreement or other arrangement with any of the Shareholders or any of such Shareholder's Affiliates;

4.14.8    unless already agreed in the then approved Business Plan and/or Budget, entering into, altering in any respect or terminating any transactions (singular or several related transactions) the value of which exceeds (whether individually or as an aggregated value of several related transactions) 25% of the book value of the Company's assets pursuant to the most recent financial statements of the Company;

4.14.9    unless already agreed in the then approved Business Plan and/or Budget, making any borrowing or altering in any respect any terms thereof, raising any debt or other finance or altering in any respect any terms thereof, or giving any guarantee, indemnity or other security;

4.14.10   unless already agreed in the then approved Business Plan and/or Budget, agreeing to payment or provision to any employee of any bonus or other benefits (whether in cash or in-kind) in excess of US$100,000 or its equivalent in another currency;

4.14.11   establishing or amending any profit-sharing, share option, bonus or other incentive scheme of any nature for the Company's employees;

4.14.12   unless already agreed in the then approved Business Plan and/or Budget, entering into any arrangement, contract or transaction outside the normal course of the Business or otherwise than on arm's length terms; and

4.14.13   subject to the nomination rights of the Shareholders pursuant to Clause 4.22 and Clause 4.23 and the right of the Shareholder 1 to terminate the appointment of the CEO pursuant to Clause 4.28, any appointment, approval and altering the terms of appointment and termination of the CEO,

provided always that an item shall only be treated as having been agreed in the then approved Business Plan and/or Budget if that Business Plan or Budget contains reasonably complete estimates of the initial and longer term costs and/or revenues of the relevant item so that for example a proposal in an annual plan to acquire additional real estate shall only justify the acquisition of any real estate if the then approved Business Plan and/or Budget contains a budget for such acquisition and estimates as to the projected running costs of such real estate and if the actual acquisition costs and expected running costs of the real estate that is chosen are in line with such actual and expected costs.

4.15    A Company Board Meeting shall be convened at the request of a Director or

a Shareholder.

4.16    At least 7 Business Days' notice of each Company Board Meeting shall be given to each Director entitled to participate therein and such notice shall be accompanied by any materials to be discussed at such Company Board Meeting and an agenda setting out in such reasonable detail as may be practicable in the circumstances the subject matter of such Company Board Meeting. Any Director may at any time waive his/her right to receive such notice and if such Director is present at any Company Board Meeting, such presence shall constitute waiver by such Director of such notice.

4.17    All matters that are within the competence of, or otherwise reserved to, the Company Board Meeting shall be resolved by a Board Approval.

4.18    A quorum for any Company Board Meeting shall exist and such Company Board Meeting shall be quorate for all purposes of this agreement if in respect of all matters that are on the agenda for such a meeting at least 1 Director nominated by the Shareholder 1 and at least 1 Director jointly nominated by the Minority Shareholders participate in such meeting within an hour of the moment at which the meeting is supposed to begin (such requirements, the "**Board Meeting Quorum Requirements**").

4.19    Any duly convened Company Board Meeting shall be adjourned if the Board Meeting Quorum Requirements are not met in respect of at least a single matter that is on the agenda for such Company Board Meeting.

4.20    Any one or more Directors may participate in and vote at the Company Board Meeting by means of a conference call or any communication equipment which allows all persons participating in the meeting to identify and hear each other. Any Director so participating in a meeting shall be deemed present in person and shall count towards the quorum.

4.21    A written resolution signed by all Directors shall be as valid and effective for all purposes of this agreement as a resolution passed by the Directors at the Company Board Meeting duly convened, held and constituted.

4.22    **Chief Executive Officer.** The Company's chief executive officer (the "**CEO**") shall be appointed by joint nomination of the Minority Shareholders subject to the right of the Shareholder 1 to reject an appointment of any candidate if such candidate either:

4.22.1    does not hold a higher education (i.e. university, college, institute) degree;

4.22.2    does not have at least 2 years of continuous record of holding a senior management position with a company or companies of the size of the Company or that are operating in a comparable industry or the Business;

4.22.3    is disqualified from the right, or otherwise restricted, to hold a position of a chief executive officer by the final decision of a competent court or other Governmental Authority; and/or

4.22.4    has a record of any criminal convictions.

4.23    If the Minority Shareholders fail to agree on nomination of the CEO within

15 Business Days following any vacancy in the relevant office, the CEO may be appointed by joint nomination of the Shareholder 1 and the Shareholder 3.

4.24    Unless this agreement otherwise expressly requires (including by virtue of Clause 4.25 and Clause 4.26), the CEO shall have the authority in respect of any matter that does not require a Shareholder Consent or a Board Approval pursuant to this agreement, the requirements of the Articles and/or the Applicable Law.

4.25    **Chief Financial Officer.** The Shareholder 1 shall have the right in its sole discretion to nominate a chief financial officer of the Company (and each of the Minority Shareholders shall take all Necessary Actions to ensure that the CEO each time employs a chief financial officer of the Company so nominated) who shall, among other functions that are customary for a position of that nature:

4.25.1    be in charge of any financial, tax and accounting matters of the Company;

4.25.2    be given, on a permanent basis, full access to all books, records (including any financial and accounting data), bank accounts, contracts, agreements and employees of the Company;

4.25.3    preliminary review any Business Plans, Budgets, reports, financial statements and any other documents presenting any financial, tax or accounting information (including any proposed amendments thereto) before submitting thereof for the review or approval of the Company Board and/or any of the Shareholders;

4.25.4    preliminary review and approve any proposals of the CEO or other Company's employees in respect of entering by the Company into any transactions, including those relating to the provision of, or raising, any debt or other finance or altering in any respect any terms thereof, or giving any guarantee, indemnity or other security (irrespective of the type and value of the proposed transaction); In case of a disagreement between the CFO and the CEO as to the terms of or the entering into any such transaction, the matter shall be finally resolved by the Company's Board of Directors or Shareholders Consent.

4.25.5    have the right of a preliminary sign-off in respect of any payments by the Company and any transactions to be entered by the Company (including any amendment or termination thereof);

4.25.6    have the right to attend and speak at all Company Shareholders Meetings and Company Board Meetings (having no voting rights);

4.25.7    have the right to make recommendations in respect of appointment and removal of the Company's auditors and tax consultants; and

4.25.8    have the right to appoint and remove any employees of the Company assigned with any accounting, financial or tax function, subject to CEO's approval which shall not be unreasonably

E

L R

M.O

withheld.

4.26 Each of the Minority Shareholders undertakes with all other Parties to ensure that none of the following decisions in respect of any of the Company's chief financial officer or the employees employed at the election of the Company's chief financial officer is taken by the CEO without prior written approval of the CFO or the Shareholder 1: termination, reallocation, suspension, promotion, amendment of any material employment terms (including compensation), payment of bonuses or other compensation in whichever form. In the event of any breach by the CEO of Clause 4.25 or this Clause 4.26, the provisions of Clause 4.31 may then be applied.

4.27 **Retention of Key Employees**: Each of the Minority Shareholders undertakes with all other Parties to make reasonable commercial efforts to procure that each of the following employees remains to be employed by the Company for a period of at least 5 years from the date hereof and that during such period each of such employees devotes the whole or majority of his business time, attention and abilities to the business of the Company as may be required:

    4.27.1    President;

    4.27.2    CEO;

    4.27.3    Chief Engineer;

    4.27.4    COO;

    4.27.5    Chief Optics Engineer; and

    4.27.6    Chief Marketing & Sales.

and to take all Necessary Actions to ensure that none of the following decisions in respect of any of key employees is taken by the CEO without a prior written approval of the Shareholder 1: termination, reallocation, suspension, promotion, amendment of any material employment terms (including compensation), payment of bonuses or other compensation in whichever form.

4.28 The Shareholder 3 undertakes with each of the other Parties that for a period of 5 years from the date of this agreement, provided that his employment contract is in effect and is complied with by the Company (save for any incompliance by the Company caused by any actions or omissions of the Minority Shareholders or their respective nominees), he will:

    4.28.1    serve the Company as President or in such other role as may be assigned to him by a Shareholder Consent;

    4.28.2    devote his substantial (or such lower scope which may be necessary for the effective conduct of the Company's Business) business time, attention and abilities to the Business of the Company;

    4.28.3    use his best endeavours to promote, protect, develop and extend the Business of the Company;

    4.28.4    promptly make such reports to the Company Board in connection

with the affairs of the Company on such matters and at such times as are reasonably required; and

4.28.5      diligently exercise such powers and perform such duties as may from time to time be assigned to him by a Shareholder Consent.

4.29      Clause 4.28 shall terminate and expire if the Shareholder's 3 position with the Company is terminated with the consent of the Shareholder 1 by the Company not for cause or for reasons outside the reasonable control of the Shareholder 3.

4.30      **Compliance Requirements.** Each of the Shareholders undertakes and agrees with each of the other Parties to take all Necessary Actions so as to procure that each person appointed to the Company by nomination of such Shareholder pursuant to this Clause 4 continually complies in all respects with all provisions of this agreement, including that none of such persons shall resolve on, or otherwise pursue, any matter that pursuant to this agreement, the Articles and/or the Applicable Law requires any Shareholder Consent or a Board Approval, in all cases without first obtaining any such consent or approval, including when a requirement to obtain any such consent or approval is provided for only by this agreement, but is not at the same time provided for in the Articles or the Applicable Law.

4.31      In the event of any:

4.31.1      breach by the CEO of the provisions of this agreement, the Articles and/or Applicable Law;

4.31.2      making any expenditure in breach of any approved Budget in an amount that exceeds 15% of the approved Budget ; and/or

4.31.3      nonfulfillment, as of the end of any Financial Year, of any approved Business Plan for at least 70%; provided such nonfulfillment does not result from circumstances and events outside the CEO reasonable control and provided further that the nonfulfillment has not been approved by the Company's Board of Directors,

the Shareholder 1 may terminate the appointment of such CEO by serving a written notice on each of the Minority Shareholders and the Company (such termination shall take effect, and a Board Approval for such termination shall be deemed to have been given by all Directors, from the date of receiving the relevant notice by the Company). Immediately after such termination, the Minority Shareholders shall have 10 Business Days to nominate a new CEO under Clause 4.22.

4.32      In the event of any:

4.32.1      breach by the CFO of the provisions of this agreement, the Articles and/or the Applicable Law;

4.32.2      such wilful conduct or misconduct by the CFO that causes the Company or is likely to cause the Company material actual loss or actual damage,

the Shareholder 3 may terminate the appointment of such CFO by serving a

written notice on the Shareholder 1 and the Company (such termination shall take effect, and a Board Approval for such termination shall be deemed to have been given by all Directors, from the date of receiving the relevant notice by the Company). Immediately after such termination, the Shareholder 1 shall have 10 Business Days to nominate a new CFO under Clause 4.25.

4.33 **Business Plan and Budget.** Each of the Minority Shareholders undertakes with each of the other Parties to procure that the CEO appointed by nomination of the Minority Shareholders shall ensure that:

4.33.1 the Company's financial statements for any reporting period as of year 2015 shall be prepared in accordance with the IFRS (if applicable, in addition to any statutory financial reporting standards which the Company is required to comply with);

4.33.2 in any Financial Year, the Business shall be conducted and expenses shall be incurred by the Company in compliance with the annual Business Plan and the Budget of the Company approved by the Company Board for such Financial Year and any amendment or addition to it approved by the Company Board;

4.33.3 a draft annual Business Plan and Budget of the Company for any Financial Year shall be made available for the approval by the Company Board no later than 1 December of the preceding Financial Year, save for the initial Business Plan and Budget of the Company for the period until the end of the first Financial Year as of the date of this agreement which shall be made available for the approval by the Company Board no later than 60 Business Days from the date of this agreement; and

4.33.4 a report on the status of fulfilment of the approved annual Business Plan and Budget of the Company in each quarter shall be made available for the review by the Company Board no later than 30 days from the end of the relevant quarter.

4.34 **Personal Licenses and Authorisations**: The Shareholder 3 undertakes with each of the other Parties, unless restricted by Applicable Law and absent circumstances and events that are outside his reasonable control, to take all Necessary Actions to ensure:

4.34.1 obtaining, timely renewal, continuation and maintaining in full force and effect of the fire arms license and export related permit issued in his name by the Israeli Ministry of Public Security, Ministry of Interior, Ministry of Defence and/or other authorities and that are necessary for the operation of the Company's Business as currently conducted, provided that if the Shareholder 3 terminates his employment with the Company not for breach by the Company of any agreement executed between the Shareholder 3 and the Company, he shall give the Company sufficient notice to enable the Company to obtain the above mentioned licenses in his stead.

4.35 **Exceptions.** The provisions of this Clause 4 shall apply unless otherwise expressly required by Clause 9.

4.36    **Dividends Policy**. The Parties agree that subject to Applicable Law, the
        Company will, promptly as practicable after the end of each Financial Year,
        distribute dividends in an amount equal to at least 60% the annual profit after
        Tax. The foregoing shall not apply if the Board determines that the cash
        available to the Company is insufficient to permit such distribution in light of
        the Business Plan and Budget approved by the Board for the next Financial
        Year.

4.37    **Labour Law related Undertakings**. Within 90 days of the date of this
        agreement, the Minority Shareholders undertake to the Shareholder 1 to take
        all Necessary Actions so as to perform and fulfil the actions set forth in
        Schedule 4 attached hereto.

5       **SHARE TRANSFER RESTRICTIONS**

5.1     Subject to Clause 5.2, each Shareholder undertakes to each of the other
        Shareholders that it will not (except with the prior written consent of each of
        such other Shareholders or as explicitly permitted or required pursuant to this
        agreement):

        5.1.1       transfer, dispose of, or agree to transfer or dispose
                    of, or grant any option in respect of, the legal or
                    beneficial interest in any Share held by such
                    Shareholder from time to time; or

        5.1.2       enter into any arrangement (including any
                    renunciation in favour of a third party of any rights
                    in relation to any Shares) as a result of which any
                    benefit or entitlement derived from any Share held
                    by such Shareholder from time to time is to be held
                    for or passed to another person.

5.2     Notwithstanding anything in this agreement to the contrary, any Shareholder
        shall be allowed (without any Shareholder Consent, consent of any of the
        other Shareholders or the Company) to transfer or assign or purport to
        transfer or assign to any of its Affiliates or any third party, as the case may
        be, any rights or entitlement of such Shareholder to receive from time to time
        and whether directly or indirectly any dividends or other distributions from the
        Company. Upon being notified in writing of any such transfer or assignment,
        the Company shall pay (to the extent it is allowed to do so under the
        Applicable Law) such dividends or other distributions directly to such
        transferee or assignee (as the case may be).

5.3     Each of the Shareholders undertakes to all other Parties that it shall (to the
        extent of its rights and the rights of any of its nominees from time to time) vote
        (or procure that its respective nominees vote) as a Shareholder or a Director
        (as the case may be) to ensure that no person becomes a Holder of any
        Share (whether on transfer, allotment, transmission or by issue) except in
        accordance with this agreement.

5.4     The Shareholders shall exercise (which includes where appropriate the giving
        of a waiver thereof) their rights under any Share transfer restrictions included
        in the Articles and/or imposed by the Applicable Law so as to give full effect
        to this agreement and the Shareholders hereby agree that they shall only
        take such actions under such Share transfer restrictions included in the

Articles and/or imposed by the Applicable Law, so as the relevant terms and conditions of this agreement are complied with, including within the time periods specified in this agreement (irrespective of the periods prescribed by the Articles). This also means that no such action under the Articles and/or the Applicable Law, including a request for the Shareholder Consent, approval, offer to co-Shareholders or request to exercise or waive (as applicable) any Share Transfer Rights, shall be initiated in respect of a transfer of the Shares that is prohibited by this agreement.

5.5    The Company undertakes to the other Parties that it will not cause or permit the registration in any register of members (shareholders) or other books and records of the Company of any transfer of the Shares made in breach of this agreement and the Shares comprised in any such transfer shall carry no rights whatsoever unless and until the breach is rectified so as such transfer is made in full compliance with the terms of this agreement.

5.6    Unless this agreement otherwise provides, a transfer of any Shares to a person which is not a Party to this agreement shall be subject to such person, at or before completion of such transfer, executing and delivering to the Company the Deed of Adherence or to a new shareholders agreement in respect of the Company on such terms as may be agreed among between the remaining shareholders and the transferee.

5.7    **Third Party Offer**. Subject to Clause 5.15, in the event of a Shareholder receiving an offer from a third party that is not an Affiliate of that or any other Shareholder (any such third party, the "**Independent Buyer**") and provided that such offer complies with all of the following requirements (such requirements, the "**Offer Requirements**" and an offer complying in full with such Offer Requirements, the "**Offer**"), where such Offer:

5.7.1    is for the acquisition by that Independent Buyer of all or some of the Shares held by that Shareholder (such Shares, the "**Offered Shares**");

5.7.2    is on bona fide arm's length commercial terms;

5.7.3    is governed either by Israeli or English law;

5.7.4    states the price of the Offer expressed in USD or EUR on a "per one Share" basis (the "**Offer Price**"); and

5.7.5    provides for payment of the Offer Price in cash only,

then, to the extent such Shareholder (the "**Selling Shareholder**") wishes to sell all or some of its Offered Shares on the terms of the Offer, it shall forthwith serve a written notice (such notice, the "**Offer Notice**") on each of the other Shareholders (each of such other Shareholders, the "**Non-Selling Shareholder**") with a copy to the Company, which Offer Notice shall:

5.7.6    be accompanied by such information as to the identity, name, company registration details, address and nationality of each Independent Buyer and such Independent Buyer's Controlling shareholders and ultimate beneficial owners, (to

the extent known or disclosed to the Selling Shareholder) in order to allow the Non-Selling Shareholders (acting reasonably) to evaluate such Independent Buyer as a potential Shareholder in the Company;

5.7.7     be accompanied by a copy of the Offer;

5.7.8     specify that the Selling Shareholder has a bona fide intention to sell all of its Offered Shares to the Independent Buyer on the terms of the Offer;

5.7.9     specify the proposed Offer Price (as stated in the Offer) payable in cash only and expressed in USD or (as applicable) EUR (as stated in the Offer) on a "per one Share" basis;

5.7.10     contain a representation of the Selling Shareholder to the effect that the Independent Buyer is not an Affiliate of the Selling Shareholder or any of its Affiliates;

5.7.11     constitute an irrevocable and unconditional offer (governed by Israeli law and being subject to Clause 15) of the Selling Shareholder to the Non-Selling Shareholders to acquire from the Selling Shareholder all (but not less than all) of the Offered Shares at the Offer Price per Share; and

5.7.12     be signed by or on behalf of the Selling Shareholder.

5.8     Within 14 days of receipt of the Offer Notice (the "**Offer Period**"), each of the Non-Selling Shareholders may either:

5.8.1     exercise pursuant to Clause 5.9 a pre-emption right to acquire its pro-rata share of the Offered Shares at its election at the lower of the Offer Price and the fair market value of the Offered Shares, but otherwise on the terms of the Offer Notice (such right to acquire the Offered Shares, the "**Transfer Pre-emption Right**");

5.8.2     approve pursuant to Clause 5.8.3 or Clause 5.10 the transfer of all Offered Shares to the Independent Buyer on the terms of the Offer Notice; or

5.8.3     do nothing, in which case such Non-Selling Shareholder shall be deemed at the expiry of the Offer Period to have approved the transfer of all Offered Shares to the Independent Buyer on the terms of Clause 5.10.

5.9     **Transfer Pre-emption Right**. If any of the Non-Selling Shareholders elects pursuant to Clause 5.8.1 to exercise its Transfer Pre-emption Right:

5.9.1   it shall serve within the Offer Period a written notice on each of the Selling Shareholder, the Company and the other Shareholder) of the exercise thereof (such notice, the "**Transfer Pre-emption Right Exercise Notice**");

5.9.2   a Transfer Pre-emption Right Exercise Notice, once served (or is deemed to have been served under the terms of this agreement), shall be deemed to be irrevocable and unconditional; and

5.9.3   if the Transfer Pre-emption Right Exercise Notice is served by the Non-Selling Shareholder pursuant to Clause 5.9.1 (or is deemed to have been served for the purposes of this agreement), the Selling Shareholder shall be bound to sell the relevant Offered Shares to the Non-Selling Shareholder at the election of the Non-Selling Shareholder at the lower of the Offer Price and the fair market value of the Offered Shares, but otherwise on the terms of the Offer Notice, whereupon completion of the transfer of the Offered Shares to the Non-Selling Shareholder shall take place on the terms of Clause 5.12 within 30 days from the latter of the date of service of the Transfer Pre-emption Right Exercise Notice and the date of issuance of the final valuation report confirming the fair market value of the Offered Shares (provided that failure to complete such sale within such time and requirements as set out above for any reason whatsoever shall oblige the Selling Shareholder to repeat the steps in Clause 5.7 and Clause 5.8 if it still wishes to sell the Offered Shares to the Independent Buyer),

and provided however that if more than one of the Non-Selling Shareholders has exercised its Transfer Pre-emption Right, the Offered Shares shall (unless otherwise agreed by all of the Non-Selling Shareholders) be allocated among all of the Non-Selling Shareholders as nearly as possible in the same proportions in which they held the Shares of the Company immediately before completion of such sale.

5.10   **Transfer Approval.** If any of the Non-Selling Shareholder elects pursuant to Clause 5.8.2 or Clause 5.8.3 to approve the transfer of all Offered Shares to the Independent Buyer on the terms of the Offer Notice:

5.10.1   it shall either serve within the Offer Period a written notice on each of the Selling Shareholder, the Company and the other Shareholder approving the transfer thereof (such notice, the "**Transfer Approval Notice**") or do nothing, in which case the Non-Selling Shareholder shall be deemed at the expiry of the Offer Period to have served its Transfer Approval Notice on the Selling

E.D

M.O

5.12 **Share Transfer Formalities**. Where the Selling Shareholder is obliged to transfer any of its Shares under any provision of this agreement to the Non-Selling Shareholder, then:

5.12.1 the relevant Shares shall be transferred with full title guarantee and free from all Encumbrances and together with all rights that attach (or may in the future attach) to such Shares including, in particular, the right to receive all dividends and distributions declared, made or paid on or after the date of such transfer;

5.12.2 the transfer of the relevant Shares shall be completed simultaneously subject to the Non-Selling Shareholder paying at or before completion of such transfer by one instalment in cash, by wire transfer of immediately available funds in the required currency, the purchase price for the relevant Offered Shares of the Selling Shareholder to such bank account of the Selling Shareholder as shall be notified by the Selling Shareholder to the Non-Selling Shareholder no later than 5 Business Days from the date of service (or deemed service) by the Non-Selling Shareholder of its Transfer Pre-emption Right Exercise Notice;

5.12.3 the Selling Shareholder shall deliver to the Non-Selling Shareholder an original instrument of transfer in relation to the relevant Selling Shareholder's Shares duly executed in favour of the Non-Selling Shareholder in full compliance with the Articles and the Applicable Law;

5.12.4 the Selling Shareholder shall deliver to the Non-Selling Shareholder the original share certificate(s) for the relevant Selling Shareholder's Shares or a lost share certificate indemnity therefor;

5.12.5 the Selling Shareholder shall deliver to each of the Non-Selling Shareholder and the Company any necessary corporate and Governmental Authority approvals required for the transfer of the relevant Shares; and

5.12.6 the Non-Selling Shareholder shall deliver to each of the Selling Shareholder and the Company any necessary corporate and Governmental Authority approvals required for the purchase of the relevant Shares from the Selling Shareholder.

5.13 Each Party hereby undertakes with the other Parties to (and shall procure that its respective nominees shall) take all Necessary Actions to give effect to any transfer of the Shares to the extent that any such transfer is made in full compliance with this agreement.

E.O

L R

M.O

5.14    **Fair Market Value**. Whenever pursuant to this agreement any of the Shares are to be sold at their fair market value, a determination of such fair market value shall be made subject to the following requirements:

> 5.14.1    such determination shall be made by an independent valuer from one of PwC, E&Y, KPMG or Delloite (not being the auditors of the Company at the same time) to be engaged by the Company by the sole nomination of the Shareholder acquiring such Shares, or (in the case of Clause 7 only) by the joint nomination of the Minority Shareholders;

> 5.14.2    the independent valuer shall determine its opinion of the fair market value of the Shares to be sold on the following assumptions and bases: (i) valuing the Shares to be sold as on an arm's length sale between a willing seller and a willing buyer; and (ii) if the Company is then carrying on business as a going concern, on the assumption that it will continue to do so and (ii) valuing the Shares at such proportion of the value of the Company as they represent of the total number of the Shares and without any premium (for a majority holding) or discount (for a minority holding);

> 5.14.3    the independent valuer shall determine its opinion of the fair market value to reflect any other factors which the independent valuer reasonably believes should be taken into account;

> 5.14.4    if any difficulty arises in applying any of these assumptions or bases then the independent valuer shall resolve that difficulty in such manner as it shall in its absolute discretion think fit;

> 5.14.5    each of the Shareholders shall be entitled to make any submission or representation to the independent valuer which it considers reasonably relevant to its determination of the fair market value. Any such submission which is in writing shall be copied to each of the other Shareholders and a reasonable summary of any submission or representation which is not reduced to writing shall be sent, as soon as reasonably practicable after the making of the same, to each of the other Shareholders. Prior to attending any meeting with the independent valuer, each Shareholder shall, by giving reasonable notice, afford each of the other Shareholders an opportunity to attend any such meeting;

> 5.14.6    the independent valuer must determine the fair market value of the relevant Shares within 20 Business Days of its appointment and shall

EC

notify each of the Shareholders of its determination. All fees, costs and expenses relating to such determination shall be borne by the Shareholder acquiring the Shares, or (in the case of Clause 7 only) by the Minority Shareholders;

5.14.7 the independent valuer shall act as an expert and not as an arbitrator and its determination shall be final and binding on the Parties (in the absence of fraud or manifest error); and

5.14.8 the independent valuer may have access to all accounting records or other relevant documents of the Company, subject to any confidentiality provisions,

and where this agreement requires an acquisition, or a Shareholder which is entitled to do so under the terms of this agreement elects to acquire the relevant Shares at their fair market, any deadlines for completion of such an acquisition shall commence from the date of issuance of the final valuation report determining the fair market of such Shares.

5.15 Each of the Shareholders undertakes to each of the other Parties that for a period of 3 years from the date hereof (such period, the "**Lock-up Period**") it will not (except with the prior written consent of the other Parties) do, initiate or agree to do (directly or indirectly) in respect of any of its Shares anything referred to in Clause 5.1 in favour of an Independent Buyer and whether by initiating any procedures set out in Clause 5.7 or otherwise, provided that nothing in this Clause 5.15 shall restrict a Party whether before or after the Lock-up Period from:

5.15.1 disposing of any of its Shares in favour of, and/or acquiring any Shares from, other Parties;

5.15.2 disposing of any of its Shares in favour of its Affiliates or Disclosed Transferees on the terms of this agreement at all times; and/or

5.15.3 disposing of any of its Shares and/or acquiring any Shares of the other Shareholder on the terms of Clause 9 (*Change of Control*).

6 **CO SALE**

6.1 Upon receipt from the Shareholder 1 of an Offer Notice pursuant to Section 5.7 above, each of the Minority Shareholders shall, in lieu of exercising his Transfer Pre-emption Right, have an option, exercisable by written notice served on the Selling Shareholder within the Offer Period (the "**Co-Sale Notice**"), to require the Shareholder 1 to provide as part of its proposed sale of the Offered Shares to the Independent Buyer that such Minority Shareholder be given the right to sell to the Independent Buyer, at the price per Share and on such other terms of the Offer, such number of the Shares in the Company owned by such Minority Shareholder as shall be determined by multiplying the total

number of the Offered Shares by a fraction, the numerator of which is the number of the issued and outstanding Shares held by such Minority Shareholder and the denominator of which is the total number of all issued and outstanding Shares held by all of the Parties (the **"Pro Rata Share"**) in accordance with the mechanism which is set out below.

6.2      To the extent that one or more of the Minority Shareholders exercise his right of participation in accordance with the terms and conditions set forth in Clause 6.1, the number of the Shares that the Shareholder 1 may sell in the transaction shall be correspondingly reduced.

6.3      No transfer of the Offered Shares by the Shareholder 1 shall be concluded unless the Independent Buyer concurrently purchases, under the same terms, all of the Shares for which the Minority Shareholders elected to participate as aforesaid.

6.4      In the event that during the Offer Period none of the Minority Shareholders elects to participate in the co-sale under this Clause 6 and has not exercised its Transfer Pre-Emption Right, the Shareholder 1 may, not later than 90 days following the end of the Offer Period, to sell the Offered Shares to the Independent Buyer at the price per Share no less than that, and subject to all other terms, specified in the Offer Notice, provided that failure to complete such sale within such time and requirements as set out above shall oblige the Shareholder 1 to repeat the procedure described in Clause 5.7 and Clause 5.8 if it still wishes to sell the Offered Shares to such Independent Buyer.

## 7     DRAG ALONG

At any time prior to an IPO, in the event that the Shareholder 1 receiving an Offer from an Independent Buyer to sell all of its Shares to such Independent Buyer and such sale is conditional upon the sale of all of the remaining Shares of the Company to such Independent Buyer at the same price per Share and on the other terms of the Offer, all of the Minority Shareholders shall be required, by notice of the Shareholder 1, to sell all of their Shares to such Independent Buyer simultaneously with the Shareholder 1 at the same price per Share and on the other terms of the Offer, or at the fair market value of such Shares (determined pursuant to Clause 5.14) whichever is greater.

## 8     PERMITTED SHARE TRANSFERS

8.1      Notwithstanding any provisions of this agreement to the contrary, a Shareholder may at any time transfer all (but not some) of the Shares held by that Shareholder to any of its Affiliates, provided that:

8.1.1      no later than 3 Business Days after completion of any such transfer, such Shareholder shall send a written notice to each of the other Shareholders and the Company informing thereof;

8.1.2      no later than 15 Business Days prior completion of any such transfer, such Shareholder shall provide

or make available to each of the Company and the other Shareholders reasonable evidence that a person to which any Shares have been so transferred by such Shareholder remains to be its Affiliate as at the date of completion of such transfer, provided that in default of provision of the required evidence, such Affiliate shall be deemed to be a Former Affiliate and the provisions of Clause 8.1.5 shall apply and shall be construed accordingly;

8.1.3 such Shareholder shall procure that on completion of any such transfer such Affiliate executes and delivers to the Company the Deed of Adherence;

8.1.4 upon completion of any such transfer such Shareholder - and only in the case of a transfer of its Shares to its Affiliate being a legal entity: shall unconditionally and irrevocably guarantee, as primary obligor and not merely as a surety, and as a continuing obligation, to each other Party the proper and punctual performance of all the obligations of such Affiliate under or pursuant to this agreement;

8.1.5 where any Shares have been transferred by such Shareholder to its Affiliate and subsequently such Affiliate ceases (or is deemed to have ceased pursuant to Clause 8.1.2) to be an Affiliate of such Shareholder (such ceased Affiliate, the "**Former Affiliate**"), then the Former Affiliate shall within 3 Business Days therefrom transfer (and such Shareholder shall take all Necessary Actions to procure that its Former Affiliate forthwith transfers) all of its Shares back to such Shareholder, provided that any such transfer shall not be subject to any Share Transfer Rights of any of the other Shareholders; and

8.1.6 in the case of any of the Minority Shareholders, a transfer of his Shares to his Affiliate is only permitted if and to the extent such Affiliate is a legal entity Controlled by such Minority Shareholder.

8.2 Notwithstanding any provisions of this agreement to the contrary, the provisions of Clause 8.1 shall apply to (and shall be construed accordingly in respect of) a transfer of all of the Shares held by a Shareholder among such Shareholder and any of its Disclosed Transferees, provided that:

8.2.1 any such transfer shall not require the provision pursuant to Clause 8.1.2 of any evidence that a Shareholder which transfers its Shares and its Disclosed Transferee to which such Shares are so transferred are Affiliates, but if applicable shall

require the provision (on the terms of Clause 8.1.2) of reasonable evidence that as of the date of completion of such transfer a person to which such Shares are so transferred by such Shareholder is either:

8.2.1.1    Controlled by any of the Disclosed Transferees of such Shareholder;

8.2.1.2    the Personal Holding Arrangement of which any of the Disclosed Transferees of such Shareholder is the Ultimate Beneficiary; and/or

8.2.1.3    a legal heir and/or a heir by will of any individual who has passed (or is deemed pursuant to the requirements of the Applicable Law to have passed) away and immediately prior to the passing (or being deemed to have passed away) was a Disclosed Transferee of such Shareholder,

provided that in default of provision of the required evidence such person shall be deemed to have ceased being a Disclosed Transferee and the provisions of Clause 8.2.2 shall apply and shall be construed accordingly; and

8.2.2    where any Shares have been transferred by such Shareholder to its Disclosed Transferee and subsequently such Disclosed Transferee ceases (or is deemed to have ceased pursuant to Clause 8.2.1) to be a Disclosed Transferee of such Shareholder (such ceased Disclosed Transferee, the "**Former Disclosed Transferee**"), then the Former Disclosed Transferee shall within 3 Business Days therefrom transfer (and such Shareholder shall take all Necessary Actions to procure that its Former Disclosed Transferee forthwith transfers) all of its Shares back to such Shareholder, provided that any such transfer shall not be subject to any Share Transfer Rights of any of the other Shareholders.

8.3    If and to the extent that a transfer of any Shares by a Shareholder to any of its Affiliates (including any of its Disclosed Transferees) is made in full compliance with the provisions of Clause 8.1 and/or Clause 8.2, such transfer shall:

8.3.1    not require or be subject to any Shareholder Consent, consent of any of the other Parties;

8.3.2    not be subject to the consent of the Company Board;

8.3.3    not trigger (as a result of such transfer only) the provisions of Clause 5.7;

8.3.4    not trigger (as a result of such transfer only) any

Share Transfer Rights of any of the other Shareholders.

8.4 Subject only to Clause 5.15, nothing in this agreement shall restrict or otherwise limit any transfers of any number of the Shares among the Shareholders and any such transfers shall not be subject to or otherwise trigger any Share Transfer Rights of any of the Shareholders.

9    **CHANGE OF CONTROL**

9.1 For all purposes of this agreement, a Change of Control shall be deemed to have occurred in respect of a Shareholder (such Shareholder, an "**Affected Shareholder**") from the date when:

9.1.1   in the case of the Shareholder 1, any person or persons other than any of its Disclosed Transferees acquires Control of the Shareholder 1 (in all cases a result of any actions, events or circumstances and whether directly or indirectly, lawfully or unlawfully and whether or not voluntary, unwillingly, through operation of any Applicable Law, any Governmental Authority order or otherwise);

9.1.2   in the case of any of the Minority Shareholders, the relevant Minority Shareholder either (in each case as confirmed by a decision of the authorised Governmental Authority) (a) passes (or pursuant to the requirements of the Applicable Law is deemed to have passed) away; (b) becomes of unsound mind (which includes lacking capacity under any Applicable Law in the relevant jurisdiction); or (c) becomes a patient under any statute relating to mental health or otherwise legally incapable under any Applicable Law in the relevant jurisdiction (for the avoidance of doubt, a Change of Control shall be deemed to have occurred in respect of any Affiliate or Disclosed Transferee to which any Shares have been transferred by any of the Minority Shareholders upon the occurrence of any events referred to in this Clause 9.1.2 in respect of such Minority Shareholder);

9.1.3   in the case of any of the Minority Shareholders who has transferred his Shares to his Affiliate in compliance with Clause 8.1.6, such Affiliate ceases to be Controlled by such Minority Shareholder (in all cases a result of any actions, events or circumstances and whether directly or indirectly, lawfully or unlawfully and whether or not voluntary, unwillingly, through operation of any Applicable Law, any Governmental Authority order or otherwise);

9.1.4   if Clause 8.1.5 applies, a Former Affiliate of such

Shareholder fails to transfer all of the Shares previously acquired by it pursuant to Clause 8.1 back to such Shareholder;

9.1.5    if Clause 8.2.2 applies, a Former Disclosed Transferee of such Shareholder fails to transfer all of the Shares previously acquired by it pursuant to Clause 8.2 back to such Shareholder; or

9.1.6    any of the Shares of such Shareholder are howsoever transferred to any person in breach of this agreement,

in each case unless any of the events referred to in Clause 9.1.1, Clause 9.1.4, Clause 9.1.5 or Clause 9.1.6 occurs with a prior written consent of each of the other Shareholders.

9.2    From the date of occurrence (or deemed occurrence) of a Change of Control in respect of the Affected Shareholder:

9.2.1    such Affected Shareholder shall be deemed to have waived its right make any nominations pursuant to Clause 4;

9.2.2    any persons appointed to, or engaged by, the Company in any capacity by nomination of such Affected Shareholder may at any time thereafter be removed or replaced by the Shareholder 1 (if any of the Minority Shareholders is the Affected Shareholder) or by joint election of the Minority Shareholders (if the Shareholder 1 is the Affected Shareholder);

9.2.3    any person which the Affected Shareholder is entitled to nominate to the Company pursuant to Clause 4 shall from that date be nominated by the Shareholder 1 (if any of the Minority Shareholders is the Affected Shareholder) or by joint election of the Minority Shareholders (if the Shareholder 1 is the Affected Shareholder);

9.2.4    such Affected Shareholder shall be deemed to have waived its right to be invited to, attend and vote at any Company Shareholders Meetings, execute any written resolutions and shall not be required to count towards a quorum of any of such meeting;

9.2.5    the right of the Directors nominated by such Affected Shareholder to be invited to, attend and vote at any Company Board Meetings and execute any written resolutions shall be deemed to have been suspended and none of such Directors shall be required to count towards a quorum of any of such meeting;

E.℮

L.L.

M.D

9.2.6      any provision of this agreement which requires a prior consent of such Affected Shareholder shall no longer apply;

9.2.7      a Shareholder Consent shall be deemed to have been obtained if given by the Shareholder 1 (if any of the Minority Shareholders is the Affected Shareholder) or jointly by the Minority Shareholders (if the Shareholder 1 is the Affected Shareholder);

9.2.8      a Board Approval shall be deemed to have been obtained if given by at least 1 Director nominated by the Shareholder 1 (if any of the Minority Shareholders is the Affected Shareholder) or by at least 1 Director jointly nominated by the Minority Shareholders (if the Shareholder 1 is the Affected Shareholder); and

9.2.9      such Affected Shareholder shall be deemed to have given to each of the other Shareholders in respect of which no Change of Control has occurred or is deemed to have occurred (each of such Shareholders, a **"Non-Affected Shareholder"**) an offer to acquire all of its Shares at the lower of the fair market value of such Shares and (if applicable) the price at which a transaction giving raise to such Change of Control has been completed.

9.3      Any of the Non-Affected Shareholders may accept the offer referred to in Clause 9.2.9 by serving written notice on each of the Affected Shareholder, the Company and the other Non-Affected Shareholders within 14 Business Days from such Non-Affected Shareholder becoming aware of the relevant Change of Control, provided that if the offer is not accepted by such Non-Affected Shareholder within 14 Business Days from it becoming aware of the relevant Change of Control, such Non-Affected Shareholder shall be deemed to have irrevocably and unconditionally waived its right to acquire any of the Shares of the Affected Shareholder in connection with such Change of Control.

9.4      If the offer referred to in Clause 9.2.9 is accepted by any of the Non-Affected Shareholders within the required time period, Completion of the transfer of the Shares of the Affected Shareholder to such Non-Affected Shareholder shall take place on the terms of Clause 5.12 (for which purpose only the Affected Shareholder shall be deemed to be the Selling Shareholder and the Non-Affected Shareholder acquiring the Shares shall be deemed to be the Non-Selling Shareholder) within 30 days from the latter of the date of the acceptance of the offer and the date of issuance of the final valuation report confirming the fair market value of the relevant Shares, provided however that if the offer of the Affected Shareholder is accepted within the required time period by more than one of the Non-Affected Shareholders, than the Shares of the Affected Shareholder shall (unless otherwise agreed by all of the Non-Affected Shareholders) be allocated among all of the Non-Affected

Shareholders as nearly as possible in the same proportions in which they held the Shares of the Company immediately before completion of such an acquisition.

9.5     A Change of Control (or a deemed occurrence thereof) in respect of a Shareholder (notwithstanding whether or not any such Change of Control occurs (or is deemed to have occurred) in compliance with, or in breach of, this agreement) shall not howsoever release either such Shareholder, any of its Affiliates or any person appointed to the Company in whichever capacity by nomination of such Shareholder from any obligations or any liabilities imposed by, or arising under, this agreement or otherwise affect or extinguish any such obligations or liabilities.

10      INFORMATION AND REPORTING

10.1    Each Shareholder (and its professional advisors) may during regular business hours examine the books, records, accounts and compliance files to be kept by the Company without unduly disrupting the on-going operations and activities of the Company. Each Shareholder shall also be entitled to receive all information it reasonably requires to keep it properly informed about the business and affairs of the Company to protect its interests as a Shareholder or to the extent required in connection with its tax, regulatory or compliance affairs. For the avoidance of doubt, the right to obtain information in the immediately preceding sentence includes, but is not limited to, information regarding compliance matters.

10.2    Without prejudice to the generality of Clause 10.1 the Company shall prepare and submit to the Company Board and to the Shareholders the following information as soon as practicable and not later than the times set out below (in respect of the Financial Year ending 31 December 2015 and each subsequent Financial Year):

    10.2.1      audited annual accounts of the Company prepared in accordance with IFRS in respect of the twelve (12) month period ending 31 December in respect of each Financial Year, within 90 days from the end of the Financial Year to which they relate;

    10.2.2      unaudited quarterly management accounts of the Company comprising of not less than a balance sheet, income statement, and a cash flow statement within 30 days from the end of the reporting period to which they relate.

10.3    Each Party shall, in a timely manner and as required from time to time, take all commercially reasonable actions as may be necessary or appropriate to cooperate with the other Parties to ensure that each Shareholder has all of the information necessary to prepare and effect any notice to or filing with any Governmental Authority, or respond to any request for information from a Governmental Authority, as required by Applicable Law with respect to this agreement.

11      DURATION AND TERMINATION

11.1    Subject to Clauses 11.2, Clause 11.3 and Clause 11.4, this agreement shall

terminate immediately:

      11.1.1    on any date on which only one Shareholder (together with its Affiliates) remains holding all Shares then issued by the Company;

      11.1.2    on the date on which an effective resolution is passed or a binding order is made for the Company's winding up; or

      11.1.3    on the date on which all Shareholders agree in writing to its termination.

11.2    If this agreement is terminated pursuant to Clause 11.1, then all further rights, obligations and covenants of any Party contemplated hereby shall terminate and cease to have effect immediately as of the date on which the termination of this agreement becomes effective, except for:

      11.2.1    the Surviving Provisions; and

      11.2.2    any rights and liabilities that have accrued under this agreement prior to its termination.

11.3    The provisions of this agreement shall cease to apply to a Shareholder and each of its Beneficiaries and Affiliates with effect from the Cessation Date in respect of such Shareholder, except for:

      11.3.1    the Surviving Provisions; and

      11.3.2    any rights and liabilities that have accrued under this agreement prior to such Cessation Date.

11.4    The following provisions (the "**Surviving Provisions**") shall continue to have effect notwithstanding any termination of this agreement or its ceasing to apply to any of the Shareholders or its Beneficiaries, as the case may be:

      11.4.1    Clause 1 (Definitions and Interpretation);

      11.4.2    this Clause 11 (Duration and Termination);

      11.4.3    Clause 12 (Notices);

      11.4.4    Clause 13 (Confidentiality);

      11.4.5    Clause 14 (Miscellaneous); and

      11.4.6    Clause 15 (Governing Law and Jurisdiction).

## 12    NOTICES

12.1    Any notice or other communication pursuant to, or in connection with, this agreement shall be:

      12.1.1    in writing in the English language (or be accompanied by a translation into English); and

      12.1.2    delivered personally; or

12.1.3    sent by pre-paid express delivery through any of FedEx, DHL, UPS or any comparable internationally recognised courier company; or

12.1.4    sent by email to such email address as may from time to time have been notified in writing to the other Parties in accordance with this Clause 10 (subject to the original notice being delivered to the same recipient personally or being delivered to any of FedEx, DHL, UPS or comparable internationally recognised courier company on the same day and being subsequently delivered by such courier company to the same recipient by pre-paid express delivery in the manner specified in this Clause 12).

in each case, to the Party due to receive that notice at the address set out in Clause 12.6 (or to such other address as may from time to time have been notified in writing to the other Parties in accordance with Clause 0).

12.2    Subject to Clause 12.3, any notice or other communication shall be deemed to have been served:

12.2.1    if delivered personally, when left at the address of the relevant recipient referred to in Clause 12.6;

12.2.2    if sent by pre-paid express delivery through either of FedEx, DHL, UPS or comparable internationally recognised courier company, on the date of its delivery to the relevant recipient, which date shall be confirmed by the relevant courier company; and

12.2.3    if sent by email, one hour from the time of transmission to the relevant recipient unless the sender has received notification that such email has not been successfully delivered to such recipient (subject to the original notice being delivered to the same recipient personally or being delivered to any of FedEx, DHL, UPS or any comparable internationally recognised courier company on the same day for delivery by pre-paid express delivery in the manner specified in this Clause 6 and being subsequently delivered by such courier company to the same recipient by pre-paid express delivery in the manner specified in this Clause 12).

12.3    If a notice is given or deemed to have been given at a time (other than from 10.00 to 17.00 at the place of receipt) or on a date which is not a Business Day, it shall be deemed to have been given on the next Business Day at 10.00 at the place of receipt.

12.4    To prove service, it is sufficient to prove that the envelope containing the notice was properly addressed to the relevant recipient and posted.

12.5    In proving a transmission by email has taken place, it shall be sufficient to prove that:

12.5.1    the email was sent to the correct email address of the relevant recipient and that dispatch of the transmission from the sender's external gateway was confirmed; and

12.5.2 the original notice was delivered to the same recipient personally or by pre-paid express delivery through any of FedEx, DHL, UPS or any comparable internationally recognised courier company on the same day with the email in question in the manner specified in this Clause 12.

12.6 Subject to Clause 0, the addresses for service of any notice pursuant to, or in connection with, this agreement are:

12.6.1 in the case of the Shareholder 1, to:

| | |
|---|---|
| Address: | 2 Marina Boulevard, #66-08, the Sail @ Marina Bay, Singapore (018987) |
| For the attention of: | _____ |
| Telephone number: | _____ |
| E-mail: | _____ |

12.6.2 in the case of the Shareholder 2, to:

| | |
|---|---|
| Address: | 1 HaBonim, Kiryat Gat, Israel 8258201 |
| For the attention of: | Eldad Oz |
| Telephone number: | +16462888777 |
| E-mail: | eldadoz1@gmail.com |

in the case of the Shareholder 3, to:

| | |
|---|---|
| Address: | 1 HaBonim, Kiryat Gat, Israel 8258201 |
| For the attention of: | Moshe Oz |
| Telephone number: | +972543343018 |
| E-mail: | mosheoz13@gmail.com |

in the case of the Company, to:

| | |
|---|---|
| Address: | 1 HaBonim, Kiryat Gat, Israel 8258201 |
| For the attention of: | Moshe Oz |
| Telephone number: | +97288520034 |
| E-mail: | mosheoz13@gmail.com |

A Party may notify the others of a change to any of the details for it. The notice must comply with the terms of Clause 12.1 and must state the date on which the change is to occur. That date must be on or after the 5th Business Day after the date on which the notice is delivered on the terms of this Clause 12.

E.O

L K

M.O

13      CONFIDENTIALITY

13.1    "**Confidential Information**" means any information:

13.1.1   which either Party may have or acquire (whether before or after the date of this agreement) in relation to the customers, business, operations, assets or affairs of the Company;

13.1.2   which either Party or any of its Affiliates may have or acquire (whether before or after the date of this agreement) in relation to the beneficial owners, Disclosed Transferees, Affiliates, customers, business, operations, assets, ownership structure or other affairs of the other Party or any of the other Party's Affiliates, as a consequence of the negotiations relating to this agreement or the performance of this agreement; or

13.1.3   which relates to the contents of this agreement (or any agreement or arrangement entered into pursuant to this agreement),

but excludes the information in Clause 13.2.

13.2    Information is not Confidential Information if:

13.2.1   it is or becomes public knowledge or otherwise comes within the public domain other than as a direct or indirect result of the information being disclosed in breach of this agreement; or

13.2.2   the Parties agree in writing that it is not confidential.

13.3    Each Party shall at all times use all reasonable endeavours to keep confidential (and to ensure that its directors (including the Directors), employees, agents, Affiliates and the directors, employees and agents of such Affiliates) shall keep confidential any Confidential Information and shall not use or disclose any such confidential information except:

13.3.1   to such professional advisers, consultants, agents, representatives, employees or officers of that Party or any, or those, of its Affiliates, if necessary to advise that Party on any matter arising out of this agreement or to facilitate the transactions contemplated by this agreement or any part of those transactions, if the disclosing Party procures that the persons to whom the information is so disclosed keep it confidential as if they were that Party;

13.3.2   to an Affiliate of that Party, where such disclosure is for a purpose related to the operation of this agreement or otherwise for the compliance by any such Affiliate with the provisions of this agreement;

13.3.3      to any person whenever nominated on the terms of this agreement by that Party to the Company, where such disclosure is for a purpose related to the operation of this agreement or otherwise for the compliance by any such person with the provisions of this agreement;

13.3.4      with the written consent of the other Party or the Party's Affiliate that the information relates to (as applicable);

13.3.5      as may be required by any Applicable Laws and/or the rules of any stock exchange or Governmental Authority, when the Party concerned (if permitted by Applicable Laws) shall supply a copy of the required disclosure to all other Parties before it is disclosed and (if permitted by Applicable Laws) incorporate any amendments or additions reasonably required by any other Party;

13.3.6      to such banks, financial institutions, investors or other finance providers as are reasonably necessary to obtain any financing in connection with this agreement or any transactions contemplated by this agreement or any part of those transactions, if the disclosing Party procures that the persons to whom the information is disclosed keep it confidential as if they were that Party;

13.3.7      to any Taxation Authority to the extent reasonably required for the purposes of the Tax affairs of the Party concerned or any of its shareholders, members or Affiliates (as applicable);

13.3.8      to the extent that the disclosure is required to protect the disclosing Party's interest in any legal proceedings, including any Dispute, but shall (for the avoidance of doubt, save for any disclosure in connection with any Dispute) use reasonable endeavours to consult the other Party and to take into account any reasonable requests it may have in relation to the disclosure before making it;

13.3.9      to the extent that the disclosure is required under any arrangements in place under which negotiations relating to terms and conditions of employment or appointment are conducted (including the employment or appointment of any person seeking to take any office or other position within the Company), if the disclosing Party procures that the persons to whom the information is so disclosed keep it confidential as if they were that Party; and/or

E.O

L R

M.O

> > 13.3.10    to a proposed Independent Buyer of that Party's
> >             Shares or the Shares of its Shareholding Affiliates
> >             (as applicable), provided that such disclosure is
> >             strictly for the purposes of enabling such
> >             Independent Buyer to determine whether or not to
> >             make an offer for such Shares, or to determine the
> >             level of such offer, having made such Independent
> >             Buyer aware of the requirement to comply with this
> >             Clause 13.

13.4    Each Party shall inform any officer, employee or agent or any professional adviser advising it in relation to the matters referred to in this agreement, or to whom it provides the Confidential Information, that such information is confidential and shall require them:

> > 13.4.1    to keep it confidential; and

> > 13.4.2    not to disclose it to any third party (other than those persons to whom it has already been disclosed in accordance with the terms of this agreement).

13.5    Upon termination of this agreement or its ceasing to apply to a Party (as applicable), such Party may demand from the other the return of any documents containing the Confidential Information in relation to the first Party and/or its nominees and by notice whereupon such other Party shall (and shall use all reasonable endeavours to ensure that its Affiliates, and its officers and employees and those of its Affiliates) shall:

> > 13.5.1    return such documents; and

> > 13.5.2    destroy (to the extent possible) any copies of such documents and any other document or other record reproducing, containing or made from or with reference to the Confidential Information,

(save, in each case, for any submission to or filings with any Governmental Authorities or any stock exchange). Such return or destruction shall take place as soon as practicable after the receipt of any such notice.

13.6    The obligations of each Party (including any Shareholder who has ceased to hold any of the Shares) in this Clause 13 shall continue without limit in time and notwithstanding termination of this agreement or its ceasing to apply to such Party for any reason whatsoever.

14      **MISCELLANEOUS**

14.1    **Assignment**. Save as otherwise set out in this agreement, neither Party may, save with a prior written consent of all other Parties, assign, transfer, delegate, sub-contract, mortgage, charge, put into trust or otherwise deal with this agreement, and/or all or any of its rights or obligations arising under or out of this agreement and/or the benefit of all or any of the other Party's obligations under this agreement.

14.2    **Entire Agreement**. This agreement (together with all documents referred to in it) constitutes the entire agreement between the Parties in relation to its

subject matter and replaces and extinguishes all prior agreements, undertakings, arrangements or statements (in whatever form) with respect to that subject matter.

14.3 **Impossibility to give effect to this agreement.** To the extent that after the date hereof any changes to any Applicable Laws are made or any decision of any court or other Governmental Authority of competent jurisdiction is issued so as:

14.3.1 any provision of this agreement or the Articles is rendered void or voidable; or

14.3.2 the rights and obligations of the Parties or the Shareholders as reflected herein cannot be given effect, fully enforced, exercised, complied with and/or implemented in the Articles, in each case as envisaged by this agreement,

the Parties have agreed to amend this agreement and/or the Articles to the extent necessary and reasonably possible to give effect, to render enforceable or to implement the rights and obligations of the Parties pursuant to this agreement together with the management and corporate governance structure as set out herein.

14.4 **Discrepancy between this agreement and the Articles.** If there shall at any time be any discrepancy between the provisions of this agreement on the one hand and the provisions of the Articles on the other, the provisions of this agreement shall prevail among the Shareholders *per se* and in their relationships among themselves and the Company, and each Party shall:

14.4.1 take such steps as may be necessary to amend the Articles in order to give effect to the provisions of this agreement and align the Articles with this agreement; and/or

14.4.2 exercise the rights attached to its Shares or otherwise provided for by this agreement (and take all Necessary Actions so as to procure that any person appointed to the Company by nomination of such Party takes or omits to take such actions as may be required or available under the Articles) in such a way that the provisions of this agreement shall be complied with including, where appropriate, the carrying into effect of such provisions as if they were embodied in the Articles.

14.5 **Consents.** Where this agreement provides that any particular transaction or matter requires a consent, approval or agreement of any Party (including a Shareholder Consent), that consent, approval or agreement shall be given or made in writing and may be given or made subject to such terms and conditions as that Party may impose and any breach of those terms and conditions by any person subject to them shall itself be deemed to be a breach of the terms of this agreement.

14.6 **Waivers and Remedies.** If any Party fails to exercise or delays in exercising

any right or remedy under this agreement that failure or delay shall not constitute a waiver of the right or remedy or a waiver of any other rights or remedies which such Party may otherwise have.

14.7 No single or partial exercise by either Party of any right or remedy under this agreement shall prevent any further exercise of the right or remedy or the exercise of any other right or remedy.

14.8 Any waiver of any right, power or remedy under this agreement shall be in writing and may be given subject to such conditions as the grantor may in its absolute discretion decide. Any such waiver (unless otherwise specified) shall only be a waiver in the particular instance and for the particular purpose for which it was given.

14.9 Each Party's rights and remedies contained in this agreement are in addition to, and not exclusive of, any other rights or remedies available to it under any Applicable Law.

14.10 **Further Assurance**. The Company and the Shareholders shall (and shall procure that their respective nominees shall) do, execute and perform all such further deeds, documents, assurances, acts and things as any Party may reasonably require to give effect to the terms of this agreement.

14.11 **Relationships of Parties**. Nothing in this agreement shall be deemed to constitute a partnership, association or other co-operative entity between any of the Parties or constitute any Party the agent of any other Party for any purpose.

14.12 **Joint Obligations**. Except as otherwise provided for by this agreement, all covenants and other obligations given or entered into by the Minority Shareholders are given or entered into jointly and severally.

14.13 **Invalidity**. If any provision of this agreement is held to be unenforceable or illegal, in whole or in part, that provision or part shall, to that extent, be deemed not to form part of this agreement but the enforceability of the remainder of this agreement shall remain unaffected.

14.14 **Variation**. With effect from the Cessation Date in respect of a Shareholder this agreement may be varied without reference to (or the need for the signature on any relevant document of) that Shareholder, provided that such variation shall not give rise to any new or increased liability of that Shareholder.

14.15 Save as otherwise set out in Clause 12.15, no amendment or variation of this agreement or of any of the documents referred to in it shall be valid unless it is in writing and signed by or on behalf of each of the Parties.

14.16 **Counterparts**. This agreement may be executed in as many counterparts (including facsimile counterparts) as may be required. It shall not be necessary that the signatures of, or on behalf of, each Party, or that the signatures of all persons required to bind any Party, appear on each counterpart; but it shall be sufficient that the signature of, or on behalf of, each Party, or that the signatures of the persons required to bind any Party, appear on one or more of the counterparts.

14.17 All counterparts together constitute the same document. It shall not be

necessary in making proof of this agreement to produce or account for more than a number of counterparts containing the respective signatures of, or on behalf of, all of the Parties hereto.

14.18 **Third Party Rights**. A person who is not a Party (unless such person becomes a Party by executing a Deed of Adherence) shall have no rights to rely on or enforce any term of this agreement provided that this does not affect any right or remedy of the third party which exists or is available pursuant to any Applicable Law.

14.19 The rights of the Parties hereto to terminate, rescind or agree to any variation, waiver or settlement under this agreement are not subject to the consent of any person that is not a Party to this deed, unless otherwise required by any Applicable Law.

14.20 **English Language**. All other documents provided under or in connection with this agreement must be:

14.20.1 in English; or

14.20.2 if not in English, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

14.21 If this agreement is translated into any language other than English, the English language text shall prevail and any questions of interpretation shall be addressed solely in the English language.

14.22 **Costs**. Unless otherwise provided for in this agreement, all costs in connection with the negotiation, preparation, execution, performance and implementation of this agreement, and any documents referred to in it, shall be borne by the Party that incurred the costs.

## 15 GOVERNING LAW AND JURISDICTION

15.1 This agreement and any dispute, controversy or claim arising out of or in relation to this agreement or its existence or formation or arising out of or in relation to the transactions contemplated by it or its formation, or the breach, termination or invalidity of it or those transactions, including any non-contractual dispute or claim (a "**Dispute**") shall be governed by and construed in accordance with the laws of Israel.

15.2 The Parties agree that any legal proceedings may be served on them by delivering a copy of such proceedings to them at their respective addresses set out in Clause 12.6 (or to such other address as may from time to time have been notified in writing to the other Parties in accordance with Clause 0).

15.3 The Parties agree to use all reasonable efforts to resolve any Dispute by mutual agreement.

15.4 The Parties irrevocably agree that if the Parties are unable to resolve a Dispute by mutual agreement within a period of 15 Business Days after the giving by either Party to the other of a notice invoking this provision, then such Dispute shall be referred to and finally resolved by arbitration in accordance with the provisions of Clause 15.5 through Clause 15.11.

E.O

M. O

15.5    The arbitration shall be conducted under the laws of the State of Israel.

15.6    The number of arbitrators shall be three. The claimant shall nominate one arbitrator (or if there is more than one claimant, the claimants, irrespective of number, shall nominate jointly one arbitrator); the respondent shall nominate the second arbitrator (or if there is more than one respondent, the respondents, irrespective of number, shall nominate jointly one arbitrator). The two arbitrators nominated by the Parties shall within 30 days of the appointment of the second arbitrator agree upon and nominate a third arbitrator who shall act as chairman of the Arbitral Tribunal. If no such agreement is reached within 30 days, the Head of the Israeli Bar of Association shall appoint a third arbitrator to act as chairman of the Arbitral Tribunal.

15.7    In the event the claimant(s) or the respondent(s) shall fail to nominate an arbitrator within the time limits specified in the Israeli law, such arbitrator shall be appointed by the Head of the Israeli Bar of Association. In the event that both the claimant(s) and the respondent(s) fail to nominate an arbitrator within the time limits specified in the Israeli law, all three arbitrators shall be appointed by the Head of the Israeli Bar of Association who shall designate one of them as chairman.

15.8    If all the Parties to an arbitration so agree in writing following the filing of a Request, any arbitration commenced pursuant to this agreement shall be heard by a sole arbitrator appointed by the Head of the Israeli Bar of Association.

15.9    The seat or legal place of arbitration shall be Tel Aviv, Israel. The language used in the arbitration shall be English. All documents submitted in connection with the proceedings shall be in the English language, or, if in another language, accompanied by a certified English translation.

15.10   Any award issued by an Arbitral Tribunal in any arbitration proceedings commenced pursuant to this Clause 15 shall be final and binding on the parties thereto. Judgement upon the award may be entered by any court having jurisdiction thereover.

15.11   For the purposes of arbitration pursuant to this Clause 15, the Parties waive any right of application to determine a preliminary point of law or appeal under the applicable law.

## SCHEDULE 1
### Definitions and rules of interpretation

1    In this agreement, all defined terms shall have the meanings assigned to them in this paragraph 1 of this Schedule 1, subject to any express contrary indication:

1.1    "**Affected Shareholder**" has the meaning given in Clause 9.1 and shall be construed so as to include:

1.1.1    if Clause 9.1.4 applies, the Former Affiliate of the relevant Shareholder;

1.1.2    if Clause 9.1.5 applies, the Former Disclosed Transferee of the relevant Shareholder; and

1.1.3    in the case of any of the Minority Shareholders, any person which acquires, or obtains any other rights in respect of, any of the Shares of such Minority Shareholder upon such Minority Shareholder either (a) passes (or pursuant to the requirements of the Applicable Law is deemed to have passed) away; (b) becomes of unsound mind (which includes lacking capacity under any Applicable Law in the relevant jurisdiction); or (c) becomes a patient under any statute relating to mental health or otherwise legally incapable under any Applicable Law in the relevant jurisdiction;

1.2    "**Affiliate**" in respect of any person, means a person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with such person, and with reference to an individual, in addition to the foregoing, means:

1.2.1    that individual's spouse and any sibling (excluding the Shareholders), parent, child or stepchild of that individual or that individual's spouse; and

1.2.2    any Personal Holding Arrangement in respect of which such individual or any person referred to in paragraph 1.2.1 of this Schedule 1 is the Ultimate Beneficiary,

and with reference to a Shareholder, in addition to any of the foregoing, shall be construed so as each of such Shareholder and its Disclosed Transferees from time to time (for certainty, only for so long as such Disclosed Transferee remains to be the Disclosed Transferee of such Shareholder) shall be considered to be the Affiliates of each other notwithstanding whether or not at any point in time any of such Shareholder and/or its relevant Disclosed Transferee meets any of the other requirements of this paragraph 1.1 for otherwise being considered to be an Affiliate of the relevant person, provided however that immediately upon ceasing by a person (or being deemed pursuant to this agreement to have ceased) to be Disclosed Transferee of such Shareholder, such person shall cease to be the Affiliate of such Shareholder and any of its Affiliates for the time being;

1.3    "**Applicable Laws**" or "**Applicable Law**" means all regional, federal, national and supranational laws, rules, regulations and statutory provisions, including those imposed by any Governmental Authority that apply from time to time to a person or activity in the circumstances in question;

1.4     "**Appointing Shareholder**" has the meaning given in Clause 4.12;

1.5     "**Articles**" means the articles of association of the Company from time to time;

1.6     "**Board Approval**", means either an approval:

    1.6.1     by a simple majority of all of the Directors participating in a duly convened and quorate Company Board Meeting; or

    1.6.2     given in writing by all the Directors;

1.7     "**Board Meeting Quorum Requirements**" has the meaning given in Clause 4.17;

1.8     "**Budget**" means a budget of the Company for a particular Financial Year approved, and as amended, from time to time by the Company Board in accordance with this agreement;

1.9     "**Business**" has the meaning given in Clause 2.1;

1.10    "**Business Day**" means a day (other than a Friday or Saturday or Sunday) when banks in each of:

    1.10.1    Singapore

    1.10.2    Israel; and

    1.10.3    Moscow (the Russian Federation),

    are open for business;

1.11    "**Business Plan**" means a business plan for the Company for each Financial Year approved, and as amended, from time to time by the Company Board in accordance with this agreement;

1.12    "**CEO**" has the meaning given in Clause 4.20;

1.13    "**Cessation Date**" in respect of a Shareholder, means the later of the date on which such Shareholder ceases to be the Holder of any Shares and the date on which all Affiliates of such Shareholder cease to be the Holders of any Shares;

1.14    "**Company**" has the meaning first given above;

1.15    "**Company Board**" means the board of Directors of the Company as it is constituted from time to time;

1.16    "**Company Board Meeting**" means a meeting of the Company Board;

1.17    "**Company Shareholders Meeting**" means a general meeting of the Shareholders of the Company;

1.18    "**Confidential Information**" has the meaning given in Clause 13.1;

1.19    "**Constitutional Documents**" in respect of any corporate body, means the memorandum of incorporation, articles of association, bylaws, charter, any partnership agreement, joint venture agreement, shareholders agreement,



trust deed or declaration of trust, limited liability company agreement or any other documents governing the affairs of such body corporate and any amendments thereto;

1.20    "**Control**" in relation to a person, means the power (whether direct or indirect and whether or not exercised) of another person (or persons acting in concert, in which case it is deemed that any person from that group of persons has the right to Control) to secure (directly or indirectly) that its affairs are conducted in accordance with the wishes of that other person (or persons acting in concert) by virtue of:

1.20.1    the direct or indirect ownership or Control of <u>more than</u> 50 per cent. of the voting shares or charter capital of the relevant person; or

1.20.2    the ability to direct (directly or indirectly) the casting of <u>more than</u> 50 per cent. of the votes exercisable at general shareholders, participants, members or partnership meetings of the relevant person on all, or substantially all, matters; or

1.20.3    the direct or indirect right or power to appoint or remove directors or members of any management body of the relevant person holding a <u>majority</u> of the voting rights at meetings of the relevant board or management body on all, or substantially all, matters; or

1.20.4    the direct or indirect right or power to appoint or remove the chief executive officer, the sole executive director (or any person occupying the position of the chief executive officer or the sole executive director by whatever name called) of the relevant person; or

1.20.5    the ability to exercise (directly or indirectly) any contractual right or right in equity as a settlor, executor, trustee, protector, enforcer or beneficiary of any Personal Holding Arrangement; and/or

.1.20.6    the right to exercise (directly or indirectly) a Dominant Influence over the relevant person by means of a right contained in the person's Constitutional Documents or by virtue of a binding contract (including through any fiduciary arrangement) or otherwise,

where for all purposes of this agreement:

1.20.7    "**Dominant Influence**" means the right of one person to give (directly or indirectly) directions with respect to the operating and financial policies of another person with which its directors are obliged to comply whether or not they are for the benefit of that other person;

. 1.20.8    unless this agreement otherwise expressly provides, a "**Change of Control**" occurs if a person (or persons acting in concert) who howsoever Controls another person ceases to do so or if another person (other than such person or persons acting in concert) acquires Control of it (in all cases a result of any actions, events or circumstances and whether directly or indirectly, lawfully or

unlawfully and whether or not voluntary, unwillingly, through operation of any Applicable Law, any Governmental Authority order or otherwise);

1.20.9 "**Control**" (when used as a verb), "**Controlled**", "**under common Control with**" and "**Controlling**" shall be construed accordingly;

1.20.10 "**persons acting in concert**", in relation to a person, are persons which actively co-operate, pursuant to an agreement or understanding (whether formal or informal), with a view to obtaining or consolidating direct or indirect Control of that person; and

1.20.11 a Personal Holding Arrangement which has any Ultimate Beneficiary, shall be deemed to be Controlled by that Ultimate Beneficiary;

1.21 "**Co-sale Notice**" has the meaning given in Clause 6.1;

1.22 "**Deed of Adherence**" means a deed of adherence to this agreement in, or substantially in, the form set out in <u>Schedule 3</u>;

1.23 "**Director**" means a director of the Company, including any person occupying the position of director of the Company by whatever name called;

1.24 "**Disclosed Transferee**" in respect of a Shareholder and each of its Shareholding Affiliates from time to time, means:

1.24.1 each individual, company or other persons whom all Shareholders shall have agreed in writing on or before the date of this agreement to be a Disclosed Transferee of the relevant Shareholder for the purposes of this agreement (in the case of an individual, for so long as the relevant individual remains, or pursuant to the requirements of the Applicable Law is deemed to have being, alive and, in the case of a company, for so long as the relevant company legally exists), provided that no subsequent replacement of any such agreed Disclosed Transferee is allowed by a Shareholder unless with a prior written consent of the other Shareholders (and if such consent is given in respect of any person, such person shall be considered to be a Disclosed Transferee of the relevant Shareholder on the terms hereof for all purposes of this paragraph 1.23 of <u>Schedule 1</u>);

1.24.2 each legal heir and/or heir by will of each Disclosed Transferee of such Shareholder referred to in paragraph 1.24.1 of this <u>Schedule 1</u>, provided that any such legal heir and/or heir by will shall only become a Disclosed Transferee for the purposes of this agreement with effect from the date when the relevant Disclosed Transferee (of which such individual is the legal heir and/or heir by will) passes (or pursuant to the requirements of the Applicable Law is deemed to have passed) away;

1.24.3 any Personal Holding Arrangement of which any of the Disclosed Transferees of such Shareholder is from time to time the Ultimate Beneficiary, provided that in respect of any legal heir and/or heir

by will of any of such Disclosed Transferees the provisions of this paragraph 1.24.3 shall only apply (and such legal heir and/or heir by will shall become a Disclosed Transferee for the purposes of this agreement) with effect from the date when the relevant Disclosed Transferee (of which such individual is the legal heir and/or heir by will) passes (or pursuant to the requirements of the Applicable Law is deemed to have passed) away; and/or

1.24.4 any person which is from time to time directly or indirectly, through one or more intermediaries Controlled by any of the Disclosed Transferees of such Shareholder, provided that in respect of any legal heir and/or heir by will of any of such Disclosed Transferees the provisions of this paragraph 1.24.4 shall only apply (and such legal heir and/or heir by will shall become a Disclosed Transferee for the purposes of this agreement) with effect from the date when the relevant Disclosed Transferee (of which such individual is the legal heir and/or heir by will) passes (or pursuant to the requirements of the Applicable Law is deemed to have passed) away;

1.25 "**Dispute**" has the meaning given in Clause 15.1;

1.26 "**Encumbrance**" means (in each case, howsoever imposed or created, whether exercisable now or in the future and whether contingent or not) any:

1.26.1 mortgage, charge, pledge, negative pledge, equity, assignment, hypothecation, security interest or lien securing any obligation of any person;

1.26.2 option, right to acquire, title retention, restriction in respect of power of sale, right of pre-emption or first refusal;

1.26.3 right to exercise (including to waive) any voting, veto or similar rights;

1.26.4 right to call for allotment, conversion, issue, exchange, sale or transfer of any shares or any other interest, or any other security;

1.26.5 option or instrument giving rise to any right over share, charter or other capital (whether authorised, issued or unissued);

1.26.6 right of set-off or other arrangement under which money or claims to, or for the benefit of, any person may be applied or set off so as to effect discharge of any sum owed or payable to any person;

1.26.7 type of preferential arrangement the effect of which is to give a creditor in respect of indebtedness a preferential position in relation to any asset of a person on any insolvency proceeding of that person; and/or

1.26.8 other form of encumbrance or third party right or claim, or any agreement, arrangement, obligation and/or commitment to create or creating any of the foregoing;

1.27 "**Financial Year**" means a time period commencing on 1 January of each

calendar year and ending on 31 December of that year;

1.28    "**Former Affiliate**" has the meaning given in Clause 6.1.4;

1.29    "**Former Disclosed Transferee**" has the meaning given in Clause 8.2.2;

1.30    "**Governmental Authority**" means, in relation to anywhere in the world, any supra-national, federal, national, state, municipal or local government, body or authority, any subdivision, court, administrative agency or commission or other authority thereof, or any quasi-governmental or private body exercising any regulatory, Taxation, importing or other governmental or quasi-governmental authority;

1.31    "**Holder**" in relation to a Share, a person whose name is entered in the register of members of the Company as the holder of that Share from time to time;

1.32    "**IFRS**" means the International Financial Reporting Standards issued from time to time by the International Accounting Standards Board;

1.33    "**Independent Buyer**" has the meaning given in Clause 5.6;

1.34    "**Intellectual Property Rights**" means any (i) copyrights, patents, database rights and rights in trademarks, designs, know-how and confidential information (whether registered or unregistered), (ii) applications for registration, and rights to apply for registration, of any of the foregoing rights and (iii) all other intellectual property rights and equivalent or similar forms of protection existing anywhere in the world;

1.35    "**Lock-up Period**" has the meaning given in Clause 5.15;

1.36    "**Losses**" means any and all losses (including any diminution of value), liabilities, claims, damages, penalties, fines, costs (including costs of mitigation and/or rectification and costs incurred in establishing, defending or enforcing a claim) and expenses (including reasonable legal and other professional fees and management time) whenever and howsoever suffered or incurred;

1.37    "**Minority Shareholders**" means collectively the Shareholder 2 and the Shareholder 3;

1.38    "**Necessary Actions**" in respect of a result required to be caused, means all lawful actions necessary to cause such result (to the extent such actions are, at the time they are required to be taken, within the power of a person obliged to take such actions), which actions may include:

    1.38.1    exercising voting rights or voting or providing a written consent or proxy with respect to any shares or other equity interest held in or by any other person (including any shares or other equity interest over which that person exercises voting Control);

    1.38.2    causing the adoption of shareholders, board of directors and/or other resolutions and/or any necessary amendments to any Constitutional Documents of the relevant person;

    1.38.3    causing any representatives and/or nominees of a Shareholder

and/or any person appointed to the Company in whichever capacity by nomination of such Shareholder to act in a certain manner or causing them to be removed in the event they do not act in such manner, provided that the power of a Shareholder to cause any of the persons appointed to the Company in whichever capacity by nomination of such Shareholder to so act is assumed for all purposes of this agreement;

1.38.4    furnishing all the necessary instructions to the trustees, settlors, protectors, agents or any other representatives of such person;

1.38.5    executing agreements and instruments that are reasonably necessary or desirable to achieve such result; and

1.38.6    receiving from, making, or causing to be made with, any Governmental Authorities or other persons, all filings, approvals, registrations, any other authorisations or similar actions that are required to achieve such result;

1.39    **"Non-Affected Shareholder"** has the meaning given in Clause 9.2.9;

1.40    **"Non-Selling Shareholder"** has the meaning given in Clause 5.6.4;

1.41    **"Offer"** has the meaning given in Clause 5.6;

1.42    **"Offer Notice"** has the meaning given in Clause 5.6;

1.43    **"Offer Period"** has the meaning given in Clause 5.7;

1.44    **"Offer Price"** has the meaning given in Clause 5.6.3;

1.45    **"Offer Requirements"** has the meaning given in Clause 5.6

1.46    **"Offered Shares"** has the meaning given in Clause 5.7.1;

1.47    **"Parties"** means the parties to this agreement from time to time;

1.48    **"Personal Holding Arrangement"** means any:

1.48.1    trust (which shall include a reference to its trustee or trustees where relevant) whether or not discretionary, revocable or irrevocable, and whether or not evidenced by a trust deed or a declaration of trust;

1.48.2    private foundation (which shall include where relevant a reference to its board, council, the sole manager or director); and/or

1.48.3    any equivalent thereof in any jurisdiction,

in each case wherever and howsoever made, settled, incorporated, created or established;

1.49    **"Relevant Proportion"** in respect of a Shareholder, a percentage calculated by:

1.49.1    dividing the total number of the Shares held by that Shareholder from time to time by the total number of the Shares (including the

Shares held by that Shareholder) in issue from time to time; and

1.49.2     then multiplying that figure by 100;

1.50     "**Selling Shareholder**" has the meaning given in Clause 5.6;

1.51     "**Share Transfer Rights**" means the right of a Shareholder to exercise on the terms of Clause 5.7 either a Transfer Pre-emption Right or to serve a Transfer Approval Notice in each case in connection with a proposed transfer by the other Shareholder of its Offered Shares to an Independent Buyer;

1.52     "**Shareholder Consent**" means an approval given in a quorate and duly convened Company Shareholders Meeting or in writing by 100% of the Shareholders (or their respective Shareholder Representatives);

1.53     "**Shareholder Representative**" has the meaning given in Clause 4.2;

1.54     "**Shareholders**" means collectively Shareholder 1, Shareholder 2 and Shareholder 3 and "**Shareholder**" means any of them;

1.55     "**Shareholders Meeting Quorum Requirements**" has the meaning given in Clause 4.8;

1.56     "**Shareholder 1**", "**Shareholder 2**" and "**Shareholder 3**" have the respective meanings first given above;

1.57     "**Shares**" means the Company's ordinary shares one (1) New Israeli Shekel par value;

1.58     "**Surviving Provisions**" has the meaning given in Clause 11.4;

1.59     "**Transfer Approval Notice**" has the meaning given in Clause 5.10.1;

1.60     "**Transfer Pre-emption Right**" has the meaning given in Clause 5.8.1;

1.61     "**Transfer Pre-emption Right Exercise Notice**" has the meaning given in Clause 5.9.1;

1.62     "**Ultimate Beneficiary**" in respect of a Personal Holding Arrangement means an individual who (or the members of whose family have) at the time in question has the beneficial right or interest (arising from being a beneficiary of such Personal Holding Arrangement) to receive, directly or indirectly, <u>50 per cent. or more</u> (as determined on a look-through basis, where applicable) of any proceeds, distributions or assets of, or from, such Personal Holding Arrangement; and

1.63     "**US$**", "**USD**" or "**Dollars**" means United States Dollars, the lawful currency of the United States of America.

2     The rules of interpretation set out in paragraph 3 through paragraph 17 (inclusive) of this Schedule 1 apply in this agreement, subject to any express contrary indication.

3     Any references to "**this agreement**" are to this share purchase agreement as the same may be amended, reinstated or varied from time to time pursuant to its terms.

4     Any references to the "**date of this agreement**" or the "**date hereof**" are to the date of execution and delivery of this agreement by all Parties.

5    The Schedules form part of (and are incorporated into) this agreement.

6    The headings to Clauses, Schedules and paragraphs are for convenience only and shall not affect the interpretation or construction of this agreement.

7    A reference to a "**person**" includes a reference to:

    7.1    any individual, firm, partnership, company, society, Governmental Authority, government, state or agency of a state, association (including unincorporated association), body corporate, joint venture, Personal Holding Arrangement, works council or employee representative body (in each case, whether or not having separate legal personality) wherever and howsoever incorporated or situated; and

    7.2    that person's legal personal representatives, trustees in bankruptcy and successors.

8    Unless the context otherwise requires:

    8.1    words denoting the singular shall include the plural and vice versa;

    8.2    words denoting a gender shall include all genders; and

    8.3    references to (or to any specified provision of) this agreement or any other document shall be construed as references to this agreement, that provision or that document as in force and as amended from time to time.

9    A reference to any Applicable Law, statute, statutory provision or subordinate legislation includes a reference to it as modified, replaced, amended and/or re-enacted from time to time (before or after the date of this agreement) and any prior or subsequent legislation made under it but this paragraph 9 shall not operate so as to impose on any Party any greater obligation than would otherwise apply.

10    A reference to a "**company**" shall include any company, corporation or other body corporate, wherever and howsoever incorporated or established.

11    Any phrase introduced by the terms "**including**", "**include**", "**in particular**" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.

12    A reference to a Clause or Schedule is to a clause of or schedule of this agreement and a reference to a paragraph is to a paragraph of the relevant Schedule or the relevant part of the relevant Schedule (as applicable).

13    References to "**writing**" or "**written**" shall include any modes of reproducing words in a legible and non-transitory form and, for the avoidance of doubt, include, but only when expressly set out in this agreement, **electronic mail**.

14    Unless otherwise provided for in this agreement, references to any "**liability**" shall be construed so as to include, as at any determination date, any liability, obligation, commitment, covenant or undertaking of any nature or kind, whether actual, contingent or otherwise including any interest, fine, penalty, surcharge, fee, cost, expense or tax relating thereto.

15    A reference to "**transfer**" or "**disposal**" in respect of any Share, asset, thing or any other interest, or any legal or beneficial title or interest therein, or any benefit or entitlement derived therefrom, when used as a *noun*, includes, without limitation

(direct or indirect):

15.1 the sale, assignment, transfer, derivative, swap or any other disposal whether or not in exchange for any consideration (including by contribution to a share or charter capital, through distribution of any dividend or other profit in kind, donation, gift or other gratuitous disposal, by way, or as a result, of any merger, consolidation, division, extraction, transformation, other reorganisation, accession, restructuring, liquidation, winding-up, dissolution, bankruptcy or otherwise);

15.2 the creation of or permitting to subsist of any Encumbrance;

15.3 the creation of any Personal Holding Arrangement or the conferring of any interest (including any beneficial interest) in respect thereof;

15.4 any agreement, arrangement or understanding in respect of the right to receive dividends or other distributions or in respect of votes, management or exercise of any other rights in respect thereof or;

15.5 any waiver, renunciation or assignment of any right to subscribe or receive such or any other Share, asset, thing or any other interest, or any legal or beneficial interest therein;

15.6 the issue of a depositary receipt in respect of any Share, asset, thing or any other interest; and/or

15.7 the transmission or attachment of such or any other Share, asset, thing or any other interest by operation of any Applicable Law or any Governmental Authority order,

and when used as a *verb*, means to do (directly or indirectly) or agree (whether or not subject to any condition) or purport to do any of the foregoing.

16 Unless otherwise provided for in this agreement, a word or expression used in any notice given in connection with this agreement has the same meaning in that notice as in this agreement.

17 Any reference to a "**day**" (including within the phrase "**Business Day**") shall mean a period of 24 (twenty-four) hours running from midnight to midnight; unless specified otherwise, any reference to a "**day**" shall mean a reference to a calendar day.

## SCHEDULE 2
## The Company

| | |
|---|---|
| Name: | CAA Industries Ltd. |
| Type of corporate entity: | Private Limited Liability Company |
| Date of incorporation: | September 19, 2007 |
| Jurisdiction of incorporation: | Israel |
| Registration number: | 51-403083-2 |
| Registered office: | 1 HaBonim, Kiryat Gat, Israel 8258201 |
| Issued share capital: | NIS100,000 |
| Number of issued shares: | 116 |
| Nominal value of one share: | NIS1 |
| Registered shareholders: | Eldad Oz and Moshe Oz |
| Directors: | Eldad Oz and Moshe Oz |
| Auditors: | BDI Ziv Haft |
| Accounting reference date: | December 31 |

## SCHEDULE 3
### Form of Deed of Adherence

**THIS DEED OF ADHERENCE** is made on [DATE]

**BETWEEN:**

(1)     **CAA INDUSTRIES LTD.**, a company incorporated and existing in accordance with the laws of the State of Israel, with registration number 51-4030832 and having its registered office at 1 Habonim St. Kiryat Gat, Israel (the "**Company**"); and

(2)     [NAME], a company incorporated and existing in accordance with the laws of [PLEASE INSERT] with registration number [PLEASE INSERT] and having its registered office at [PLEASE INSERT] (the "**New Shareholder**").

Capitalized terms used but not otherwise defined herein shall have the same meaning as in the Shareholders Agreement (as defined below).

**RECITALS**

A.     The Shareholder [1/2/3] (the "**Selling Shareholder**") intends to transfer to the New Shareholder [PLEASE INSERT NUMBER] Shares of the Company subject to the execution by the New Shareholder of this Deed of Adherence.

B.     This Deed of Adherence is entered into in compliance with the terms of Clause 5.6 of the shareholders agreement dated [DATE] 2014 made between the Selling Shareholder and all other parties thereto, as such agreement shall have been or may be amended or supplemented from time to time (the "**Shareholders Agreement**").

**THIS DEED OF ADHERENCE WITNESSES** as follows:

1     The New Shareholder undertakes to be bound by the provisions of the Shareholders Agreement, and to perform the obligations imposed by the Shareholders Agreement that are to be performed on or after the date of this Deed of Adherence, as if the New Shareholder were a Party to the Shareholders Agreement in the same capacity as the Selling Shareholder, but without prejudice to such obligations of the Selling Shareholder under the terms of the Shareholders Agreement.

2     This Deed of Adherence is made for the benefit of all original parties to the Shareholders Agreement and any other person(s) who after the date of the Shareholders Agreement (and whether prior to or after the date of this Deed of Adherence) adheres to the Shareholders Agreement.

3     The address for service of any notices to each of the New Shareholder and the New Shareholder Beneficiary for the purposes of Clause 12 of the Shareholders Agreement (which Clause 6 shall be construed accordingly):

| | |
|---|---|
| Name: | [PLEASE INSERT] |
| Address: | [PLEASE INSERT] |
| For the attention of: | [PLEASE INSERT] |
| Telephone number: | [PLEASE INSERT] |
| E-mail: | [PLEASE INSERT] |

4       This Deed of Adherence shall be governed by and construed in accordance with the laws of Israel and is subject to Clause 15 of the Shareholders Agreement.

**IN WITNESS WHEREOF**, this Deed of Adherence has been executed and delivered by or on behalf of the parties thereto as a deed the day and year first before written.

[INSERT SIGNATURES OF ALL PARTIES TO THE DEED OF ADHERENCE
AND WITNESSES THEREOF]

## SCHEDULE 4
### Minority Shareholders' Undertakings

Within no later than 180 days following the Date of Completion, as such term is defined in the Share Purchase Agreement between the Minority Shareholders, the Shareholder 1 and the Company dated ____, January 2015 (the "**Covenants Period**"), the Minority Shareholders undertake to procure that the Company shall:

(i)     duly record the working hours of its employees and arrange for the adjustment of pay slips and overtime working hours, to meet the requirements of the applicable law;

(ii)    settle any deferred and/or unpaid salaries and/or disbursements for employees pension funds, social benefits and severance pay, and arrange for its employees to undertake to be bound by the arrangement under Section 14 of the Israeli Severance Pay Law; and

(iii)   use reasonable efforts to amend its existing employment agreements to comply with the requirements of the applicable law, policies, procedures and agreements relating to employment, terms and conditions of employment and to the proper withholding and remission to the proper tax and other authorities of all sums required to be withheld from employees or persons deemed to be employees under applicable laws respecting such withholding, as such is relating to commissions, bonuses, benefits and other compensation due and payable to such employees.

In addition to the aforementioned, the Minority Shareholders shall also procure that:

(iv)    the Company will, if requested by the Shareholder 1 at any time, obtain and maintain effective a directors' and officers' liability insurance from financially sound and reputable insurers, providing coverage in an amount of at least US$1,000,000; and

(v)     the Company shall at all times maintain such insurance coverage in effect for as long as the directors are subject to any exposure related to their capacity as directors.



**IN WITNESS WHEREOF**, this CAA Industries Ltd. Shareholders Agreement has been executed and delivered by or on behalf of the Parties as a deed the day and year first before written.


**SIGNED** (but not delivered until the date hereof) as a **DEED** by
**Sky of Blue Pte Ltd.** acting by:


**DIRECTOR**

Signature:

Name (in block capitals):   LENAL   RAKHMANOV


In the presence of:

**WITNESS**

Signature:

Name (in block capitals):   ANTONINA   MARSOVA

Address:   7 Bldg 2, Soymonovsky proezd, Moscow, Russia

Occupation:   Legal Counsel

E.

**IN WITNESS WHEREOF**, this CAA Industries Ltd. Shareholders Agreement has been executed and delivered by or on behalf of the Parties as a deed the day and year first before written.

**SIGNED** (but not delivered until the date hereof) as a **DEED** by
**Eldad Oz**:

Signature:

Name (in block capitals): ELDAD OZ

in the presence of

**WITNESS**

Signature:

Name (in block capitals): ELINA PEVZNER

Address: Azrieli Center, Round Tower, 6702101 TEL AVIV, Israel

Occupation: Legal Adviser

E.O

M.O

**IN WITNESS WHEREOF,** this CAA Industries Ltd. Shareholders Agreement has been executed and delivered by or on behalf of the Parties as a deed the day and year first before written.

**SIGNED** (but not delivered until the date hereof) as a **DEED** by
**Moshe OZ:**

Signature:

Name (in block capitals):   MOSHE OZ

in the presence of

**WITNESS**

Signature:

Name (in block capitals):   ELINA PEVZNER

Address:   Azrieli Center, Round Tower, Tel Aviv 6702101 Israel

Occupation:   Legal Adviser

E.O

**IN WITNESS WHEREOF**, this CAA Industries Ltd. Shareholders Agreement has been executed and delivered by or on behalf of the Parties as a deed the day and year first before written.

**SIGNED** (but not delivered until the date hereof) as a **DEED** by
**CAA Industries Ltd.** acting by:

| | |
|---|---|
| **DIRECTOR** | CAA INDUSTRIES LTD |
| Signature: | |
| Name (in block capitals): | MOSHE OZ |
| In the presence of: | |
| **WITNESS** | |
| Signature: | |
| Name (in block capitals): | ELINA PEVZNER |
| Address: | Azriell Center, Round Tower, Tel Aviv 6702101 Israel |
| Occupation: | Legal Adviser |

E.O